1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

STEVEN A. GIBSON
Nevada Bar No. 6656
sgibson@dickinsonwright.com
JODI DONETTA LOWRY
Nevada Bar No. 7798
jdlowry@dickinsonwright.com

# DICKINSON WRIGHT PLLC

City Center West
7201 West Lake Mead Boulevard, Suite 503
Las Vegas, Nevada 89128
Telephone (702) 541-7888
Facsimile (702) 541-7899

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

STEVO DESIGN, INC., a Florida corporation;
STEVEN BUDIN, an individual; and ALAN
ROLLI, an individual,

                    Plaintiffs,

v.

SBR MARKETING LTD., a foreign
corporation; and BRIAN DANIELE, an
individual,

                    Defendants.

CASE NO.: 2:11-CV-00304-LRH-CWH

**PLAINTIFFS' OPPOSITION TO SBR
MARKETING, LTD.'S MOTION TO
DISMISS PLAINTIFFS' FIRST
AMENDED COMPLAINT**

Plaintiffs Stevo Design, Inc. ("Stevo"), Steven Budin and Alan Rolli (collectively
"Plaintiffs") oppose Defendant SBR Marketing, Ltd.'s ("SBR Marketing's") Motion to Dismiss
Plaintiffs' First Amended Complaint ("SBR Marketing's Motion"; Doc. No. 26).

This Opposition is based on the Memorandum of Points and Authorities incorporated
herein, on the pleadings and papers already of record in this matter, and on any other matter this
Court wishes to take into consideration.

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.    INTRODUCTION

Unfortunately for SBR Marketing, the making of numerous bad arguments does not equate to one good one.  SBR Marketing's failure to recognize (either willfully or otherwise) the basic allegations made in the Complaint results in the making of fundamentally unfounded arguments.  To suggest that the Complaint does not allege sufficient United States nexus is mystifying.  To further raise defenses as attacks on the sufficiency of allegations is unfathomable.  Uninterestingly, SBR Marketing's remaining arguments prove even more unmeritorious than the aforementioned.

## II.   FACTS

Stevo, a Florida corporation with its principal place of business in Florida, is in the business of selling, on pay-per-view and subscription bases, limited, non-exclusive licenses to access electronically-distributed reports setting forth sports handicapping information and analysis regarding selected sporting events determined by the authors of those reports to be of particular interest to readers (the "Handicapper Reports").  First Amended Complaint (Doc. No. 7) at ¶¶2, 21.  Stevo is the owner of the following service marks registered with the United States Patent and Trademark Office (the "USPTO") (collectively, the "Registered Marks"):

A.    AL DEMARCO, registration number 3844682, registered September 7, 2010, in International Class 41 for handicapping for sporting events (the "DeMarco Mark");

B.    BRANDON LANG, registration number 3447313, registered June 17, 2008, in International Class 41 for handicapping for sporting and other entertainment events (the "Lang Mark");

C.    JEFF BENTON, registration number 3849982, registered September 21, 2010, in International Class 41 for handicapping for sporting events (the "Benton Mark");

1        D.      MATT RIVERS, registration number 3849850, registered September 21,

2                 2010, in International Class 41 for handicapping for sporting events (the

3                 "Rivers Mark"); and

4        E.      STEVE BUDIN, registration number 3847503, registered September 14,

5                 2010, in International Class 41 for handicapping for sporting events (the

6                 "Budin Mark").

7  Doc. No. 7 at ¶22.

8       Stevo also provides services in the nature of handicapping for sporting events under, at a

9  minimum, the following service marks that have not yet achieved registration with the USPTO

10  (collectively with the Registered Marks, the "Marks"):

11       1.     ANDY FANELLI (the "Fanelli Mark");

12       2.     ANTHONY REDD (the "Redd Mark");

13       3.     BOB VALENTINO (the "Valentino Mark");

14       4.     BOBBY MAXWELL (the "Maxwell Mark");

15       5.     BRETT ATKINS (the "Atkins Mark");

16       6.     CHRIS JORDAN (the "Jordan Mark");

17       7.     CHUCK O'BRIEN (the "O'Brien Mark");

18       8.     CRAIG DAVIS (the "Davis Mark");

19       9.     DEREK MANCINI (the "Mancini Mark");

20       10.    JAY MCNEIL (the "McNeil Mark");

21       11.    JOEL TYSON (the "Tyson Mark");

22       12.    KARL GARRETT (the "Garrett Mark");

23       13.    MICHAEL CANNON (the "Cannon Mark");

24       14.    SCOTT DELANEY (the "Delaney Mark");

25       15.    SEAN MICHAELS (the "Michaels Mark");

26       16.    STEPHEN NOVER (the "Nover Mark"); and

27       17.    TRACE ADAMS (the "Adams Mark").

28

Doc. No. 7 at ¶23.  By virtue of Stevo's long-standing use of the Marks, extensively advertised throughout the United States, the Marks have each gained secondary meaning primarily denoting Stevo as each Mark's respective source of origin.

