STEVEN A. GIBSON
Nevada Bar No. 6656
sgibson@dickinsonwright.com
JODI DONETTA LOWRY
Nevada Bar No. 7798
jdlowry@dickinsonwright.com

# DICKINSON WRIGHT PLLC

City Center West
7201 West Lake Mead Boulevard, Suite 503
Las Vegas, Nevada 89128
Telephone (702) 541-7888
Facsimile (702) 541-7899

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| STEVO DESIGN, INC., a Florida corporation; STEVEN BUDIN, an individual; and ALAN ROLLI, an individual,<br><br>                    Plaintiffs,<br>v.<br><br>SBR MARKETING LTD., a foreign corporation; and BRIAN DANIELE, an individual,<br>                    Defendants. | **CASE NO.: 2:11-CV-00304-LRH-CWH**<br><br>**PLAINTIFFS' MOTION TO ALTER OR AMEND JUDGMENT UNDER FED.R.CIV.P. 59(e)** |

        Plaintiffs Stevo Design, Inc., Steve Budin, and Alan Rolli (collectively "Stevo"), by and through their counsel, Dickinson Wright PLLC, hereby submits Plaintiffs' Motion to Alter or Amend Judgment pursuant to Fed.R.Civ.P. 59(e) with respect to this Court's Order (Doc. No. 45, filed March 13, 2012; the "Order") dismissing Plaintiffs' Amended Complaint (Doc. No. 7).

        Plaintiffs' Motion to Alter or Amend Judgment is based on the following Memorandum of Points and Authorities, on the pleadings and papers on file herein, on any oral argument of

1   counsel to be adduced at hearing, and on any other matter of which this Court wishes to take

2   consideration.

3                                    **MEMORANDUM OF POINTS AND AUTHORITIES**

4   **I.      INTRODUCTION**

5               This Court's Order dismissing Plaintiffs' First Amended Complaint in the entirety is

6   clearly erroneous, because this Court: (a) erred in treating extraterritoriality of copyright

7   violations as jurisdictional; (b) erred in dismissing Stevo's federal and state claims against the

8   unquestionably domestic Defendant Brian Daniele ("Mr. Daniele"); (c) erred in not recognizing

9   that Stevo's valid federal claims against Mr. Daniele warrant the exercise of this Court's

10  supplemental jurisdiction; (d) erred in concluding that Stevo made "no allegations of any direct

11  infringement within the United States" when Stevo pled ample facts from which this Court could

12  have reasonably inferred that infringement did take place within the United States; and (e)

13  incorrectly used the Ninth Circuit's rulings in *Subafilms, Ltd. v. MGM-Pathe Communications

14  Co.,* 24 F.3d 1088 (9th Cir. 1994) and *Ocean Garden, Inc. v. Marktrade Co., Inc.,* 953 F.2d 500

15  (9th Cir. 1991) to conclude that Stevo's Copyright Act and Lanham Act claims were barred on

16  the basis of extraterritoriality.

17  **II.     FACTS**

18          **A.      Procedural Facts**

19              Plaintiff Stevo initially filed this action against Defendant SBR Marketing on February

20  24, 2011.  Doc. No. 1.  On April 6, 2011, Plaintiffs filed a First Amended Complaint adding

21  claims by all Plaintiffs against both SBR Marketing and newly-added Defendant Mr. Daniele.

22  Doc. No. 7.  The First Amended Complaint[1] alleges against SBR Marketing: (1) registered mark

23  infringement under the Lanham Act; (2) contributory registered mark infringement under the

24  Lanham Act; (3) false designation of origin under the Lanham Act; (4) contributory false

25  designation of origin under the Lanham Act; (5) mark dilution (blurring) under the Lanham Act;

26  (6) contributory mark dilution (blurring) under the Lanham Act; (7) mark dilution (tarnishment)

27  under the Lanham Act; (8) contributory mark dilution (tarnishment) under the Lanham Act; (9)

28

---

[1] Any references herein to simply the "Complaint" refer to the First Amended Complaint.

direct copyright infringement of 17 separate works; (10) vicarious copyright infringement of 21 separate works; and (11) contributory copyright infringement.  The First Amended Complaint also alleges against SBR Marketing: (1) misappropriation of trade secrets under Florida statute; (2) misappropriation of licensable commercial property under Florida common law; (3) contributory misappropriation of licensable commercial property under Florida common law; (4) civil theft under Florida statute; and (5) tortious interference with contractual relations under Florida common law (the "SBR State-Based Causes of Action").  The First Amended Complaint further alleges against both SBR Marketing and Mr. Daniele direct copyright infringement of four separate works, and alleges against Mr. Daniele: (1) contributory copyright infringement and (2) direct copyright infringement of three separate works (collectively the "Daniele Federal Causes of Action").  Finally, the First Amended Complaint alleges against Mr. Daniele: (1) misappropriation of licensable commercial property under Nevada common law; (2) two separate claims for tortious interference with business relations under Florida common law; (3) defamation under Nevada common law; and (4) business disparagement under Nevada common law (the "Daniele State-Based Causes of Action").

SBR Marketing moved to dismiss the First Amended Complaint on August 24, 2011.  Doc. No. 26.  On March 13, 2012, this Court granted SBR Marketing's Motion to Dismiss the First Amended Complaint.  Doc. No. 45 (the "Dismissal Order").  In the Dismissal Order, this Court stated:

> The Court has reviewed the documents and pleadings on file in this matter and finds that the underlying federal claims are insufficient to establish federal question jurisdiction.  Neither the Copyright Act, nor the Lanham Act[,] cover infringement of copyrights or service marks that occurred entirely outside the United States. …  As alleged in the complaint, all infringement took place on SBR's website operated entirely from Costa Rica.  ***There are no allegations of any direct infringement within the United States.***  Further, ***Stevo has failed to identify a single user of SBR's website that lives in the United States and uploaded the handicap reports.***  Rather, Stevo's complaint focuses on the effects of the alleged infringement and its impact in the United States.  However, such allegations are insufficient to constitute a claim under either the Copyright Act or the Lanham Act.

Doc. No. 45 at 3:14-4:3 (emphasis supplied).