Stevo sells licenses to access the Handicapper Reports through a number of websites reposed at various Internet domains owned by Stevo, including, without limitation, ATSadvantage.com; ATSadvice.com; ATSdoctor.com; ATSedge.com; BetBrandonLang.com; BetDeMarco.com; Bigdogpicks.com; BrandonLang.com; BrandonLangExperts.com; BrandonLangPicks.com; BrandonLangWins.com; ChrisJordanSports.com; DeMarcoExperts.com; DeMarcoSports.com; DeMarcoWins.com; Famouscappers.com; Gamedaycappers.com; Gameseven.com; Gametimeadvice.com; Gametimeadvisors.com; Gametimeedge.com; Gametimepicks.com; Gametimeplays.com; Gametimereport.com; PickNation.com; PickReport.com; PicksForTheMoney.com; Primetimecappers.com; Scoresoddsandinfo.com; Sportsadvisors.com; Sportscapper.com; Sportsinfo.com; StephenNover.com; Theplatinumsheet.com; Thesportsadvisors.com; Vegasadvisors.com; WhoWillCover.com; and winners.com (the "Stevo Websites").  Doc. No. 7 at ¶25.  Each of the Stevo Websites displays terms of use (the "User Contract," Doc. No. 7-1), which may be viewed by anyone accessing any of the Stevo Websites irrespective of purchase of a license to view any of the Handicapper Reports.  *Id.* at ¶26.  By entering into the User Contract, a purchaser of a license to view any of the Handicapper Reports expressly represents and warrants that such licensee "will not reproduce, republish, rebroadcast, retransmit, recast or in any way distribute the information that [the purchaser] will receive from this website (regardless of whether [the purchaser] receive[s] such information directly, from this website or from any affiliated website) **anywhere**, including without limitation on the Internet (e.g. on other websites, blogs, newsgroups, chat rooms, discussion forums, message boards and social media services such as Twitter, Facebook and MySpace), via instant or text messaging services (whether Internet- or phone-based), in podcasts, or in any other printed or electronic form, including without limitation radio and television" (emphasis in original).  *Id.* at ¶27.

SBR Marketing publishes content related to sports betting and handicapping at the website reposed at the domain sbrforum.com (the "SBR Website"), enabling members of the public to contribute content for publication by SBR Marketing regarding topics related to, at a minimum, sports wagering and handicapping. Doc. No. 7 at ¶33. The content published by SBR Marketing through the SBR Website is available to and used by individuals throughout the United States, including, without limitation, individuals in Nevada. *Id.* at ¶34. SBR Marketing receives revenue from advertisers who pay SBR Marketing for customers and/or revenue gained by those advertisers when those customers click through advertisements appearing on the SBR Website and thereby reach the advertisers' own websites. *Id.* at ¶35. The more SBR Website readers that click through advertisements to advertisers' websites, the more revenue SBR Marketing gains from those advertisers. *Id.* at ¶36.

SBR Marketing awards loyalty points, which SBR Marketing describes as "our *currency here*" (emphasis in original) (the "SBR Currency"), to registered users of the SBR Website ("SBR Contributors") whenever those SBR Contributors engage in certain activities on the SBR Website, including merely logging on to the SBR Website, contributing content to the SBR Website, or reporting other users' infractions of the SBR Website's terms of use to SBR Marketing. Doc. No. 7 at ¶37. SBR Marketing's incentivization of contributions from SBR Contributors by means including, without limitation, payment of SBR Currency to SBR Contributors creates privity of publishing relationship between SBR Marketing and each so-incentivized SBR Contributor. *Id.* at ¶38. SBR Contributors may transfer SBR Currency from themselves to other SBR Contributors to further incentivize those SBR Contributors to continue to provide useful or entertaining content to the SBR Website. *Id.* at ¶39. SBR Contributors may "gamble" SBR Currency in wagering and other contests offered by SBR Marketing, and, if successful, win additional SBR Currency. *Id.* at ¶40. SBR Contributors may spend accrued SBR Currency on, without limitation, merchandise such as T-shirts and shot glasses; gift cards from national chain restaurants and stores; and credits at offshore online sports books that advertise on the SBR Website. For example, as of January 31, 2011, any SBR Contributor could exchange 825 SBR Currency units for $50 credit at the bodog.com offshore online sports book. If that user

bet via bodog.com the $50 bodog.com credit that SBR Contributor received from the SBR Website in exchange for 825 SBR Currency units, and won the bet, that SBR Contributor would be able to recoup from bodog.com the full monetary amount of that SBR Contributor's winnings (minus fees charged by bodog.com) irrespective of the fact that the credit used for the bet came from SBR Website in exchange for SBR Currency, and not from actual funds provided by the SBR Contributor.  *Id.* at ¶41.  When SBR Contributors visit offshore online sports books that advertise on the SBR Website after exchanging SBR Currency for credit at those offshore online sports books, if those SBR Contributors bet any amount of those SBR Contributors' own funds beyond the credits received in exchange for SBR Currency, SBR Marketing gains revenue from those advertisers as a result of those transactions.  *Id.* at ¶42.  An SBR Contributor who demonstrates to SBR Marketing that such SBR Contributor has a balance of at least $200 of that SBR Contributor's own funds in that SBR Contributor's account with one of the offshore online sports books advertising on SBR Marketing can become an "SBR PRO," and thereby earn double SBR Currency for SBR Website publishing activity, obtain additional opportunities to wager SBR Currency on SBR Marketing-sponsored contests, and enjoy a reduction of the amount of SBR Currency that must be spent in order to receive merchandise from SBR Marketing.  *Id.* at ¶43.