**B.**    **<u>Facts Supporting "Direct Infringement Within The United States"</u>**

Although the Dismissal Order is based on this Court's conclusion that the First Amended Complaint sets forth "no allegations of any direct infringement within the United States," the First Amended Complaint includes, at a minimum, the following allegations to the contrary, in addition to those set forth in Stevo's direct copyright infringement allegations themselves:

> 2.    Stevo is, and has been at all times relevant to this lawsuit, a Florida corporation with its principal place of business in Florida.
>
> 3.    Mr. Budin is, and has been at all times relevant to this lawsuit, a Florida resident and the Chief Executive Officer of Stevo.
>
> 4.    Mr. Rolli is, and has been at all times relevant to this lawsuit, a Pennsylvania resident and the General Manager of Stevo.
>
> …
>
> 6.    Mr. Daniele is, and has been at all times relevant to this lawsuit, a Virginia resident.
>
> …
>
> 11.    Personal jurisdiction over SBR Marketing is proper because SBR Marketing, a foreign corporation, directs a significant portion of SBR Marketing's marketing efforts to the United States.
>
> 12.    Personal jurisdiction over SBR Marketing is proper because SBR Marketing, a foreign corporation, derives a significant portion of SBR Marketing's revenue from revenue-generating activities in the United States.
>
> 13.    Personal jurisdiction over SBR Marketing is proper because SBR Marketing, a foreign corporation, offers United States residents the opportunity to earn money through SBR Marketing's sites on the Internet.
>
> 14.    Personal jurisdiction over SBR Marketing is proper because SBR Marketing, a foreign corporation, pays United States residents for republishing intellectual property created in the United States and concerning sporting events in the United States.
>
> 15.    Personal jurisdiction over Mr. Daniele is proper because SBR Marketing has incentivized Mr. Daniele to make contributions of content to the website reposed at the domain sbrforum.com (the "SBR Website"), thereby creating a privity of publishing relationship between SBR Marketing and Mr. Daniele.
>
> 16.    Personal jurisdiction over Mr. Daniele is proper because Mr. Daniele has been paid by SBR Marketing for republishing

-4-

intellectual property created in the United States and concerning sporting events in the United States.

17.     Personal jurisdiction over Mr. Daniele is proper because Mr. Daniele's unlawful conduct, which is more fully described in paragraphs 181 through 236, infra, relates specifically to the sports wagering and handicapping industry and, therefore, Mr. Daniele's unlawful conduct has its most direct impact in the State of Nevada, the only State in which sports wagering is legal.

18.     Personal jurisdiction over Mr. Daniele is proper because Mr. Daniele has purposefully directed his activities, which are more fully described in paragraphs 181 through 236, infra, toward the State of Nevada, including, but not limited to, publishing information on websites which are accessible via the Internet throughout the State of Nevada.

…

26.     Each of the Stevo Websites displays terms of use (the "User Contract," attached hereto as Exhibit 1), which may be viewed by anyone accessing any of the Stevo Websites irrespective of purchase of a license to view any of the Handicapper Reports.

27.     Before a user of any of the Stevo Websites can complete a purchase of a license to view any of the Handicapper Reports, that user must scroll all the way through the User Contract, then deliberately click on a "button" to indicate that such user agrees to enter into the User Contract as a condition of viewing any of the Handicapper Reports. If the user does not scroll all the way through the User Contract, and thereby, at a minimum, obtain the opportunity to read the entire User Contract, that user cannot complete that user's purchase of a license to view any of the Handicapper Reports.

28.     By entering into the User Contract, a purchaser of a license to view any of the Handicapper Reports expressly represents and warrants that such licensee "will not reproduce, republish, rebroadcast, retransmit, recast or in any way distribute the information that [the purchaser] will receive from this website (regardless of whether [the purchaser] receive[s] such information directly, from this website or from any affiliated website) anywhere, including without limitation on the Internet (e.g. on other websites, blogs, newsgroups, chat rooms, discussion forums, message boards and social media services such as Twitter, Facebook and MySpace), via instant or text messaging services (whether Internet- or phone-based), in podcasts, or in any other printed or electronic form, including without limitation radio and television" (emphasis in original).

29.     By entering into the User Contract, a purchaser of a license to view any of the Handicapper Reports expressly represents and warrants that such licensee "will not provide or otherwise convey the information that [the licensee] receive[s] from this website (regardless of whether [the licensee] receive[s] such information directly, from this website or from any affiliated website) to any third parties."

30.     By entering into the User Contract, a purchaser of a license to view any of the Handicapper Reports expressly acknowledges that all the information that user receives from Stevo is confidential, to be held in strict confidence, not to be disclosed to any third party, and not to be used "for any purpose other than as expressly permitted" by Stevo.

31.     By entering into the User Contract, a purchaser of a license to view any of the Handicapper Reports expressly acknowledges that the trademarks and service marks appearing on any of the Stevo Websites are not that licensee's property and that nothing in the User Contract confers on that licensee any license or other grant of rights to use those marks.

32.     By entering into the User Contract, a purchaser of a license to view any of the Handicapper Reports expressly represents that such licensee has read and understood the User Contract and agrees to be bound by the User Contract.

33.     SBR Marketing publishes content related to sports betting and handicapping at the website reposed at the domain sbrforum.com (the "SBR Website"), enabling members of the public to contribute content for publication by SBR Marketing regarding topics related to, at a minimum, sports wagering and handicapping.

34.     The content published by SBR Marketing through the SBR Website is available to and used by individuals throughout the United States, including, without limitation, individuals in Nevada.

35.     SBR Marketing receives revenue from advertisers who pay SBR Marketing for customers and/or revenue gained by those advertisers when those customers click through advertisements appearing on the SBR Website and thereby reach the advertisers' own websites.

36.     The more SBR Website readers that click through advertisements to advertisers' websites, the more revenue SBR Marketing gains from those advertisers.

37.     SBR Marketing awards loyalty points, which SBR Marketing describes as "our currency here" (emphasis in original) (the "SBR Currency"), to registered users of the SBR Website ("SBR Contributors") whenever those SBR Contributors engage in certain activities on the SBR Website, including merely logging on to the SBR Website, contributing content to the SBR Website, or reporting other users' infractions of the SBR Website's terms of use to SBR Marketing.

38.     SBR Marketing's incentivization of contributions from SBR Contributors by means including, without limitation, payment of SBR Currency to SBR Contributors creates privity of publishing relationship between SBR Marketing and each so-incentivized SBR Contributor.

39.     SBR Contributors may transfer SBR Currency from themselves to other SBR Contributors to further incentivize those

SBR Contributors to continue to provide useful or entertaining content to the SBR Website.

40.     SBR Contributors may "gamble" SBR Currency in wagering and other contests offered by SBR Marketing, and, if successful, win additional SBR Currency.

41.     SBR Contributors may spend accrued SBR Currency on, without limitation, merchandise such as T-shirts and shot glasses; gift cards from national chain restaurants and stores; and credits at offshore online sports books that advertise on the SBR Website. For example, as of January 31, 2011, any SBR Contributor could exchange 825 SBR Currency units for $50 credit at the bodog.com offshore online sports book. If that user bet via bodog.com the $50 bodog.com credit that SBR Contributor received from the SBR Website in exchange for 825 SBR Currency units, and won the bet, that SBR Contributor would be able to recoup from bodog.com the full monetary amount of that SBR Contributor's winnings (minus fees charged by bodog.com) irrespective of the fact that the credit used for the bet came from SBR Website in exchange for SBR Currency, and not from actual funds provided by the SBR Contributor.

42.     When SBR Contributors visit offshore online sports books that advertise on the SBR Website after exchanging SBR Currency for credit at those offshore online sports books, if those SBR Contributors bet any amount of those SBR Contributors' own funds beyond the credits received in exchange for SBR Currency, SBR Marketing gains revenue from those advertisers as a result of those transactions.