SBR Marketing's business model is based in significant part on the revenue SBR Marketing receives from offshore online sports books that advertise on SBR Website as a result of SBR Contributors and other readers of the SBR Website clicking directly through those offshore online sports books' advertisements on the SBR Website to the offshore online sports books' own websites.  SBR Marketing boasts in SBR Marketing's communications to potential advertisers that "[m]ore players join the top sportsbooks via [the SBR Website] than all other watchdog and rating sites combined."  Doc. No. 7 at ¶44.  SBR Marketing developed and implemented the SBR Website "to meet the demand for handicapping stat[istic]s and sports handicapping information."  *Id.* at ¶45.  One subdivision of the SBR Website is titled "Service Plays" (the "Service Plays Section") and the content of the Service Plays Section is specifically related to analysis provided by professional handicapping services like Stevo.  *Id.* at ¶46.  SBR

Marketing retains, pursuant to the SBR Website's terms of use, the right to edit and/or delete any content submitted by any SBR Contributor, including, without limitation, an SBR Contributor who has submitted content in the Service Plays Section.  *Id.* at ¶49.

Daily or almost daily, SBR Marketing publishes Handicapper Reports, or portions thereof, in the Service Plays Section, as well as solicitations from SBR Contributors to one another to submit content from Handicapper Reports for publication in the Service Plays Section. Doc. No. 7 at ¶50.  An SBR Contributor who submits for publication in the Service Plays Section all or a portion of a Handicapping Report automatically receives at least six units of SBR Currency—two for logging in to the SBR Website, and four for contributing content to the SBR Website.  *Id.* at ¶51.  SBR Marketing recognizes that at least a subset of content published on the SBR Website constitutes republications of content not personally authored by the SBR Contributors submitting that material for publication by SBR Marketing, because SBR Marketing specifies that SBR Marketing will pay more than four units of SBR Currency to an SBR Contributor "contributing a well[-]thought[-]out pick write[-]up or handicapping[-]oriented post in any sports subforum," and that "[o]nly original content will be eligible for this reward." *Id.* at ¶52.  Daily or almost daily, SBR Contributors who submit all or a portion of a Handicapping Report for publication in the Service Plays Section request and receive additional units of SBR Currency as rewards from other SBR Contributors.  *Id.* at ¶53.  SBR Marketing has promoted the SBR Website by advertising that readers of the Service Plays Section, including, without limitation, SBR Contributors, can obtain pay-per-view sports Handicapper Reports, such as Stevo's Handicapper Reports, free of charge.  *Id.* at ¶56.

Based on SBR Marketing's incentivization of SBR Marketing's privy SBR Contributors to engage in infringement of Stevo's intellectual property, Stevo has brought suit herein against, relevantly, SBR Marketing for service mark infringement under § 32 of the Lanham Trademark Act of 1946 (the "Lanham Act") (15 U.S.C. § 1114); contributory service mark infringement under § 32 of the Lanham Act and federal common law; false designation of origin under § 43(a) of the Lanham Act (15 U.S.C. § 1125(a)); contributory false designation of origin under § 43(a) of the Lanham Act and federal common law; mark dilution under § 43(c) of the Lanham Act (15

U.S.C. § 1125(c)) by blurring and by tarnishment; contributory mark dilution under § 43(c) of the Lanham Act and federal common law by blurring and by tarnishment; copyright infringement under 17 U.S.C. § 501; vicarious copyright infringement under 17 U.S.C. § 501 and federal common law; contributory copyright infringement under 17 U.S.C. § 501 and federal common law; misappropriation of trade secrets under Fla. Stat. 688.001 *et seq.* (2010); direct and contributory misappropriation of licensable commercial property under Florida and Nevada common law; civil theft under Fla. Stat. 772.11 (2010); defamation under Nevada common law; business disparagement under Nevada common law; and tortious interference with contractual and business relations under Florida common law.

## III.   ARGUMENT

### A.   Stevo Owned The Copyrights At Issue At The Time Of Infringement.

As Stevo clearly alleged in the First Amended Complaint, Stevo owned the copyrights to the Infringed Works at the time of SBR Marketing's infringement of those works.  SBR Marketing's suggestion that, because Stevo's User Contract (perhaps inartfully) specifies the name of the Stevo-owned website from which a Stevo user purchased a particular Handicapper Report, rather than Stevo itself, as the owner of the copyrights thereto, Stevo must not have owned those copyrights at the time of infringement, demonstrates at best an obstinate ignorance of the clear language of the First Amended Complaint.  As Stevo clearly alleges in ¶25 of the First Amended Complaint:

> Stevo sells licenses to access the Handicapper Reports through *a*
> *number of websites* reposed at various Internet domains *owned by*
> *Stevo,* including, without limitation, ATSadvantage.com;
> ATSadvice.com; ATSdoctor.com; ATSedge.com;
> BetBrandonLang.com; BetDeMarco.com; Bigdogpicks.com;
> BrandonLang.com; BrandonLangExperts.com;
> BrandonLangPicks.com; BrandonLangWins.com;
> ChrisJordanSports.com; DeMarcoExperts.com;

DeMarcoSports.com; DeMarcoWins.com; Famouscappers.com;
Gamedaycappers.com; Gameseven.com; Gametimeadvice.com;
Gametimeadvisors.com; Gametimeedge.com;
Gametimepicks.com; Gametimeplays.com; Gametimereport.com;
PickNation.com; PickReport.com; PicksForTheMoney.com;
Primetimecappers.com; Scoresoddsandinfo.com;
Sportsadvisors.com; Sportscapper.com; Sportsinfo.com;
StephenNover.com; Theplatinumsheet.com;
Thesportsadvisors.com; Vegasadvisors.com; WhoWillCover.com;
and winners.com (the "Stevo Websites").