43.     An SBR Contributor who demonstrates to SBR Marketing that such SBR Contributor has a balance of at least $200 of that SBR Contributor's own funds in that SBR Contributor's account with one of the offshore online sports books advertising on SBR Marketing can become an "SBR PRO," and thereby earn double SBR Currency for SBR Website publishing activity, obtain additional opportunities to wager SBR Currency on SBR Marketing sponsored contests, and enjoy a reduction of the amount of SBR Currency that must be spent I order to receive merchandise from SBR Marketing.

44.     SBR Marketing's business model is based in significant part on the revenue SBR Marketing receives from offshore online sports books that advertise on SBR Website as a result of SBR Contributors and other readers of the SBR Website clicking directly through those offshore online sports books' advertisements on the SBR Website to the offshore online sports books' own websites. SBR Marketing boasts in SBR Marketing's communications to potential advertisers that "[m]ore players join the top sportsbooks via [the SBR Website] than all other watchdog and rating sites combined."

45.     SBR Marketing developed and implemented the SBR Website "to meet the demand for handicapping stat[istic]s and sports handicapping information."

46.     One subdivision of the SBR Website is titled "Service Plays" (the "Service Plays Section") and the content of the Service Plays Section is specifically related to analysis provided by professional handicapping services like Stevo.

47.     As of February 23, 2011, no fewer than seven individuals, plus "SBRForumStaff" and "SBR.tv," were identified as "moderators" of the Service Plays Section.

48.     Moderators of the Service Plays Section are conferred by SBR Marketing with the authority and ability to edit and/or delete any content submitted by any SBR Contributors in the Service Plays Section.

49.     SBR Marketing retains, pursuant to the SBR Website's terms of use, the right to edit and/or delete any content submitted by any SBR Contributor, including, without limitation, an SBR Contributor who has submitted content in the Service Plays Section.

50.     Daily or almost daily, SBR Marketing publishes Handicapper Reports, or portions thereof, in the Service Plays Section, as well as solicitations from SBR Contributors to one another to submit content from Handicapper Reports for publication in the Service Plays Section.

51.     An SBR Contributor who submits for publication in the Service Plays Section all or a portion of a Handicapping Report automatically receives at least six units of SBR Currency—two for logging in to the SBR Website, and four for contributing content to the SBR Website.

52.     SBR Marketing recognizes that at least a subset of content published on the SBR Website constitutes republications of content not personally authored by the SBR Contributors submitting that material for publication by SBR Marketing, because SBR Marketing specifies that SBR Marketing will pay more than four units of SBR Currency to an SBR Contributor "contributing a well[-]thought[-]out pick write[-]up or handicapping[-]oriented post in any sports subforum," and that "[o]nly original content will be eligible for this reward."

53.     Daily or almost daily, SBR Contributors who submit all or a portion of a Handicapping Report for publication in the Service Plays Section request and receive additional units of SBR Currency as rewards from other SBR Contributors.

54.     Daily or almost daily, SBR Contributors who submit only a portion of a Handicapping Report for publication in the Service Plays Section offer to provide the remainder of the Handicapping Report via "PM," or private message, to other SBR Contributors, in exchange for SBR Currency from those SBR Contributors.

55.     SBR Marketing recognizes that at least a subset of content published on the SBR Website constitutes republications of content not personally authored by the SBR Contributors submitting that material for publication by SBR Marketing, because SBR

Marketing specifies that SBR Marketing will pay more than four units of SBR Currency to an SBR Contributor "contributing a well[-]thought[-]out pick write[-]up or handicapping[-]oriented post in any sports subforum," and that "[o]nly original content will be eligible for this reward."

56.    SBR Marketing has promoted the SBR Website by advertising that readers of the Service Plays Section, including, without limitation, SBR Contributors, can obtain pay-per-view sports Handicapper Reports, such as Stevo's Handicapper Reports, free of charge.

57.    On or about June 3, 2010, Stevo sued SBR Marketing in Florida state court for, without limitation, misappropriation of trade secrets and tortious interference with contractual relations, based on SBR Contributors' activity as alleged herein, incorporating by reference as part of Stevo's Complaint the terms of the User Contract.

58.    On or about June 10, 2010, an individual with the username "Lou" and the e-mail address of help@sportsbookreview.com published a message to SBR Contributors in the Service Plays Section stating, "Hi guys.  For legal reasons must update our forum policy for Service Plays.  **What is allowed:**  [Capper Name] + play & odds.  **What is not allowed.**  *amount, write ups [*sic*], $ amount, unit amount etc.  You can rank the plays, or say so and so really likes this play or that play, but please do not repost copyrighted written material" (emphasis in original) (the "Service Plays Warning").

…

189.    Under the username "PepperMillRick," Mr. Daniele contributed content to the SBR Website (the "Daniele SBR Contributions") that included, without limitation, (a) defamatory and disparaging statements that Plaintiffs, collectively and respectively, have engaged, and continue to engage in, fraudulent, corrupt and unscrupulous business practices; (b) unauthorized republications of Stevo's copyrighted material; and (c) unauthorized republications of Stevo's licensable commercial property.

…

227.    Stevo is the owner of respective copyrights in:
     a.    a photograph of the Stevo handicapper who contributes Handicapper Reports that are published and licensed by Stevo under the Mancini Mark (the "Mancini Photograph");
     b.    a literary work entitled "Who is Derek Mancini?" (the "Mancini Biography");
     c.    a photograph of the Stevo handicapper who contributes Handicapper Reports that are published and licensed by Stevo under the Mancini Mark, superimposed text, and layout (the "Mancini Header");
     d.    a January 7, 2010 motion picture of the Stevo handicapper who contributes Handicapper Reports that are

published and licensed by Stevo under the Lang Mark (the "1-7-10 Lang Video");

      e.    a February 6, 2011 motion picture of the Stevo [h]andicapper who contributes Handicapper Reports that are published and licensed by Stevo under the Budin Mark (the "2-6-11 Budin Report");

      f.    a February 10, 2011 motion picture of the Stevo handicapper who contributes Handicapper Reports that are published and licensed by Stevo under the Lang Mark (the "2-10-11 Lang Video");

      g.    a February 15, 2011 motion picture of the Stevo [h]andicapper who contributes Handicapper Reports that are published and licensed by Stevo under the Budin Mark (the "2-15-11 Budin Report"; subparagraphs (a) through (g) collectively, the "Daniele Infringed Works")[.]

228.    Mr. Daniele willfully copied the Daniele infringed Works without the authorization of Stevo.

229.    Mr. Daniele has displayed, and continues to display, unauthorized reproductions of the Daniele Infringed Works under the Daniele Usernames on, at a minimum, the Infringing Websites.