(Emphasis supplied.)  The First Amended Complaint could hardly be more clear:  **Stevo owns the Stevo Websites.**  Thus, to the extent the User Contract refers to a particular Stevo Website as "the owner of all rights, title and interest in and to this website…," the User Contract is referring back to Stevo itself.

To the extent this Court believes there are any questions with respect to the ownership of the Stevo Websites, those questions are issues of fact, not of the sufficiency of Stevo's pleading, and should not serve as a basis for relief for SBR Marketing under Fed.R.Civ.P. 12(b)(6), as by no means has SBR Marketing identified a failure on Stevo's part to state a claim upon which can be relief can be granted in this respect.  Indeed, SBR Marketing provides no case law supporting a proposition that potentially inartfully-drafted website material definitively negates ownership for purposes of copyright analysis.

**B.    Subject Matter Jurisdiction Is Appropriate.**

How SBR Marketing can, with a straight face, suggest that its United States sports wagering "review" website activities are purely extraterritorial in nature is mystifying. As the allegations pled in the First Amended Complaint clearly complain about SBR Marketing's liability-creating activities with respect to and in the United States, SBR Marketing's contention that this Court does not have subject matter jurisdiction is utterly unfounded.  Not only has SBR Marketing apparently completely ignored the First Amended Complaint, but SBR Marketing has

undertaken gross disrespect of this Court by somehow suggesting that SBR Marketing has no

United States commercial relationship relevant to the liability-creating activities.

The First Amended Complaint has already alleged more than sufficient facts clearly

establishing a relevant United States nexus.  Moreover, these allegations must be taken as true

for purposes of a jurisdictional analysis.  *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.,*

243 F.Supp.2d 1073, 1082 (C.D. Cal. 2003).  All of the following allegations allege sufficient

United States nexus:

(a)      in relation to the infringement activity, SBR "directs a significant portion of SBR

Marketing's marketing efforts to the United States" (Doc. No. 7 at ¶11);

(b)      SBR Marketing "derives a significant portion of SBR Marketing's revenue from

revenue-generating activities in the United States" (Doc. No. 7 at ¶12) and that activity is

directly associated with the infringing content;

(c)      SBR Marketing "offers United States residents the opportunity to earn money

through SBR Marketing's sites on the Internet" (Doc. No. 7 at ¶13) and those are the very sites

through which the infringing content appears and attracts the United States actors to engage in

commerce with SBR Marketing; and

(d) SBR Marketing "pays United States residents for republishing intellectual property

created in the United States and concerning sporting events in the United States" (Doc. No. 7 at

¶14) including, without limitation, the infringing content.

Arguably, even more critically, the pleadings allege "the content published by SBR

Marketing through the SBR Website is available to and used by individuals throughout the

United States, including, without limitation, individuals in Nevada." Doc. No. 7 at ¶34. SBR

Marketing ignores all such allegations in SBR Marketing's argument that there is no United

States nexus.  Independently, the Court need only view (and take judicial notice of) SBR

Marketing's website, for convenience in part depicted at Exhibit 1, to see the targeted United

States sports review activities referencing the NFL (clearly referencing the National Football

League in the United States), MLB (clearly referencing United States Major League Baseball),

amongst virtually every other United States-based professional and collegiate football sports organization.

Not surprisingly, **SBR Marketing's cited authority** is supportive of this Court's maintenance of subject matter jurisdiction. *Am. Banana Co. v. United Fruit Co.,* 213 U.S. 347, 29 S.Ct. 511 (1909), decided over a century ago, did not relate to targeted United States commercial activities performed online through the Internet and merely stands for the proposition that antitrust prohibitions do not extend extraterritorially. Copyright infringement, however, is not the same as antitrust activity. Moreover, arguable antitrust activity in Panama in 1909 is not the same as the online commercial activity targeted at the United States in the 21st century by SBR Marketing. Whether SBR Marketing's computer servers are located in Las Vegas or in Costa Rica does not change the nature and substance of SBR Marketing's targeted United States commercial activities. Indeed, it is now firmly-established law that copyright infringement is deemed an act in the forum that is the locus of the infringed work. In *Penguin Group (USA) Inc. v. American Buddha,* 640 F.3d 497 (2d Cir. 2011) ("*Penguin*"), the Second Circuit reiterated the holding of the New York Court of Appeals on a certified question regarding long-arm jurisdiction wherein the New York Court of Appeals "concluded that 'a New York copyright owner alleging infringement sustains an in-state injury . . . when its printed literary work is uploaded without permission onto the Internet for public access.'" 640 F.3d at 500, *citing Penguin Group (USA) Inc. v. American Buddha,* 946 N.E.2d 159, 163 (N.Y. 2011). The New York Court of Appeals further "observed that 'the Internet itself plays an important role in the jurisdictional analysis in the specific context of this case . . . . [T]he alleged injury in this case involves online infringement that is dispersed throughout the country and perhaps the world." *Id.*, *citing* 946 N.E.2d at 164. The Second Circuit recognized that the New York Court of Appeals "concluded that 'it is illogical to extend' the traditional tort approach that 'equate[s] a plaintiff's injury with the place where its business is lost or threatened' to the context of 'online copyright infringement cases where the place of uploading is inconsequential and it is difficult, if not impossible, to correlate lost sales to a particular geographic area." *Id.* As such, it is also illogical to assume that SBR Marketing could only engage in online copyright infringement in