230.    Mr. Daniele knew that the Daniele Infringed Works were originally published at the Stevo Websites.

Additionally, Stevo's Buyers Agreement, attached to and incorporated into the First Amended Complaint, contains the following provisions:

5.    Confidentiality.  You acknowledge that all of the information you will receive from this website, whether through this website (or any affiliated website) or directly, is confidential and constitutes trade secrets (the "Trade Secrets") as defined by Florida's adoption of the Uniform Trade Secrets Act, Florida Statutes §688.001 et seq. …

…

14.    General Provisions.  These terms and conditions shall be governed by and interpreted under the laws of the State of Florida (without regard to its principles regarding conflicts of laws).  The sole and exclusive venue for any action relating to this Agreement or the parties hereto shall be in the state or federal courts in Miami, Miami-Dade County, Florida. …

Doc. 7-1 at 4, 6.

### C.   Facts Supporting Stevo's Identification Of "User[s] Of SBR's Website That Live[] In The United States And Uploaded The Handicap Reports"

Although the Dismissal Order is based on this Court's conclusion that the First Amended Complaint "fail[s] to identify a single user of SBR's website that lives in the United States and uploaded the handicap reports," the First Amended Complaint includes, at a minimum, the following allegations to the contrary:

> 6.     Mr. Daniele is, and has been at all times relevant to this lawsuit, a Virginia resident.
>
> …
>
> 15.     Personal jurisdiction over Mr. Daniele is proper because SBR Marketing has incentivized Mr. Daniele to make contributions of content to the website reposed at the domain sbrforum.com (the "SBR Website"), thereby creating a privity of publishing relationship between SBR Marketing and Mr. Daniele.
>
> 16.     Personal jurisdiction over Mr. Daniele is proper because Mr. Daniele has been paid by SBR Marketing for republishing intellectual property created in the United States and concerning sporting events in the United States.
>
> 17.     Personal jurisdiction over Mr. Daniele is proper because Mr. Daniele's unlawful conduct, which is more fully described in paragraphs 181 through 236, infra, relates specifically to the sports wagering and handicapping industry and, therefore, Mr. Daniele's unlawful conduct has its most direct impact in the State of Nevada, the only State in which sports wagering is legal.
>
> 18.     Personal jurisdiction over Mr. Daniele is proper because Mr. Daniele has purposefully directed his activities, which are more fully described in paragraphs 181 through 236, infra, toward the State of Nevada, including, but not limited to, publishing information on websites which are accessible via the Internet throughout the State of Nevada.
>
> …
>
> 189.     Under the username "PepperMillRick," Mr. Daniele contributed content to the SBR Website (the "Daniele SBR Contributions") that included, without limitation, (a) defamatory and disparaging statements that Plaintiffs, collectively and respectively, have engaged, and continue to engage in, fraudulent, corrupt and unscrupulous business practices; (b) unauthorized republications of Stevo's copyrighted material; and (c) unauthorized republications of Stevo's licensable commercial property.

…

227.    Stevo is the owner of respective copyrights in:
a.      a photograph of the Stevo handicapper who contributes Handicapper Reports that are published and licensed by Stevo under the Mancini Mark (the "Mancini Photograph");
b.      a literary work entitled "Who is Derek Mancini?" (the "Mancini Biography");
c.      a photograph of the Stevo handicapper who contributes Handicapper Reports that are published and licensed by Stevo under the Mancini Mark, superimposed text, and layout (the "Mancini Header");
d.      a January 7, 2010 motion picture of the Stevo handicapper who contributes Handicapper Reports that are published and licensed by Stevo under the Lang Mark (the "1-7-10 Lang Video");
e.      a February 6, 2011 motion picture of the Stevo [h]andicapper who contributes Handicapper Reports that are published and licensed by Stevo under the Budin Mark (the "2-6-11 Budin Report");
f.      a February 10, 2011 motion picture of the Stevo handicapper who contributes Handicapper Reports that are published and licensed by Stevo under the Lang Mark (the "2-10-11 Lang Video");
g.      a February 15, 2011 motion picture of the Stevo [h]andicapper who contributes Handicapper Reports that are published and licensed by Stevo under the Budin Mark (the "2-15-11 Budin Report"; subparagraphs (a) through (g) collectively, the "Daniele Infringed Works")[.]

228.    Mr. Daniele willfully copied the Daniele Infringed Works without the authorization of Stevo.

229.    Mr. Daniele has displayed, and continues to display, unauthorized reproductions of the Daniele Infringed Works under the Daniele Usernames on, at a minimum, the Infringing Websites.

230.    Mr. Daniele knew that the Daniele Infringed Works were originally published at the Stevo Websites.

Further, Stevo's 52nd cause of action alleges contributory copyright infringement against Mr. Daniele based on the fact that "Mr. Daniele intentionally induced and encouraged SBR to engage in infringement of Stevo's copyrights, by causing SBR to reproduce, display, distribute copies of, and prepare derivative works based on Handicapper Reports, in derogation of Stevo's exclusive rights under 17 U.S.C. § 106." Doc. No. 7 at ¶915. Stevo's 61st cause of action alleges misappropriation of licensable commercial property under Nevada common law against Mr. Daniele based on Mr. Daniele's wrongful use on, *inter alia,* the SBR Website of Stevo's licensable commercial properties. Doc. No. 7 at ¶¶1037-1046.

-12-

III. **ARGUMENT**

A. **This Court Erred In Treating Extraterritoriality As A Proper Subject For Subject Matter Jurisdiction**

The issue before this Court regarding extraterritoriality did not give rise to a dismissal on the basis of a lack of subject matter jurisdiction.  The Supreme Court of the United States has held that when the issue before the court addresses the actual measure of the federal claim for relief, the issue is not one of subject matter jurisdiction and that federal courts have been "less than meticulous" in "conflating"  the question of subject matter jurisdiction with whether a claim for relief is stated.  *Arbaugh v. Y & H Corp.,* 546 U.S. 500, 511 (2006).  The Federal Circuit applied *Arbaugh* to the context of the issue of extraterritoriality and claims for patent and copyright infringement in *Litecubes, LLC v. Northern Light Products, Inc.,* 523 F.3d 1353 (Fed. Cir. 2008).  In *Litecubes* the Federal Circuit held that "*Arbaugh*'s bright line rule **mandates** that the requirement that the allegedly infringing act occur in the United States be treated as non-jurisdictional."  *Litecubes* at 1363 (emphasis added).  This is because, in part, "Congress has not clearly stated in 35 U.S.C. § 271 or in any other statute that § 271's requirement that the infringing act happen within the United States is a threshold jurisdictional requirement as opposed to an element of the claim." *Id.*   As such, at a global level, this Court erred in ruling that this Court lacked subject matter jurisdiction over this case.

B. **This Court Erred In Dismissing Plaintiffs' Claims Against Defendant Mr. Daniele.**

1. **This Court's Failure To Indicate Its Basis For Declining Jurisdiction Over The Daniele State-Based Causes of Action Was Erroneous.**

This case should not have been dismissed against Mr. Daniele and the absence of any articulated rationale for doing so was clear error.  A declination of jurisdiction is in error if the basis for same is not indicated.  In *Bahrampour v. Lampert,* 356 F.3d 969 (9th Cir. 2004), the Ninth Circuit held that the United States District Court for the District of Oregon erred in failing to "indicate the basis for declining to exercise its jurisdiction over [plaintiff-appellant]'s state law

claim." 356 F.3d at 979.  In this case, Mr. Daniele was dismissed pursuant to a clerk's entry of judgment (Doc. No. 46) and nothing in this Court's Opinion and Order with respect to SBR indicated any application to Mr. Daniele at all, whether with respect to the Daniele State-Based Causes of Action or otherwise.  As such, this Court's wholesale dismissal of Mr. Daniele was contrary to the requirements established by the Ninth Circuit.