Costa Rica, when Stevo alleges in the First Amended Complaint that SBR Marketing effects unauthorized reproduction of Stevo's intellectual property via a website specifically designed to engage in commerce in the United States with United States sports as that website's principal subject matter.

SBR Marketing's additional cited authority is equally unavailing.  Also decided well before the advent of the Internet, the Second Circuit's opinion in *The Robert Stigwood Group Ltd. v. O'Reilly,* 530 F.2d 1096 (2d Cir. 1976) alluded to certain Canadian performances and that those performances were not "torts" within the United States.  530 F.2d at 1101.  Clearly, the Second Circuit's updated analysis in *Penguin* reforms such notions within the context of the Internet and copyright infringement.  Finally, in *Subafilms, Ltd. v. MGM-Pathé Communications Co.,* 24 F.3d 1088 (9th Cir. 1994), yet another case decided before the real heyday of the Internet, the Ninth Circuit recognized that infringement taking place *entirely outside the United States* was not actionable within the United States.  This case differs markedly from *Subafilms,* however, because, as Stevo has alleged throughout the First Amended Complaint, SBR Marketing's acts of infringement involve multiple nexi with the United States.  Indeed, as the United States District Court for the Central District of California recognized  in *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.,* 243 F.Supp.2d 1073 (C.D. Cal. 2003) "jurisdiction may be exercised over copyright claims against a foreign defendant where sufficient contacts with, or injury to, U.S. residents is alleged, even though there are not sufficient contacts with any single state to justify jurisdiction in that state." 243 F.Supp.2d at 1094.  This Court has recognized the Ninth Circuit's holdings in this regard as well:  "The Ninth Circuit found that where a defendant 'willfully infringed copyrights owned by [the plaintiff], which as [the defendant] knew, had its principal place of business in the Central District [of California], 'this fact alone is sufficient to satisfy the 'purposeful availment' requirement." *Righthaven, LLC v. Majorwager.com, Inc.,* 2010 U.S. Dist. LEXIS 115007, case no. 2:10-CV-00484-GMN-LRL (D. Nev., October 28, 2010), at *8-*9, *quoting Columbia Pictures Television v. Krypton Broadcasting of Birmingham, Inc.,* 106 F.3d 284, 289 (9th Cir. 1994).  Certainly, SBR Marketing knew that Stevo was a United States actor and that Stevo's copyrighted material emanated from the United States, which is,

with respect to a foreign entity, the only relevant situs, as opposed to any given state.  *See* Fed.R.Civ.P. 4(k)(2).

Moreover, SBR Marketing is correct on the cited case law that extraterritorial acts that have a domestic effect give rise to jurisdiction.  *Ocean Garden, Inc. v. Marktrade Co., Inc.,* 953 F.2d 500 (9th Cir. 1991).  SBR Marketing is grossly mistaken that SBR Marketing's targeted United States online business has no effect or relationship to the United States, however—a proposition that needs no further argument.

**C.**      **SBR Marketing Is Not Entitled To Dismissal Of Stevo's Mark-Related Claims Under The Defense Of Nominative Fair Use.**

**1.**      **Fair Use Is An Affirmative Defense, Not Appropriately The Subject Of An Adjudication Under Fed.R.Civ.P. 12(b)(6).**

SBR Marketing's invocation of the doctrine of nominative fair use with respect to Stevo's mark-related claims represents an inappropriate attempt by SBR Marketing to have this Court rule as a matter of law that SBR Marketing is entitled to prevail on an affirmative defense, at a stage of these proceedings when this Court is appropriately concerned with the sufficiency of Stevo's pleading pursuant to Fed.R.Civ.P. 12(b)(6).  Nominative fair use is an affirmative defense on which SBR Marketing will bear the ultimate burden of proof.  *Designer Skin, LLC v. S&L Vitamins, Inc.,* 2007 U.S. Dist. LEXIS 19506, case no. CV-05-3699-PHX-JAT (D. Ariz., March 19, 2007) ("*Designer Skin*"), at *4, *citing New Kids on the Block v. News America Pub., Inc.,* 971 F.2d 302, 308 (9th Cir. 1992) ("*New Kids*").  Courts in the Ninth Circuit have recognized that "it would be highly unusual for a Court to 'dismiss' a complaint on 12(b)(6) grounds based on Defendants having proven an affirmative defense." *Designer Skin,* fn.2.  SBR Marketing cites no authority supporting a contrary position.  Stevo thus respectfully requests that, given the procedural stage of this litigation, this Court decline to find that SBR is entitled to prevail as a matter of law with respect to any affirmative defenses, including, without limitation, nominative fair use.