**2.     Any Conclusion That Extraterritorial Issues Exist With Mr. Daniele Would Be In Error**

Mr. Daniele, a Virginia resident (or at least a resident of the United States of America) as alleged in the Complaint, whose liability-effecting acts all occurred in the United States of America, as alleged in the Complaint, clearly does not benefit from an extraterritorially-based dismissal of the Daniele Federal Causes of Action.  The Complaint clearly alleged Mr. Daniele's United States residency.  Doc. No. 7 at ¶6.  The Complaint also clearly alleged sufficient facts tying Mr. Daniele to the United States and his liability-effecting acts to the United States.  *See, e.g.,* Doc. No. 7 at ¶¶15-18, ¶¶181-230.  There can be no question that Mr. Daniele's acts stemming from a computer in Virginia (or at least in the United States of America) have sufficient nexus with the United States of America to confer subject matter jurisdiction.  This Court certainly has not ruled to the contrary.  Therefore, any dismissal of Mr. Daniele on the basis of some entirely extraterritorial nexus would be unfounded and it is clear error to have this case dismissed against Mr. Daniele.

**C.     <u>At A Minimum, It Would Be Error To Conclude That Supplemental Jurisdiction Over SBR Marketing Does Not Exist At Least With Respect To Certain Causes of Action.</u>**

**1.     The Daniele Federal Causes of Action Give Rise to Supplemental Jurisdiction.**

Supplemental jurisdiction is generally permitted under circumstances like those presented by this case, when state-law-based causes of action are "so related to [federal] claims in the action that they perform part of the same case or controversy."  This Court has recognized that 28 U.S.C. § 1367(a) allows a court to assume supplemental jurisdiction "over all other claims

-14-

1  that are so related to claims in the action within such original jurisdiction that they form part of

2  the same case or controversy under Article III of the United States Constitution," including

3  "claims involving the joinder of additional parties."  *City of N. Las Vegas v. Clark County,*

4  *Nevada,* case no. 2:11-cv-00944-PMP-PAL, 2001 U.S. Dist. LEXIS 88590 (D. Nev. August 9,

5  2011).  The Ninth Circuit has held that "[n]onfederal claims are part of the same 'case' as federal

6  claims when they derive from a common nucleus of operative fact and are such that a plaintiff

7  would ordinarily be expected to try them in one judicial proceeding."  *Kuba v. 1-A Agricultural*

8  *Ass'n,* 387 F.3d 850, 855-856 (9th Cir. 2004) (*quoting Trustees of the Construction Industry &*

9  *Laborers Health & Welfare v. Desert Valley Landscape & Maintenance, Inc.,* 333 F.3d 923, 925

10  (9th Cir. 2003)).  Thus, claims that "derive from a common nucleus of operative fact" with

11  claims over which federal subject-matter jurisdiction exists, and which Plaintiffs "would

12  ordinarily be expected to try… in one judicial proceeding," are appropriately the subject of this

13  Court's supplemental jurisdiction.

14          **2.**    **This Court Has Supplemental Jurisdiction Over the**

15              **SBR State-Based Causes of Action**

16        As the SBR State-Based Causes of Action derive from a common nucleus of operative

17  fact with the Daniele Federal Causes of Action, supplemental jurisdiction exists.  There can be

18  no legitimate question that the SBR State-Based Causes of Action derive from a common

19  nucleus of operative fact as the Daniele Federal Causes of Action.  Indeed, the tortious

20  interference, direct and contributory misappropriation of commercial property, misappropriation

21  of trade secrets, and civil theft claims against SBR Marketing address the very same factual

22  circumstances of the relationship between SBR Marketing, Mr. Daniele and Stevo whereby SBR

23  Marketing leveraged its relationship with Mr. Daniele to misappropriate Stevo's content through

24  a contractual breach.  Indeed, logic dictates that it would be impossible to factually separate out

25  the circumstances of Mr. Daniele's acquisition of Stevo's intellectual and/or commercial

26  properties, and then Mr. Daniele's unauthorized reproduction of said intellectual and/or

27  commercial properties on the SBR Marketing website, all while being incentivized by SBR

28  Marketing to do so and will full knowledge by SBR Marketing that such unauthorized content

was being republished on said website.  It is hard to imagine factual circumstances more

intertwined.  As such, as a common nucleus of operative fact exists, supplemental jurisdiction is

appropriate under 28 U.S.C. § 1367(a).  *See, e.g., Qualcomm, Inc. v. Motorola, Inc.,* 989 F.Supp.

1048 (S.D. Cal. 1997), in which the United States District Court for the Southern District of

California found that it clearly had supplemental jurisdiction over plaintiff Qualcomm's state-

law claims for conversion, trade secrets, and unfair business practices, in a case in which

Qualcomm's patent-infringement claims conferred federal subject-matter jurisdiction, when

those claims arose from defendant Motorola's alleged theft of a component of a patented

Qualcomm device.  The court held that:

> Motorola's theft of Qualcomm's material does arise from the same
> set of facts as Qualcomm's federal claims regarding patent
> infringement.  Motorola's representative took the Qualcomm
> material because it appeared similar to a patented Motorola phone.
> … Hence, the theft was indeed related to the patent claims.
> Accordingly, the Court finds that Qualcomm's proposed state law
> claims do arise from the same set of operative facts as the existing
> claims, and may exercise supplemental jurisdiction over those
> claims.

989 F.Supp. at 1051.  In this case, the factual circumstances surrounding the SBR State-Based

Causes of Action are even more intertwined with the factual circumstances surrounding the

Daniele Federal Causes of Action than in *Qualcomm,* in which Qualcomm's state-based causes

of action arose from discrete acts that took place after Qualcomm's filing of suit against

Motorola; here, all of the SBR State-Based Causes of Action arise from SBR Marketing's course

of conduct that gave rise to Mr. Daniele's ability to engage in the acts conferring liability on Mr.

Daniele.  Supplemental jurisdiction is thus abundantly appropriate.

Finally, there further appears to have been no indication that this Court has declined to

exercise supplemental jurisdiction as a result of "exceptional circumstances" as described in 28

U.S.C. § 1367(c)(4).  As such, Stevo Design hereby seeks reconsideration of the Court's

determination of an absence of jurisdiction at least over the SBR State-Based Causes of Action.