2.   **SBR Marketing Creates Initial Interest Confusion Through SBR Marketing's Use Of Stevo's Registered Service Marks, And SBR Marketing Is Thus Not Protected By The Defense Of Nominative Fair Use.**

Further, SBR Marketing's use of Stevo's service marks does not cognizably constitute nominative fair use, as Stevo has clearly pled in the First Amended Complaint, and SBR Marketing thus cannot prevail on this basis under Fed.R.Civ.P. 12(b)(6) with respect to Stevo's mark-related claims.  SBR Marketing's attempt to subsume SBR Marketing's use of Stevo's service marks into the territory "outside the strictures of trademark law" described in *New Kids* represents a failure to respond meaningfully to the allegations set forth in the First Amended Complaint that place SBR Marketing's use of Stevo's service marks well outside that territory. As an initial matter, SBR Marketing takes well out of context the Ninth Circuit's remarks in *New Kids* regarding the underlying rationale of the nominative fair use doctrine, and ignores the marked factual dissimilarities between the instant matter and the circumstances giving rise to the *New Kids* decision.  In *New Kids,* a once-popular vocal group sued for mark infringement two newspapers of national circulation—the well-known general-interest newspaper *USA Today* and the gossip tabloid *The Star*—that conducted polls using (900) numbers asking fans of the group to vote for the fans' favorite group member. 971 F.2d at 304.  The newspapers' proceeds from the polls were exceedingly modest—less than $300 for *USA Today,* all of which the newspaper donated to charity, and about $1600 for *The Star. Id.* at n.1.  The Ninth Circuit found that, even though the newspapers used the plaintiffs' registered marks for the newspapers' financial benefit, the doctrine of "nominative fair use" precluded the newspapers' liability for mark infringement. Specifically, the Ninth Circuit held that:

> Indeed, we may generalize a class of cases where the use of the trademark does not attempt to capitalize on consumer confusion or to appropriate the cachet of one product for a different one.  Such *nominative* use of a mark—where the only word reasonably available to describe a particular thing is pressed into service—lies

outside the strictures of trademark law:  Because it does not

implicate the source-identification function that is the purpose of

trademark, it does not constitute unfair competition; such use is

fair because it does not imply sponsorship or endorsement by the

trademark holder.

971 F.2d at 307-308 (emphasis in original).  In *New Kids,* neither *USA Today* nor *The Star* were attempting to "capitalize on consumer confusion" or "appropriate the cachet of [the New Kids on the Block]" for themselves by using the plaintiffs' registered marks, but were simply conducting reader polls regarding a popular vocal group whose name happened to be the subject of federal mark registrations.

In this case, however, as Stevo has alleged in the First Amended Complaint, SBR Marketing is using Stevo's registered marks specifically to capitalize on consumer confusion and to "appropriate the cachet" of Stevo's handicappers for SBR Marketing's own purposes, and SBR Marketing should thus not be entitled to assert the defense of nominative fair use.  Stevo alleges, in ¶130 of the First Amended Complaint, that "Internet users seeking information online regarding the 'picks' of a particular sports handicapper are more likely to obtain that information from a source that appears at or near the top of results from Internet search engines such as Google than from sources that appear lower in search engine results," and then alleges, in ¶¶131-179, that as a result of SBR Marketing's unauthorized use of Stevo's registered and unregistered service marks, effectuated by SBR Contributors who are in privity of publishing relationship with SBR Marketing (Doc. No. 7 at ¶38), Google searches for "picks" by Stevo handicappers almost inevitably yield results that place the SBR Website ahead of any website owned by Stevo. The Ninth Circuit has clearly held that cultivation of such initial interest confusion may constitute actionable mark infringement, because the infringer "improperly benefits from the goodwill that [the mark owner] developed in its mark."  *Brookfield Communications, Inc. v. West Coast Entertainment Corp.,* 174 F.3d 1036, 1062 (9th Cir. 1999).  SBR Marketing has in no way responded to Stevo's allegations of initial interest confusion, which allegations thoroughly undercut SBR Marketing's attempted nominative fair use defense.  Moreover, the First Amended

Complaint has gone much further than required to articulate all the facts associated with the initial interest confusion cultivated by SBR Marketing, facts which likely would preclude judgment as a matter of law even under Fed.R.Civ.P. 56, let alone Fed.R.Civ.P. 12(b)(6).  In no way has SBR Marketing demonstrated entitlement as a matter of law to a dismissal under Fed.R.Civ.P. 12(b)(6) of Stevo's mark-related claims.

D.     **Stevo Has Pled Allegations Sufficient To Demonstrate The Inapplicability Of SBR Marketing's First Sale Defense, And Dismissal Of Stevo's Mark-Related Claims On That Basis Is Thus Inappropriate.**