D.     **This Court Erred In Dismissing Plaintiffs' Claims Against**
       **SBR Marketing On The Basis of Extraterritoriality.**

The Court's determination that there were no allegations of direct infringement is in error. The Court went on to hold that "[t]here are no allegations of any direct infringement within the United States." This, of course, begs the question of what is a "direct infringement" allegation. To the extent that the Court is differentiating between the well-recognized variations of infringement (namely, direct, vicarious or contributory), Stevo alleges all three forms. To the extent that the Court is not maintaining such distinction, then Stevo has clearly alleged conduct deemed to be "direct infringement" in well-settled, controlling law.

The existence of specific personal jurisdiction bears mightily on geographic-based subject matter jurisdiction. Logic dictates that if the defendant has purposefully availed itself of the forum in such a manner to give rise to the plaintiff's claims, then the defendant has something more than mere extraterritorial ties to the forum. Indeed, "the personal jurisdiction requirement—which prevents federal courts from exercising authority over defendants without sufficient contacts with the United States . . . is an important limitation on the jurisdiction of the federal courts over purely extraterritorial activity that is independent of the extraterritorial reach of a federal statute or the court's subject matter jurisdiction." *Litecubes* at 1363. Thus, if there is personal jurisdiction over the copyright infringer by virtue of the nature of the infringing acts, then it would follow that the court should also have subject matter jurisdiction based upon a geographic limitation.

In this context, it is abundantly clear that direct infringement was more than adequately alleged. In case of any doubt, initially, this Court's decision in *Righthaven, LLC v. Majorwager.com, Inc.,* case no. 2:10-cv-00484-GMN-LRL, 2010 U.S. Dist. LEXIS 115007 (D. Nev. October 28, 2010) ("*Majorwager*") is highly instructive. *Majorwager* also involved the question of copyright infringement by an actor present outside the United States and an argument by that defendant that the complaint did "not allege any infringing activity occurring in the United States." *Majorwager* at *12-*13. In finding that Righthaven did in fact plead "facts sufficient to sustain a cause of action," this Court held that although the Righthaven complaint,

in the Court's view, did "not specifically allege that the alleged infringement occurred within the United States, when adjudicating the defendant's motion to dismiss under Fed. R. Civ. P. 12(b)(6), all reasonable inferences from the complaint's factual allegations must be drawn in favor of the plaintiff." *Majorwager* at *15. Thus, this Court understood that necessity of looking at the allegations generally and reaching reasonable inferences, not that reasonable inferences are required in the instant case.

Viewed by way of reasonable inference or not, the Complaint clearly alleges direct infringement. One factor this Court identified in *Majorwager* was the fact that the complaint alleged that the copyright "articles copied were 'from a source emanating from Nevada.'" *Id.* There can be no question of sufficient allegations in the Complaint making clear that the misappropriated and infringed Stevo Content was copied from a source emanating from the United States. First, Stevo alleged in Paragraph 2 of the Complaint that Stevo was not only a Florida corporation but maintained its principal place of business in Florida. As such, Stevo's operations creating and publishing the Stevo Content were not overseas. Indeed, it would take a remarkable negative inference by the Court to determine that the Stevo Content did not emanate from within the United States. Independently, the Terms of Use, incorporated into the Complaint, clearly mandate that anyone who views the Stevo Content consent that Florida law governs the terms of agreement by and between the viewer and Stevo. Therefore, anyone acquiring, whether authorized or not, Stevo Content for unauthorized republication can only do so by entering into the Terms of Use from a clearly Floridian source. This Court also definitively held in *Majorwager* that "it is not difficult to infer that since Righthaven discovered the infringing material on Majorwager's website, it likely did so in its Nevada office and therefore any ***infringement on the part of Defendant took place within the United States***." *Id.* (emphasis added). It would require a remarkable negative inference again to assume that somehow Stevo or Stevo's principals only went overseas to view the infringing content. ***Emphatically, then, under Majorwager, this fact alone means that SBR Marketing's infringement was not extraterritorial.*** Moreover, the Complaint clearly alleged that the subject matter of SBR Marketing's website was nearly exclusively focused at a United States audience

of fans of United States-based professional and collegiate sports.  Doc. No. 7 at ¶¶14, 16.  As discussed *infra,* the Ninth Circuit has made clear that forum-centric content on a website can confer personal jurisdiction over the website operator.  *Mavrix Photo, Inc. v. Brand Technologies, Inc.,* 647 F.3d 1218 (9th Cir. 2011) ("*Mavrix*").  In this case, to assume that **only** non-United States residents are viewing SBR Marketing's website under such circumstances would be remarkable.  Indeed, to argue that SBR Marketing did not target the United States and purposefully avail itself of the United States as a forum for SBR Marketing's advertising and content would be equally remarkable.

Direct infringement in this case is also clear because the harm resulting from copyright infringement is deemed to occur in, *inter alia,* the forum of the copyright owner.  The Ninth Circuit has held that copyright infringement is treated for these analytical purposes as a tort. *Brayton Purcell LLP v. Recordon & Recordon,* 606 F.3d 1124 (9th Cir. 2010) ("*Brayton Purcell*") at 1128; *Mavrix,* 647 F.3d  at 1228.  As such, courts in the Ninth Circuit analyze copyright infringement cases, for purposes of specific jurisdictional analysis, for "purposeful direction" of the defendant's conduct toward a particular forum.  Under this test, as the Ninth Circuit recently reiterated in *Brayton Purcell* and *Mavrix,* "the defendant allegedly must have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state."  *Brayton Purcell* at 1128, *quoting Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme,* 433 F.3d 1199, 1206 (9th Cir. 2006); *Mavrix* at 1228.  In this case, the First Amended Complaint alleges that SBR Marketing has committed intentional acts of copyright infringement and service mark infringement.  *See, e.g.,* Doc. No. 7 at ¶¶45-60.  Those intentional acts are expressly aimed at the United States. Doc. No. 7 at ¶¶11-14.  Finally, those intentional acts cause harm that SBR Marketing knows is likely to be suffered in the United States, because Stevo knowingly infringed SBR Marketing's copyrights and knew that Stevo's principal place of business is in the United States.  *See* Doc. No. 7 at ¶¶57-58; SBR Marketing's issuance of the Service Plays Warning clearly demonstrates SBR Marketing's knowledge, after Stevo sued SBR Marketing in Florida state court, of SBR Marketing's copyright infringement activities.  *See Mavrix,* 647 F.3d at 1231-32, in which the

Ninth Circuit recognized that "a corporation can suffer economic harm both where the bad acts occurred and where the corporation has its principal place of business" (*quoting Dole Food Co., Inc. v. Watts,* 303 F.3d 1104, 1113 (9th Cir. 2002)), and "[t]he economic loss caused by the intentional infringement of a plaintiff's copyright is foreseeable." *Id., citing Brayton Purcell,* 606 F.3d at 1131. Given that, under this iteration of the "*Calder* effects test," personal jurisdiction in the United States would clearly be appropriate as to SBR Marketing, the notion that SBR Marketing is not subject to *subject matter* jurisdiction in the United States defies logic.