Similarly, Stevo has sufficiently alleged acts and omissions on the part of SBR Marketing that would vitiate SBR Marketing's affirmative defense of the first sale doctrine to Stevo's mark-related claims, because Stevo has made allegations that SBR Marketing has cultivated initial interest confusion among Internet users searching for "picks" by Stevo handicappers.  Under the first sale doctrine, "[r]esale by the first purchaser of the original article under the producer's trademark is neither trademark infringement nor unfair competition."  *Sebastian Int'l, Inc. v. Longs Drug Stores Corp.,* 53 F.3d 1073, 1074 (9th Cir. 1995).  Leaving aside for the moment the questions of whether SBR Marketing can properly be deemed a "reseller" or a "purchaser" of Stevo's Handicapper Reports, the Ninth Circuit has recognized that the first sale doctrine may not protect resellers who use trademarks "in a manner likely to cause the public to believe the reseller was part of the producer's authorized sales force or one of its franchisees."  *Id.* at 1076. In this case, Stevo has alleged that SBR Marketing, through SBR Contributors, has used Stevo's registered and unregistered service marks in a manner that creates confusion among the public as to whether or not the SBR Forum is an authorized source for Stevo's Handicapper Reports.  For example, at ¶133 of the First Amended Complaint, Stevo alleges that, as of February 3, 2011, a Google user searching for "Al Demarco picks"—*i.e.,* using Stevo's registered mark AL DEMARCO—would retrieve content from the SBR Forum stating, "Somebody (possibly me) will probably post Al DeMarco's pick as soon as we get ahold [*sic*] of it, and if that happens, you're welcome to take it…"  Similarly, at ¶166 of the First Amended Complaint, Stevo alleges

-16-

that, as of February 3, 2011, a Google user searching for "Jay McNeil picks"—*i.e.,* using Stevo's unregistered mark JAY MCNEIL—would retrieve content from the SBR Forum actually consisting of at least the first few sentences of a Handicapper Report originally published by Stevo under that mark.  As such, an Internet user who had heard of sports handicappers Al DeMarco or Jay McNeil, but was not necessarily aware that those handicappers' picks were only legitimately available from Stevo, might easily come to the conclusion that those picks were available for free from the SBR Forum and never even stumble across the legitimate Stevo Websites.  SBR Marketing has done absolutely nothing in SBR Marketing's Motion to address these allegations' potential to vitiate SBR Marketing's first sale doctrine defense.  Given that this Court must construe all of Stevo's claims in the light most favorable to Stevo, it is clear that, based on the First Amended Complaint as pled, dismissal of Stevo's mark-related claims as a matter of law under Fed.R.Civ.P. 12(b)(6) based on the first sale doctrine is inappropriate at this time.

> **E.**   **Stevo's Common-Law And Statutory Claims Are Not Pre-Empted By The Communications Decency Act Because SBR Marketing Is An "Information Content Provider" Not Immunized From Liability.**

Stevo's common-law and statutory claims are not subject to dismissal under the Communications Decency Act  (the "CDA") because Stevo has pled allegations sufficient to establish that SBR Marketing, which solicits and pays users to infringe copyrighted Handicapping Reports, is an "information content provider" not immunized from liability under the CDA.  SBR Marketing argues that 47 U.S.C. § 230(c)(1), which provides that "[n]o provider… of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider," immunizes SBR Marketing from liability on Stevo's common-law and statutory claims because SBR Marketing is merely an "interactive computer service," not liable for content posted on the SBR Website by third parties.

Stevo has pled allegations sufficient to establish, however, that SBR Marketing's role in publishing the SBR Website goes beyond that of an "interactive computer service" and makes

1   SBR Marketing an "information content provider" under the CDA, not immunized by §

2   230(c)(1).  Specifically, Stevo has pled that SBR Marketing has created privity of publishing

3   relationship between SBR Marketing and SBR Contributors through "SBR Marketing's

4   incentivization of contributions from SBR Contributors by means including, without limitation,

5   payment of SBR Currency to SBR Contributors" (Doc. No. 7 at ¶38) which SBR Currency can

6   be used to purchase merchandise, gift cards, and credits at offshore online sports books

7   redeemable for cash (*id.* at ¶41).  SBR's Website contains a special subdivision entitled "Service

8   Plays" devoted to analysis provided by professional sports handicapping services like Stevo.  *Id.*

9   at ¶46.  Any SBR Contributor who submits for publication in the Service Plays section any

10  portion of a copyrighted Handicapping Report automatically receives at least six units of SBR

11  Currency in compensation. *Id.* at ¶51. Agents of SBR Marketing sporadically delete certain

12  elements of illegitimately republished Handicapper Reports, but do not effectuate those

13  deletions, in many instances, until after the sporting events discussed in those illegitimately

14  republished Handicapper Reports have concluded, thereby attempting to maximize the economic

15  benefit to SBR Marketing of SBR Marketing's republication of those Handicapper Reports.  *Id.*

16  at ¶60.

17          By actively soliciting and compensating SBR Contributors for infringing Handicapping

18  Reports and other copyrighted material, SBR Marketing has engaged in conduct that elevates

19  SBR Marketing out of the realm of "interactive computer services" into that of "information

20  content providers."  47 U.S.C. § 230(f)(3) defines an "information content provider" as "any

21  person or entity that is responsible, in whole or in part, for the creation or development of

22  information provided through the Internet or any other interactive computer service."  The Ninth

23  Circuit has recognized that "the party responsible for putting information online may be subject

24  to liability, even if the information originated with a user," *Fair Housing Council of San*

25  *Fernando Valley v. Roommate.com, LLC,* 521 F.3d 1157, 1165 (9th Cir. 2008)

26  ("*Roommate.com*"), and, in this case, SBR Marketing's compensation of SBR Contributors

27  makes SBR Marketing at least in part "responsible for putting… online" the multitude of

28  copyright infringements in which SBR Marketing's incentive scheme directly encourages SBR