In furtherance of this Court finding "direct infringement within the United States" are precedents, such as *Mavrix*, that look to the effect of the copyright infringement and the forum. For example, in *Mavrix,* the Ninth Circuit found that defendant Brand's paparazzi-photo website business was tied intimately to the state of California, even though the website's principal place of business was in Ohio, because the website business "continuously and deliberately exploited the California market for its website." The Ninth Circuit specifically held in this regard:

> Brand makes money by selling advertising space on its website to third-party advertisers: the more visitors there are to the site, the more hits that are made on the advertisements; the more hits that are made on the advertisements, the more money that is paid by the advertisers to Brand. A substantial number of hits to Brand's website came from California residents. One of the ways we know this is that some of the third-party advertisers on Brand's website had advertisements directed to Californians. In this context, it is immaterial whether the third-party advertisers or Brand targeted California residents. The fact that the advertisements targeted California residents indicates that Brand knows—either actually or constructively—about its California user base, and that it exploits that base for commercial gain by selling space on its website for advertisements.

647 F.3d at 1230. In this case, to make unmistakably clear that SBR Marketing's activities were intimately tied to the United States, the Complaint alleged that SBR Marketing "directs a significant portion of SBR Marketing's marketing efforts to the United States," "derives a significant portion of SBR Marketing's revenue from revenue-generating activities in the United States"; "offers United States residents the opportunity to earn money through SBR Marketing's sites on the Internet"; and "pays United States residents for republishing intellectual property created in the United States and concerning sporting events in the United States." Doc. No. 7 at

¶¶11-14.  Of course, these allegation, as all others, must be taken as true.[2]  As such, the infringement by SBR Marketing of Stevo's content, "created in the United States and concerning sporting events in the United States," while marketing to the United States, deriving revenue from the United States, and offering money-earning opportunities in the United States, must clearly be seen as to constitute activity within the United States sufficient to confer subject matter jurisdiction.

Furthermore, any notion of pure extraterritoriality is defeated by Stevo's agency allegations.  The First Amended Complaint further sets forth allegations demonstrating that SBR Marketing paid agents to engage in infringement of Stevo's United States-originating content, which agency relationships further confer jurisdiction over SBR Marketing.  The Ninth Circuit has made clear that "[f]or purposes of personal jurisdiction, the actions of an agent are attributable to the principal."  *Sher v. Johnson,* 911 F.2d 1357, 1362 (9th Cir. 1990); *see also Myers v. The Bennett Law Offices,* 238 F.3d 1068, 1073 (9th Cir. 2001); *cf. Bauman v. DaimlerChrysler Corp.,* 644 F.3d 909 (9th Cir. 2011), in which the acts of a subsidiary *corporation,* rather than individuals as in the instant case, *Sher,* and *Myers*, were imputed to an overseas corporate principal for jurisdictional purposes based on a complex test limited in its application by the Ninth Circuit to assessment of foreign parent-domestic subsidiary corporate relationships for jurisdictional purposes.  644 F.3d at 920 *et seq.*  In this case, the allegations set forth in paragraphs 37-43 of the First Amended Complaint describe the agency relationships SBR Marketing created with SBR Marketing users throughout the United States.  Briefly, SBR Marketing paid SBR Marketing users (with Mr. Daniele being no exception) in cash-equivalent loyalty points in exchange for contributing content, including infringing content, to SBR Marketing's Website.  As SBR Marketing had users subject to this relationship within the United States, including Mr. Daniele, SBR Marketing's agents in the United States provide yet another nexus for this Court to find that SBR Marketing engaged in acts in the United States sufficient to confer this Court with subject-matter jurisdiction.

---

[2] *See, e.g., Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1950 (2009).

E.  **Subafilms and Ocean Garden Do Not Support This Court's**
    **Dismissal Of Stevo's First Amended Complaint.**

    1.  ***Subafilms* Is Distinguishable Because The Infringement**
        **At Issue Therein Could *Only* Have Taken Place Outside**
        **The United States.**

This Court's reliance on *Subafilms, Ltd. v. MGM-Pathé Communications Co.,* 24 F.3d 1088 (9th Cir. 1994) in support of this Court's finding of no subject matter jurisdiction is misplaced for at least two reasons.  First, as discussed *supra,* under *Arbaugh,* which postdates *Subafilms,* extraterritoriality of copyright infringement does not give rise to dismissal based on want of subject-matter jurisdiction; to the extent the *Subafilms* court held to the contrary, *Subafilms* is thus no longer good law.[3]  Second, SBR Marketing's conduct in this case is geographically and otherwise distinguishable from that of the *Subafilms* defendants and the *Subafilms* court's rationale was based on those conduct- and geography-related facts.  In *Subafilms,* United States-based companies including MGM/UA Communications Co. and Warner Bros., Inc. (the "Domestic Actors") authorized foreign distribution of videotapes of the Beatles' animated film *Yellow Submarine,* allegedly in contravention of licensing agreements. 24 F.3d at 1090. The Ninth Circuit held that the Domestic Actors' intra-United States activity of *authorizing* infringing distribution did not violate 15 U.S.C. § 106, 24 F.3d at 1091-92, and the infringement effectuated by that authorization was not redressable under the Copyright Act due to the infringement's total extraterritoriality.  However, in the instant case, SBR Marketing's infringement is not totally extraterritorial, as in *Subafilms,* but, as discussed at length *infra,* involves the solicitation of United States customers, the use of United States-based agents, and the purposeful targeting of the United States as a forum for advertising and solicitation.  The facts of this case are thus clearly distinguishable from those of *Subafilms,* which, given that the copyright infringement allegations against the Domestic Actors resulted *by definition* from the Domestic Actors' breach of a licensing agreement specifically with respect to overseas

---

[3] One must also query whether *Subafilms* survives into the Internet era, given the Ninth Circuit's rulings in cases like *Brayton Purcell* and *Mavrix.*

distribution, *could only* have occurred entirely outside the United States.  There was no way for the *Subafilms* court to have considered, *e.g.,* the impact within the United States on the holder of the infringed copyrights, because distribution of the *Yellow Submarine* videos at issue would not have constituted copyright infringement in the United States owing to the terms of the parties' licensing agreement.  *Subafilms* is thus not on point with the instant case, in which Stevo has pled allegations sufficient to demonstrate that infringing activity has taken place within the United States.

### 2.   *Ocean Garden* Supports Stevo.

The *Ocean Garden* case, in contrast to *Subafilms,* actually supports Stevo's position.  In *Ocean Garden,* the Ninth Circuit found that extraterritorial jurisdiction over Lanham Act claims *was* appropriate if the criteria set forth in *Timberlane Lumber Co. v. Bank of America National Trust & Savings Ass'n,* 549 F.2d 597 (9th Cir. 1976) ("*Timberlane I*")[4] were met.  This Court appears to have dismissed Stevo's Lanham Act causes of action without applying the factored *Timberlane I* analysis, making it unclear on what basis this Court concluded that Stevo could not pursue Stevo's Lanham Act causes of action against SBR Marketing. While Stevo contends, once again, that SBR Marketing's actions in this case are *not* entirely extraterritorial, the facts of this case demonstrate that SBR Marketing's illicit activity does meet the *Timberlane I* test for appropriate extraterritorial application of the Lanham Act.