Contributors to engage.  In *Roommate.com,* the Ninth Circuit found that a World Wide Web site that "steer[ed] users," 521 F.3d at 1167, to housing applicants that did or did not belong to certain protected classes (*i.e.* of particular races, or with or without children) in violation of the Federal Housing Act was not entitled to CDA immunity even though all the data on the site had been provided in the first instance by users.  Finding that this system was "no different from a real estate broker saying to a client: 'Sorry, sir, but I can't show you any listings on this block because you are [gay/female/black/a parent],'" the Ninth Circuit held, "If such screening is prohibited when practiced in person or by telephone, we see no reason why Congress would have wanted to make it lawful to profit from it online."  *Id.*  In this case, by paying SBR Contributors to illegally copy Stevo's intellectual property and illegitimately republish that intellectual property on a section of the SBR Website specifically designated for "Service Plays"—for the illegitimate sharing of pay-per-view sports handicapping reports—SBR Marketing has behaved no differently than if SBR Marketing had set up a booth at a flea market, headed with a banner reading "TRADE SECRETS AND COMMERCIAL PROPERTY," to sell printouts of companies' trade secrets and licensable commercial property, supplied by individuals to whom SBR Marketing paid some premium or commission.  "Requiring website owners to refrain from taking affirmative acts that are unlawful does not strike us as an undue burden," the Ninth Circuit held in *Roommate.com,* and SBR Marketing should not be able to hide behind the CDA to avoid being held accountable for paying SBR Contributors to engage in the misappropriation of others' intellectual property.

F.   **Stevo May Bring Florida Common-Law Claims In This Forum.**

Because Stevo is headquartered in Florida, Stevo has alleged Florida common-law torts against SBR Marketing based on SBR Marketing's misappropriation of Stevo's intellectual property, and SBR Marketing's argument that this Court is somehow incapable of entertaining those causes of action is both illogical and entirely unsupported by statute, rule, or case law.  As discussed *supra,* courts increasingly are adopting the rule that when intellectual property owned by an entity is the subject of online tortious activity, the situs of injury is the location of the

1   intellectual property owner's principal place of business.  *Penguin, supra,* 640 F.3d at 500.

2   Stevo's principal place of business is in Florida, as alleged in the First Amended Complaint.

3   Doc. No. 7 at ¶2.  Nothing prevents this Court from adjudicating Stevo's Florida-state-law-based

4   claims against SBR Marketing, as SBR Marketing implicitly concedes through SBR Marketing's

5   utter lack of authority for SBR Marketing's proposition that "[f]ederal [c]ourts generally apply

6   the law of the state in which they are sitting.  There is no contract or choice of forum provision

7   that would change this generally applicable rule."  Doc. No. 26 at 15:12-14.  SBR Marketing has

8   thus provided this Court with no basis by which to dismiss Stevo's Florida state-law claims.

9         **G.**      **<u>Stevo Clearly Sets Forth Facts Describing Copyright</u>**

10                **<u>Infringements By Defendant Mr. Daniele On The SBR</u>**

11                **<u>Website.</u>**

12        Finally, Stevo is simply baffled by SBR Marketing's argument that "the [First Amended

13  Complaint] is completely devoid of a single specific allegation that [Defendant Brian] Daniele

14  posted any of the specified material on SBR [Marketing]'s website," Doc. No. 26 at 13:21-22,

15  which is untrue.  The First Amended Complaint clearly describes Mr. Daniele's postings of

16  infringed material on the SBR Website.  Doc. No. 7 at, *e.g.,* ¶¶639, 641, 661, 663, 683, 685, 703,

17  705.  It is not clear what additional information SBR Marketing believes is necessary for Stevo

18  to provide in order to meet the requirements of notice pleading, but in any event, SBR

19  Marketing's argument that Stevo has not adequately alleged that Mr. Daniele posted

20  infringements on the SBR Website lacks any factual basis.

21

22

23

24

25

26

27

28

1

## IV.  **CONCLUSION**

2

For the reasons set forth herein, Stevo respectfully requests that this Court deny SBR

3

Marketing's Motion to Dismiss in the entirety.

4

Respectfully submitted this 12th day of September, 2011.

5

DICKINSON WRIGHT PLLC

6

7

By   /s/ J.D. Lowry

8

STEVEN A. GIBSON
Nevada Bar No. 6656

9

JODI DONETTA LOWRY
Nevada Bar No. 7798

10

City Center West
7201 West Lake Mead Boulevard, Suite 503

11

Las Vegas, Nevada 89128

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

Pursuant to Local Rule 5-1 of this Court, I certify that I am an employee of Dickinson

Wright PLLC and that on this 12th day of September, 2011, I electronically filed the foregoing

**Plaintiffs' Opposition to SBR Marketing, Ltd.'s Motion to Dismiss Plaintiffs' First**

**Amended Complaint** with the Clerk of the Court by using the CM/ECF system, and copies have

been electronically mailed to:

Gary Jay Kaufman, Esq.
The Kaufman Law Group
1901 Avenue of the Stars, Suite 1010
Los Angeles, California  90067

Chad Bowers, Esq.
Chad A. Bowers, Ltd.
3202 West Charleston Boulevard
Las Vegas, Nevada 89102

*Attorneys for Defendants*

By: /s/  J.D. Lowry
An employee of Dickinson Wright PLLC