### a.   SBR Marketing's Activities Have "Some Effect On American Foreign Commerce."

SBR Marketing's acts have an effect on American foreign commerce by impeding Stevo's sales of Stevo's content, as licensed by Stevo under Stevo's registered and unregistered marks, to potential customers in the United States and throughout the world.  *Ocean Garden,* 953 F.2d 500, 503 (9th Cir. 1991). This factor thus supports extraterritorial application of the Lanham Act.

---

[4] While the *Timberlane I* test was originally formulated for use in the antitrust context, and has been superseded by statute in that context, *Timberlane I* remains good law in the Ninth Circuit with respect to Lanham Act analysis.  *Aurora World, Inc. v. Ty Inc.,* 719 F.Supp.2d 1115, 1142 (C.D. Cal. 2009).

> **b.** **_SBR Marketing's Activities Have An Effect Sufficiently Great To Present A Cognizable Injury To Stevo._**

Stevo, which has its principal place of business in the United States, has alleged "cognizable injury" to Stevo's registered and unregistered marks based on SBR Marketing's illicit activities. 953 F.2d at 503. Stevo has alleged at length that, as a result of SBR Marketing's infringement and misuse of Stevo's registered and unregistered marks, SBR Marketing's infringed versions of Stevo's intellectual property outrank the legitimate versions offered by Stevo in Internet search engines such as Google, minimizing the likelihood that sports bettors looking for handicapping reports offered under any particular Stevo-owned mark will purchase licenses to view those reports from Stevo. Doc. No. 7 at ¶¶130-180. This factor thus supports extraterritorial application of the Lanham Act.

> **c.** **_Links To American Foreign Commerce Are Sufficiently Strong In Relation To Those Of Other Nations._**

Stevo's claims against SBR Marketing strongly relate to United States foreign commerce in relation to other nations' foreign commerce. Under _Timberlane I,_ and by extension _Ocean Garden,_ this Court must weigh seven subfactors in determining the applicability of this criterion. All seven of these factors weigh in favor of Stevo.

> **i.** <u>_No Decision By This Court Would Conflict With Foreign Law._</u>

Stevo is not aware of any proceedings pending against SBR Marketing in any other nation, meaning that the first subfactor under this factor, "[d]egree of conflict with foreign law,"[5] favors Stevo. Stevo is similarly not aware of, and SBR Marketing has not brought to Stevo's or this Court's attention, any Costa Rican or Curaçaoan law that would be offended by this Court's finding of Lanham Act liability in the United States on the part of SBR Marketing. This factor thus supports extraterritorial application of the Lanham Act.

---

[5] 953 F.2d at 503-504.

### ii.    *Stevo Is A United States Entity.*

Stevo is a United States entity, meaning that the second subfactor under this criterion, "[n]ationality of the parties,"[6] favors Stevo, or, at worst, is neutral.

### iii.    *Stevo Expects Enforcement Of Stevo's Lanham Act Rights To Achieve Compliance By SBR Marketing.*

Stevo believes that this Court's enforcement of Stevo's rights under the Lanham Act will result in SBR Marketing's cessation of use of Stevo's registered and unregistered service marks, meaning that the third subfactor under this criterion, "[e]xtent to which enforcement is expected to achieve compliance,"[7] favors Stevo.

### iv.    *SBR Marketing's Activities Affect United States Commerce More So Than Any Other Nation's Commerce.*

Because Stevo is a United States entity, Stevo's losses as a result of SBR Marketing's illicit activity axiomatically affect United States commerce more so than the commerce of any other nation.  As discussed *supra,* the entire context of Stevo's commercial activity is related to United States sports and sports aficionados, not Costa Rican or Curaçaoan/Dutch sports and fans.  As a result, the fourth subfactor under this criterion, "[r]elative significance of effects on U.S. as compared to elsewhere,"[8] favors Stevo.

### v.    *SBR Marketing's Explicit Purpose Is To Harm United States Commerce.*

SBR Marketing has knowingly encouraged the infringement of Stevo's content, which emanates from the United States, meaning that the fifth subfactor under this criterion, "[e]xplicit purpose is to harm U.S. commerce,"[9] favors Stevo.

### vi.    *SBR Marketing's Harm To United States Commerce Was Foreseeable To SBR Marketing.*

---

[6] 953 F.2d at 504.
[7] *Id.*
[8] *Id.*
[9] *Id.*

As discussed *supra,* SBR Marketing has continued to incentivize infringement of Stevo's copyrights notwithstanding the fact that SBR Marketing has already been sued by Stevo in Florida state court for tortious interference with contract and misappropriation of trade secrets based on conduct identical to that at issue in this case.  As a result, the sixth subfactor under this criterion, "[f]oreseeability of such effect," favors Stevo.

*vii.*      <u>SBR Marketing's Lanham Act Violations Are Important</u>
<u>Within The United States.</u>

Applying the Ninth Circuit's rationale in *Ocean Garden,* SBR Marketing's violations of the Lanham Act have "importance" to United States commerce.  As was the case in *Ocean Garden,* Stevo is "a U.S. corporation and is hurt by the infringement." 953 F.2d at 504.  This seventh subfactor, "[r]elative importance of violations within the U.S.," thus favors Stevo.  Altogether, given that each of the *Timberlane I* factors and subfactors do favor Stevo, extraterritorial application of the Lanham Act—assuming such application would truly be "extraterritorial" in the first instance—appears under *Ocean Garden* to be entirely appropriate.  This Court's conclusion to the contrary, at which this Court apparently arrived without engaging in a *Timberlane I* analysis, thus appears to be in error.

## IV.   **CONCLUSION**

For the reasons set forth herein, Plaintiffs respectfully request that this Court alter or amend this Court's March 13, 2012 Order, pursuant to Fed.R.Civ.P. 59(e), to reinstate Plaintiffs' claims against Defendants.

Respectfully submitted this sixth day of April, 2012.

DICKINSON WRIGHT PLLC


By   /s/ J.D. Lowry.

STEVEN A. GIBSON
Nevada Bar No. 6656
JODI DONETTA LOWRY
Nevada Bar No. 7798
City Center West
7201 West Lake Mead Boulevard, Suite 503
Las Vegas, Nevada 89128

**CERTIFICATE OF SERVICE**

Pursuant to Local Rule 5-1 of this Court, I certify that I am an employee of Dickinson Wright PLLC and that on this sixth day of April, 2012, I electronically filed the foregoing **PLAINTIFFS' MOTION TO ALTER OR AMEND JUDGMENT** with the Clerk of the Court by using the CM/ECF system:

Gary Jay Kaufman, Esq.
The Kaufman Law Group
1901 Avenue of the Stars, Suite 1010
Los Angeles, California  90067

Chad Bowers, Esq.
Chad A. Bowers, Ltd.
3202 West Charleston Boulevard
Las Vegas, Nevada 89102

*Attorneys for Defendants*

By: /s/ J.D. Lowry. _____
    An employee of Dickinson Wright PLLC