1
2
3
4
5
6

UNITED STATES DISTRICT COURT

7

DISTRICT OF NEVADA

8

* * *

9   STEVO DESIGN, INC., a Florida corporation;
    STEVEN BUDIN, an individual; and ALAN
10  ROLLI, an individual,

    2:11-CV-00304-LRH-CWH

11          Plaintiffs,

    ORDER

12  v.

13  SBR MARKETING LTD., a foreign
    corporation; and BRIAN DANIELE, an
14  individual,

15          Defendants.

16

17      This is a copyright and trademark dispute, for the most part. Before the court is Stevo

18  Design, Inc., Steven Budin, and Alan Rolli's ("Plaintiffs'") motion to alter or amend judgment

19  under Federal Rule of Civil Procedure 59(e) (#49[1]). Defendant SBR Marketing Ltd. ("SBR") has

20  opposed this motion (#50), and Plaintiffs have replied (#51).

21  **I.    Facts and Procedural History**

22      Plaintiff Stevo Design, Inc. ("Stevo") is a Florida corporation with its principal place of

23  business in Florida. Stevo is in the business of selling, on pay-per-view and subscription bases,

24  licenses to access electronically-distributed sports betting reports, including compiled sports

25

26  _____

    [1] Refers to the court's docket number.

1   handicapping information. Plaintiffs Budin and Rolli are Stevo officers, and neither are Nevada

2   residents.

3       Defendant SBR is a foreign corporation with its principal place of business in Costa Rica.

4   SBR operates a website, www.sbrforum.com, which publishes sports betting and handicapping

5   information. SBR also operates a message board allowing users to post messages related to sports

6   betting and handicapping and to send messages to other users.[2] Pro se defendant Brian Daniele, a

7   Virginia resident, is an SBR user.

8       SBR encourages users to frequent its website through the award of "loyalty points." For

9   instance, a user receives two loyalty points for logging on to the website, and a user receives four

10  loyalty points for contributing content to the message board. SBR awards more than four loyalty

11  points for well thought-out "original" content. Users can also give each other loyalty points. These

12  loyalty points may be turned in for "credits" at off-shore gambling websites, and these credits are

13  redeemable for cash as long as they are gambled with first.

14      Plaintiff Stevo originally filed its complaint against SBR on February 24, 2011 (#1). Stevo

15  then amended its complaint to add the individual plaintiffs and defendant Daniele, as well as

16  several claims against Daniele (#7). The first amended complaint asserts sixty-five causes of action

17  against the defendants, including trademark infringement, copyright infringement, and Florida and

18  Nevada state law claims. These claims collectively allege that SBR and its users have published

19  Stevo's protected works on SBR's website without having obtained a license. For example,

20  defendant Daniele is alleged to have purchased sports analysis from Stevo and to have unlawfully

21  posted this analysis on SBR's message board.

22

23      [2] "A 'message board' is a system of online discussion allowing users to 'post' messages.
24  Messages are organized by topic . . . and the system generally allows users to read and reply to
    messages posted by others." *Fair Housing Council of San Fernando Valley v. Roommates.Com, LLC*,
25  521 F.3d 1157, 1163 n.10 (9th Cir. 2008).

26

1        On March 13, 2012, this court dismissed Plaintiffs' amended complaint on the basis of

2   subject matter jurisdiction. (Order #45, p. 4.) Plaintiffs have timely objected to this judgment

3   through a motion to alter or amend under Rule 59(e).

4   **II.   Discussion**

5        Plaintiffs allege that the court erred in dismissing their amended complaint. This allegation

6   stands, principally, on two legs. First, Plaintiffs argue that the court erroneously treated the

7   extraterritorial application of the copyright and trademark laws as jurisdictional in nature. Second,

8   Plaintiffs note that the Clerk of Court entered judgment against all defendants, whereas the court's

9   order only dismissed claims against SBR.

10       Plaintiffs' claims against defendant Daniele should not have been dismissed on the basis of

11  the extraterritorial application of the intellectual property laws. This was manifest error meriting a

12  reconsideration of the judgment under Rule 59(e). On reconsideration, however, Plaintiffs' claims

13  do not warrant a different result. The court properly dismissed Plaintiffs' claims, but for the wrong

14  reasons. Set forth below are the right ones.

15       **A.   Rule 59(e)**

16       A motion to alter or amend judgment under Rule 59(e) is "an extraordinary remedy which

17  should be used sparingly." *McDowell v. Calderon*, 197 F.3d 1235, 1255 n.1 (9th Cir. 1999)

18  (citation and quotation marks omitted). It is available in four "basic" situations: (1) where the

19  motion is necessary to correct "manifest errors of law or fact upon which the judgment rests;" (2)

20  where the motion is necessary to present newly discovered or previously unavailable evidence; (3)

21  where the motion is necessary to "prevent manifest injustice;" and (4) where the amendment is

22  justified by an intervening change in controlling law. *Allstate Insurance Co. v. Herron*, 634 F.3d

23  1101, 1111 (9th Cir. 2011). Since Rule 59(e) does not itself provide standards for granting or

24  denying a motion to alter or amend, "the district court enjoys considerable discretion in granting or

25  denying the motion." *Id*. (citations and quotation marks omitted). Yet the Rule 59(e) motion may

26  not be used to "relitigate old matters, or to raise arguments or present evidence that could have

1   been raised prior to the entry of judgment." 11 Charles Alan Wright et al., *Federal Practice and*

2   *Procedure* § 2810.1 (2d ed. 1995). Finally, amendment of the judgment will be denied if it would

3   serve no useful purpose. *Id.*

4       Plaintiffs' first point of error is the court's treatment of subject matter jurisdiction under the

5   copyright and trademark laws. In the March 13 order, the court observed that "all infringement [by

6   SBR] took place on SBR's website operated entirely from Costa Rica." (Order #45 at p. 3:22-23.)

7   The court also noted, incorrectly, that the amended complaint did not identify an SBR user who

8   "lives in the United States and uploaded [ ] handicap reports." (*Id.* at 3:35.) (In fact, Daniele is one

9   such user. *See* First Amended Complaint ("FAC") #7, ¶¶ 639, 641, 661, 663, 683, 685, 703, 705.)

10  The court concluded that "[n]either the Copyright Act [17 U.S.C. § 101 *et seq.*], nor the Lanham

11  Act [15 U.S.C. § 1051 *et seq.*] cover infringement of copyrights or service marks that occurred

12  entirely outside the United States," and dismissed Plaintiffs' claims against SBR for lack of subject

13  matter jurisdiction under 28 U.S.C. § 1331.[3] (Order #45 at pp. 3-4.)

14      The court's treatment of extraterritoriality as a limit of subject matter jurisdiction rather

15  than as an element of the copyright and trademark claims is not "manifest error" under Rule 59(e).

16  As a court in this Circuit has ruled, "There is currently no clear consensus among the courts

17  regarding whether the issue of the extraterritorial reach of the Copyright Act should be treated as

18  an issue of subject matter jurisdiction, or should instead be treated as an element of a claim."

19  *Shropshire v. Canning*, 809 F. Supp. 2d 1139, 1143 (N.D. Cal. 2011). And Ninth Circuit precedent

20  provides conflicting treatments of extraterritoriality under the Copyright Act. *Compare Peter Starr*

21  *Production Co. v. Twin Continental Films*, 783 F.2d 1440, 1442 (9th Cir. 1986) (treating

22  extraterritoriality as a matter of subject matter jurisdiction) *with Subafilms, Ltd. v. MGM–Pathe*

23  *Communications Co.*, 24 F.3d 1088, 1095 (9th Cir. 1994) (treating extraterritoriality as an element

24  _____

25      [3] Though the court explicitly discussed jurisdiction under § 1331 in its order, the court's
    reasoning is equally applicable to jurisdiction under 28 U.S.C. § 1338(a) (giving federal courts original
26  jurisdiction over copyright and trademark claims).

of the copyright infringement claim). Furthermore, Ninth Circuit courts have explicitly treated the extraterritorial application of the Lanham Act as jurisdictional in nature. *See* 5 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 29:58 (4th ed. 2012) ("The Ninth Circuit has developed an involved and elaborate test of subject matter jurisdiction when infringing acts occur in a foreign nation."); *see also Zenger-Miller, Inc. v. Training Team, GmbH*, 757 F. Supp. 1062, 1069-71 (N.D. Cal. 1991) (treating an extraterritorial Lanham Act claim as exceeding the court's subject matter jurisdiction). Finally, the relationship of subject matter jurisdiction and the extraterritorial application of the Copyright Act and the Lanham Act was fully argued by the parties. (*See* SBR's Motion to Dismiss #26, pp. 8-9; Plaintiffs' Opposition #31, pp. 9-13.) Since Rule 59(e) may not be used to "relitigate old matters," Plaintiffs may not use Rule 59(e) to revisit the proper interpretation of extraterritoriality. *See Exxon Shipping Co. v. Baker*, 554 U.S. 471, 486 n.5 (2008) (quoting Wright et al. § 2810.1).

However, entry of judgment in favor of defendant Daniele was manifest error. In its March 13 order, the court granted defendant SBR's motion to dismiss, but SBR's motion did not address the claims against Daniele. Therefore, when the court dismissed Plaintiffs' complaint, it dismissed it as to defendant SBR but not as to defendant Daniele. The entry of judgment in favor of Daniele had no basis and was therefore erroneous. *See Executive Software North America, Inc. v. United States District Court for Central District of California*, 24 F.3d 1545, 1561 (9th Cir. 1994), *overruled on other grounds by California Department of Water Resources v. Powerex Corp.*, 533 F.3d 1087 (9th Cir. 2008) (holding that the failure to articulate the basis for declining jurisdiction may be clear error).

**B.  Motion to Dismiss under Rule 12(b)(6)**

In light of this error, Rule 59(e) allows the court to reconsider its judgment. Upon reconsideration, the court concludes that while it had the power to hear Plaintiffs' case, it did not have the power to grant Plaintiffs' relief under Federal Rule of Civil Procedure 12(b)(6).

\\\

1

### 1.      Legal Standard

2      To survive a motion to dismiss for failure to state a claim, a complaint must satisfy the

3 Federal Rule of Civil Procedure 8(a)(2) notice pleading standard. *See Mendiondo v. Centinela*

4 *Hospital Medical Center*, 521 F.3d 1097, 1103 (9th Cir. 2008). A complaint must contain "a short

5 and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P.

6 8(a)(2). The Rule 8(a)(2) pleading standard does not require detailed factual allegations; however,

7 a pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a

8 cause of action" will not suffice. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic*

9 *Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

10      Furthermore, Rule 8(a)(2) requires a complaint to "contain sufficient factual matter,

11 accepted as true, to state a claim to relief that is plausible on its face." *Id.* (internal quotation marks

12 omitted). A claim has facial plausibility when the pleaded factual content allows the court to draw

13 the reasonable inference, based on the court's judicial experience and common sense, that the

14 defendant is liable for the misconduct alleged. *See id.* at 678-79. "The plausibility standard is not

15 akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has

16 acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's

17 liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* at

18 678 (internal quotation marks and citation omitted).

19      In reviewing a motion to dismiss, the court accepts the facts alleged in the complaint as

20 true. *Id.* (citation omitted). However, "bare assertions . . . amount[ing] to nothing more than a

21 formulaic recitation of the elements of a . . . claim . . . are not entitled to an assumption of truth."

22 *Moss v. United States Secret Service*, 572 F.3d 962, 969 (9th Cir. 2009) (quoting *Iqbal*, 556 U.S. at

23 680) (alteration in original) (internal quotation marks omitted). The court discounts these

24 allegations because they do "nothing more than state a legal conclusion – even if that conclusion is

25 cast in the form of a factual allegation." *Id.* "In sum, for a complaint to survive a motion to dismiss,

26

1   the non-conclusory 'factual content,' and reasonable inferences from that content, must be

2   plausibly suggestive of a claim entitling the plaintiff to relief." *Id.* (quoting *Iqbal*, 556 U.S. at 678).

3   **2.      Copyright Infringement Claims against SBR**

4       Subsequent to the parties' arguments on the motion to dismiss, a non-controlling decision in

5   this Circuit raised persuasive reasons for treating extraterritoriality as an element of the copyright

6   claim (rather than as a feature of subject matter jurisdiction). Thus, while the court did not commit

7   "manifest error" in treating the extraterritorial application of the Copyright Act as jurisdictional,

8   this persuasive authority warrants reconsideration of the court's subject matter jurisdiction over

9   Plaintiffs' copyright claims.

10      The Copyright Act has only limited extraterritorial reach. *Litecubes, LLC v. Northern Light*

11  *Products, Inc.*, 523 F.3d 1353, 1368 (Fed. Cir. 2008). But does this limitation prevent a court from

12  hearing extraterritorial cases or does it prevent a court from granting relief in these cases? The

13  answer is important because a court's ability to hear a case can never be waived, a court may

14  evaluate contested facts with respect to this ability, and this ability brings with it the discretion to

15  exercise supplemental jurisdiction. *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 524 (2006).

16      In *Shropshire*, the district court concluded that the extraterritorial application of the

17  Copyright Act is more properly considered an element of the infringement claim rather than a

18  question of subject matter jurisdiction–the court's ability to hear a case. 809 F. Supp. 2d at 1144.

19  The Supreme Court in *Arbaugh* articulated a "readily adminstrable bright line rule": "If the

20  Legislature clearly states that a threshold limitation on a statute's scope shall count as

21  jurisdictional, then courts and litigants will be duly instructed. . . . But when Congress does not

22  rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as non-

23  jurisdictional in character." 546 U.S. at 516. Since Congress has not indicated that the

24  extraterritorial restrictions on the scope of the Copyright Act limit a federal court's subject matter

25  jurisdiction, "*Arbaugh* requires extraterritoriality to be decided as an element of a claim for

26  copyright infringement rather than an issue of subject matter jurisdiction." *Shropshire*, 809 F.

1  Supp. 2d at 1144.[4]

2  However, while this court has subject matter jurisdiction to decide Plaintiffs' copyright

3  claims, Plaintiffs' inconsistent copyright ownership assertions have failed to allege facts sufficient

4  to state a claim.[5] "[A] complaint . . . must contain either direct or inferential allegations respecting

5  all the material elements necessary to sustain recovery under some viable legal theory." *See*

6  *Twombly*, 550 U.S. at 562. In the copyright context, these material elements include ownership of

7  the valid copyright and a showing that the defendant infringed the owner's exclusive rights. *Ellison*

8  *v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004).

9  Here, Plaintiffs allege both that Stevo owns the rights that have been infringed and that

10  Stevo's websites own those rights. (*Compare, e.g.* FAC #7 at ¶ 26 (the websites own the rights)

11  *with* ¶ 630 (Stevo owns the rights).[6]) A parent may not assert the intellectual property rights of its

12  subsidiary in a copyright infringement action. *See Lanard Toys Ltd. v. Novelty Inc.*, 511 F. Supp.

13  2d 1020, 1033 (C.D. Cal. 2007). Therefore, these allegations create a material inconsistency with

14  respect to the element of ownership. And inconsistent language in the pleadings relating to a

15  material element of a claim "fail[s] to state a plausible claim for relief as required to survive a

16  12(b)(6) motion." *Velazquez v. Arrow Financial Services LLC*, 2009 WL 2780372 at *2 (S.D. Cal.

17

18      [4] As noted in the discussion of the Lanham Act claims, below, Plaintiffs would likely succeed
19  in showing that their copyright claims are within the reach of the Copyright Act.

20      [5] This issue was briefed and argued prior to the court's order dismissing Plaintiffs' claims.

21      [6] Stevo customers don't go to Stevo itself to purchase handicapping reports. Instead, they visit
22  Stevo's many websites. When they purchase a report from one of these websites, they agree to a "User
    Contract." Under this contract, "*this website* is and shall remain the owner of all . . . copyrightable
23  material." (FAC #7 at Ex. 1, ¶ 4 (emphasis added).) The court may properly construe this contract in
    relation to the motion to dismiss. *See Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d
24  1542, 1555 n. 19 (9th Cir. 1990). (Indeed, calling Plaintiffs' allegations of ownership "inconsistent"
    is generous, since, "when a written instrument contradicts allegations in a complaint to which it is
25  attached, the exhibit trumps the allegations." *Thompson v. Illinois Department of Professional
    Regulation*, 300 F.3d 750, 754 (7th Cir. 2002). Under the *Thompson* rule, Plaintiffs may have pleaded
26  that they are *not* the owners of the copyrights at issue.)

8

Aug. 31, 2009) (quoting *Iqbal*, 556 U.S. at 679). Since Plaintiffs have not plausibly pleaded the

ownership element, Plaintiffs have failed to state a claim for which relief may be granted.

### 3.   Trademark Infringement Claims against SBR

Plaintiffs have alleged trademark infringement against SBR under 15 U.S.C. § 1114(1),

false designation of origin under 15 U.S.C. § 1125(a), and dilution under 15 U.S.C. § 1125(c). SBR

argues that the court lacks subject matter jurisdiction to hear extraterritorial trademark

infringement claims or, alternatively, that the trademark doctrines of first sale and nominative fair

use deprive Plaintiffs of their claims. The marks at issue are the proper names of Stevo's

handicapping analysts. Five of these marks are registered with the United States Patent and

Trademark Office, and seventeen are not. (FAC #7 at ¶¶ 22, 23.)

   a.   The legal standard for Plaintiffs' trademark claims.

To prevail on a claim of trademark infringement under the Lanham Act, the owner of a

federally registered mark must show that the defendant used the mark in interstate commerce in

connection with the "sale, offering for sale, distribution, or advertising of any goods or services,"

and that such use is likely to cause consumer confusion. 15 U.S.C. § 1114(1); *see also Network

Automation, Inc. v. Advanced Systems Concepts, Inc.*, 638 F.3d 1137, 1144-45 (9th Cir. 2011).

Similar elements inhere in claims under 15 U.S.C. 1125(a) for false designation of origin. *See New

West Corp. v. NYM Co. of California, Inc.*, 595 F.2d 1194, 1201 (9th Cir. 1979). "Whether we call

the violation infringement, unfair competition or false designation of origin, the test is identical: is

there a 'likelihood of confusion?'" *Id.*

Dilution, on the other hand, is not confusion. *Visa International Service Association v. JSL

Corp.*, 610 F.3d 1088, 1090 (9th Cir. 2010). Dilution is a cause of action "invented and reserved

for a select class of marks—those marks with such powerful consumer associations that even

non-competing uses can impinge on their value." *Avery Dennison Corp. v. Sumpton*, 189 F.3d 868,

875 (9th Cir. 1999) (citation omitted). The dilution claims require the plaintiff to show that its

mark is famous and distinctive, that the defendant began using its mark in commerce after the

1    plaintiff's mark became famous and distinctive, and that the defendant's mark is likely to dilute the

2    plaintiff's mark. *Visa International Service Association v. JSL Corp.*, 610 F.3d 1088, 1090 (9th

3    Cir. 2010). To prove dilution by blurring, the plaintiff must show that the association between the

4    plaintiff's mark and the defendant's mark "weakens the mark's ability to evoke the first product in

5    the minds of consumers." *Id.* Dilution by tarnishment occurs where the plaintiff's mark is linked

6    with "something unsavory or degrading." *Toho Co., Ltd. v. Sears, Roebuck & Co.*, 645 F.2d 788,

7    793 (9th Cir. 1981) (interpreting California's antidilution statute). The latter category includes

8    things like X-rated movies, adult content web sites, crude humor, and illegal drugs. 4 McCarthy,

9    *supra*, § 24:89.

10                          b.      Extraterritorial application of the Lanham Act.

11            SBR's first objection to Plaintiffs' Lanham Act claims is that the Lanham Act does not

12   apply to extraterritorial infringement. The extraterritorial reach of the Lanham Act is "considerably

13   broader than that of the patent and copyright laws." 5 McCarthy, *supra*, § 28:57. But even in the

14   copyright context, when "the point of origin of the communication is outside the U.S., but the

15   actual or intended recipients of the [infringing acts] . . . are located in the U.S., courts have readily

16   found that an act of infringement, to which U.S. law applied, takes place in the U.S." Jane C.

17   Ginsburg & Robert A. Gorman, *Copyright Law* 234 (2012). Similarly, "[t]he use of an infringing

18   mark as part of an Internet site available for use in the United States may constitute an

19   infringement of the mark in the United States." 5 McCarthy, *supra*, § 29:56. In *Playboy*

20   *Enterprises, Inc. v. Chuckleberry Publishing, Inc.*, 939 F. Supp. 1032 (S.D.N.Y. 1996), for

21   example, the court found that an Italian website that "actively solicited [U.S.] customers to its

22   Internet site" was an infringer within the United States.

23            Here, SBR's alleged infringement took place in the United States. SBR's U.S.-centric

24   content–English-language analysis of American professional and collegiate sports–supports the

25   notion that the SBR website's "intended audience" was United States consumers. In addition, the

26   complaint successfully alleges that at least one member of SBR's "actual audience," Daniele,

accessed the SBR website from Virginia. Therefore, whether Lanham Act extraterritoriality is an

issue of subject matter jurisdiction or an element of the Lanham Act claim, Plaintiffs have shown

that SBR's alleged infringement lies within the reach of the Lanham Act.

       c.  The first sale rule for trademarks.

   SBR's second objection falls under the "first sale" rule. Under this rule, "the right of a

producer to control distribution of its trademarked product does not extend beyond the first sale of

the product." *Sebastian International, Inc. v. Longs Drugs Stores Corp.*, 53 F.3d 1073, 1074 (9th

Cir. 1995). Therefore, a reseller of branded goods–who does not materially change the goods–is not

a trademark infringer. *See id.*; *see also Softman Products Co., LLC v. Adobe Systems, Inc.*, 171 F.

Supp. 2d 1075, 1092 (C.D. Cal. 2001) ("The first sale doctrine does not apply, however, when an

alleged infringer sells trademarked goods that are materially different than those sold by the

trademark owner."). The same goes for service marks, at least where the service can be sold and

resold without change to its "nature, quality, and genuineness." *See Tumblebus Inc. v. Cranmer*,

399 F.3d 754, 766 (6th Cir. 2005) (explaining how service marks differ from marks on goods with

respect to the first sale doctrine). The rationale for the rule is that "trademark law is designed to

prevent sellers from confusing or deceiving consumers about the origin or make of a product,

which confusion ordinarily does not exist when a genuine article bearing a true mark is sold." *NEC

Electonics v. CAL Circuit Abco*, 810 F.2d 1506, 1509 (9th Cir. 1987). Given the first sale

doctrine's relationship to the likelihood of confusion, it is appropriate to raise the doctrine in a

Rule 12(b)(6) motion to dismiss. *See Enesco Corp. v. Price/Costco Inc.*, 146 F.3d 1083, 1085 (9th

Cir. 1998) (reviewing, without objection, a district court's dismissal under Rule 12(b)(6) pursuant

to the first sale doctrine).

   The first sale doctrine applies to Stevo's handicapping reports. Stevo's marks are the proper

names of its sports analysts, and the service Stevo sells with these marks is "sports analysis."

Drawing all inferences in Plaintiffs' favor, SBR users bought trademarked sports analysis from

Stevo and then resold it (or gave it away) on SBR's message board. SBR users usually repeated the

analysis verbatim. Thus, the complaint identifies predicate acts of infringement in which SBR users resold a lawfully acquired trademarked service without material alteration. The first sale doctrine teaches that such acts are not infringement at all.

Plaintiffs respond that SBR, by publishing the allegedly infringing posts, created initial interest confusion as to the legitimate source of the handicapping reports. Thus, Plaintiffs seek an exception to the first sale doctrine for resellers who "used the trademark in a manner likely to cause the public to believe the reseller was part of the producer's authorized sales force or one of its franchises." *Sebastian International, Inc.*, 53 F.3d at 1076. The charge of initial interest confusion is based on Google search results: a search for Stevo's marks plus the word "picks" (i.e., "Steve Budin picks") returns results in which SBR's website is ranked higher than any of Stevo's.

The exception to the first sale doctrine requires more than this. In *Bandag, Inc. v. Al Boster's Tire Stores*, 750 F.2d 911 (Fed. Cir. 1984), the reseller used the producer's mark in a phone book ad to suggest that the reseller was an authorized franchisee. The court found that this conduct created the false impression that the reseller was an authorized dealer. 750 F.2d at 916. In *Bernina of America, Inc. v. Fashion Fabrics International, Inc.*, 2001 WL 128164 (N.D. Ill. Feb 9, 2001), the court concluded that the reseller misrepresented itself as an authorized dealer when the reseller "[held] itself out to the public to be abreast of the latest news regarding [the trademark owner]." On the other hand, when a website included comments critical of the mark owner, a court has found confusion as to authorization or sponsorship "incredible." *Patmont Motor Werks, Inc. v. Gateway Marine, Inc.*, 1997 WL 811770, *4 (N.D. Cal. Dec. 18, 1997).

Here, the complaint cannot be read to allege that SBR used Stevo's marks in any ads or that SBR held itself out as knowledgeable as to Stevo's workings.[7] Moreover, Plaintiffs' complaint

---

[7] One of Plaintiffs' complaint's1,084 paragraphs alleges that SBR advertises that its visitors can obtain pay-per-view sports analysis for free. (FAC #7 at ¶ 56.) Not only is this allegation without any factual support, it also does not create the type of confusion needed to merit the exception to the first sale rule. Consumers would need to believe that a Stevo-authorized retailer provided for free what Stevo itself charged for. In context, therefore, it is implausible that such advertisements create the

1   identifies comments critical of Stevo's analysts on the SBR message board. (FAC #7, ¶¶ 189-93.)

2   Nor do Plaintiffs allege SBR manipulated Google's search results. For instance, Plaintiffs do not

3   allege that SBR purchased search engine keywords incorporating Stevo's marks, or that SBR used

4   website metadata incorporating Stevo's marks–conduct at the heart of initial interest confusion on

5   the internet. *See Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d

6   1036, 1065 (9th Cir. 1999) (discussing how use of metadata can create initial interest confusion);

7   *Playboy Enterprises, Inc. v. Netscape Communications Corp.*, 354 F.3d 1020, 69 U.S.P.Q.2d 1417

8   (9th Cir. 2004) (discussing how the purchase of trademarked keywords can create initial interest

9   confusion). In short, Plaintiffs have alleged nothing to show that SBR created the type of confusion

10   needed to defeat application of the first sale doctrine.

11                    d.       The nominative fair use doctrine.

12          SBR's third objection to Plaintiffs' trademark claims is the nominative fair use doctrine.

13   This doctrine divides trademark "use" from trademark "mention."[8] To use a mark as a mark–a

14   "trademark use"–the defendant must attempt to identify the source of the mark with the defendant

15   itself. See *Rescuecom Corp. v. Google Inc.*, 562 F.3d 123, 128-31 (2d Cir. 2009) (contrasting

16   trademark use with "use in commerce"). "Trademark mention" is any other use of a mark; it is "to

17   refer to a particular product for purposes of comparison, criticism, point of reference or any other

18   such purpose." *New Kids on the Block v. News America Publishing, Inc.*, 971 F.2d 302, 306 (9th

19   Cir. 1992). In a terminological infelicity common to this area of the law, nominative fair use

20   denotes trademark mention.

21          The Ninth Circuit identified three factors in attempting to carve out trademark mention

22

23   ─────────────────────────

24   impression that SBR is an authorized retailer of Stevo's services. *See Electronic Arts, Inc.*, 2012 WL
     3042668, at *5 (quoting *Louis Vuitton Mallatier S.A. v. Warner Bros. Entertainment Inc.*, 2012 WL

25   2248593, at *8 (S.D.N.Y. Jun.15, 2012)).

26          [8] In other words, the nominative fair use doctrine is an application of the use/mention
     distinction. *See* W.V.O. Quine, *Mathematical Logic* § 4 (1940).

from trademark use. First, the product or service in question must not be readily identifiable

without the trademark. Second, the mark may only be used to identify the product or service. And

third, the mark user must do nothing to imply "sponsorship or endorsement" by the trademark

holder. *See New Kids on the Block*, 971 F.2d at 308.

Courts are conflicted as to whether nominative fair use is an affirmative defense,

inappropriate for resolution at the motion to dismiss stage, or a defect of the pleadings. *Compare

Health Grades, Inc. v. Robert Wood Johnson University Hospital, Inc.*, 634 F. Supp. 2d 1226, 1242

(D. Colo. 2009) (holding that nominative fair use involves questions of fact whose resolution is

inappropriate on a motion to dismiss) *with Elecronic Arts, Inc. v. Textron Inc.*, 2012 WL 3042668,

at *5 (N.D. Cal. July 25, 2012) (holding that determining nominative fair use at the motion to

dismiss stage is appropriate if the pleadings show it is "implausible that a viewer will be

confused"). However, the Ninth Circuit–progenitor of nominative fair use–"did not intend [it] to

constitute an affirmative defense." 6 McCarthy, *supra*, § 31:156.50; *see also Cairns v. Franklin

Mint Co.*, 292 F.3d 1139, 1150 (9th Cir. 2002) (holding that the nominative fair use factors replace

the traditional *Sleekcraft* factors for likelihood of confusion where nominative fair use is at issue).

Instead, "nominative fair use" names a use of the mark that is not likely to confuse. Therefore, if

the pleadings fail to allege a mark use beyond nominative fair use, then the plaintiff has failed to

allege likelihood of confusion. That is, the plaintiff has failed to state a claim for which relief may

be granted. *See KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 125

(2004) (noting that plaintiffs carry the burden on likelihood of confusion).

Here, Plaintiffs have failed to allege anything beyond SBR's nominative fair use of their

marks. First, the marks at issue are the proper names of the handicapping analysts. It would be

difficult (if not impossible) to identify Stevo's sports analysis services without using these marks,

especially since the quality of the analyst bears directly on the quality of the analysis (and

conveying information about quality is one of a trademark's functions). Second, as alleged in the

complaint, when the marks appeared on SBR's website, they only identified Stevo's services. For

example, one SBR user identified as "Pin Fish" posted handicapping reports under the subject line

"redd, jordan, davis, nover, o'brien, mancini???" (FAC #7 at ¶ 80.) The subject line identifies

Plaintiffs' analysts Redd, Jordan, Davis, Nover, O'Brien, and Mancini, and the body of the posting

contained these analysts' reports. Third, the criticism of Stevo's analysts on the message board

greatly reduces the likelihood that a visitor to SBR's message board would infer Plaintiffs'

"sponsorship or endorsement" of SBR users' postings. (FAC #7 at ¶¶ 189-93.) Finally, the various

screen names under which Stevo's reports were posted–"Pin Fish," "PepperMillRick,"

"goldengreek," etc.–do not suggest to a visitor that either the posting user or SBR itself is the

ultimate source of the report.

        As with the first sale doctrine, Plaintiffs argue that SBR created initial interest confusion by

publishing Stevo's marks and, therefore, the doctrine of nominative fair use is not applicable. The

court has already addressed the lack of initial interest confusion in the first sale context, above. The

cases decided under the nominative fair use doctrine similarly require more indicia of endorsement

than Plaintiffs have alleged. In *Abdul-Jabar v. General Motors Corp.*, 85 F.3d 407 (9th Cir. 1996),

for example, the "commercial custom" of celebrity endorsements in television commercials created

an issue of fact as to whether the defendant's commercial implied the celebrity plaintiff's

endorsement of its product. In *Downing v. Abercrombie & Fitch*, 265 F.3d 994 (9th Cir. 2001),

another celebrity endorsement case, the court found an issue of fact with respect to endorsement

when the mark was used to describe the defendant's product rather than the plaintiff's. Here,

however, there is no "custom" of sports analysts endorsing SBR's message boards. *See Abdul-

Jabar*, 85 F.3d at 413. Nor did SBR's users (or SBR itself) use Stevo's marks to describe their own

products or services rather than Stevo's. *See Downing*, 265 F.3d at 1009. Therefore, the doctrine of

nominative fair use operates to deprive Plaintiffs of their trademark claims.

                        e.      Dilution and contributory infringement.

        The first sale and nominative fair use doctrines bar Plaintiffs' dilution and contributory

trademark infringement claims. For the dilution claims, the bar is straightforward. *See* 15 U.S.C.

1125(c) (providing that nominative fair use is not actionable as dilution by blurring or

tarnishment). And since Plaintiffs have not successfully alleged any predicate acts of trademark

infringement by SBR users, SBR may not be liable for contributory infringement. *See Perfect 10,*

*Inc. v. Visa International Service Association*, 494 F.3d 788, 807 (9th Cir. 2007) (quoting *Inwood*

*Labs., Inc. v. Ives Labs., Inc.,* 456 U.S. 844, 855 (1982)) (holding that contributory trademark

infringement requires some predicate act of infringement).

### 4.    State Law Claims against SBR

Plaintiffs allege several Florida state claims against SBR. These claims are for

misappropriation of trade secrets, misappropriation of licensable commercial property, civil theft,

and tortious interference with contractual relations. SBR responds that it is immunized against

these state claims by the Communications Decency Act ("CDA"), 47 U.S.C. § 230(c).

Under the CDA, "[n]o provider or user of an interactive computer service shall be treated as

the publisher or speaker of any information provided by another information content provider." 47

U.S.C. §230(c)(1). An "interactive computer service" is "any information service . . . that provides

or enables computer access by multiple users to a computer server." 47 U.S.C. § 230(f)(2). Today,

the most common interactive service providers are websites. *Fair Housing Council of San*

*Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1162 n.6 (9th Cir. 2008). However, the

immunity provided by the CDA does not extend to "any law pertaining to intellectual property." 47

U.S.C. § 230(e)(2). (In this Circuit's interpretation of this provision, "'intellectual property . . .

mean[s] 'federal intellectual property.'" *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1119 (9th

Cir. 2007). *But see Atlantic Recording Corp. v. Project Playlist, Inc.*, 603 F. Supp. 2d 690, 703

(S.D.N.Y. 2009) (including state intellectual property laws within § 230(e)(2)'s mention of

"intellectual property").) Nor does CDA immunity extend to a website that is responsible "in whole

or in part for the creation or development of information provided through the internet." 47 U.S.C.

§ 230(f)(3).

In *Roommates.com*, the Ninth Circuit considered the CDA immunity of a roommate-

matching website ("Roommate") that required users to answer questions about age, race, sexual

orientation, and other topics before suggesting matches. The answers to these questions formed

part of a user's website profile. Users were also "encouraged" to add open-ended "Additional

Comments." 521 F.3d at 1161. The court found that Roommate qualified as an interactive

computer service–and therefore for immunity–for the purposes of the Additional Comments

section, but not for the purposes of its questions. *Id*. at pp. 1164-65, 1173-75. The former merited

immunity because the website did not "provide any specific guidance as to what the [comments]

should contain, nor did it encourage [unlawful comments]." *Id*. at 1173-74. The content of the

"Additional Comments" came "entirely from subscribers and is passively displayed by

Roommate." *Id*. at 1174. In contrast, the Roommate formulated the questions itself and it required

users to answer these questions in order to use its roommate-matching service. *Id*. at 1165. The

questions contributed "materially to the alleged illegality of the conduct"–there, discriminatory

housing practices. *See id*. at 1168 (describing how Roommate's search system contributed to

potential violations of the Fair Housing Act). Thus, the court held that Roommate's questions fell

outside the scope of an interactive computer service and, consequently, outside section 230's

immunity.

SBR's message board is closer to Roommate's Additional Comments section than to the

required questions. Congress intended the CDA's grant of immunity to overrule a state court case

holding a website "responsible for a libelous message posted on one of its financial message

boards." *Id*. at 1163. Thus, "passive" message boards with only occasional curation by message

board moderators warrant immunity under section 230. *See, e.g.*, *Carafano v. Metrosplash.com,*

*Inc.*, 339 F.3d 1119, 1124 (9th Cir. 2003) (discussing a dating website profile). On the other hand,

websites with a hand in the "development" of the online content do not warrant immunity. In the

internet context, development means "the process of researching, writing, gathering, organizing,

and editing information for publication on web sites." *Roommates.com*, 521 F.3d at 1168 (quoting

from Wikipedia).

1    The question is then whether SBR's practice of awarding loyalty points for posts makes
2    SBR a "developer" under the CDA. By the *Roommates.com* definition, it does not. First, though
3    SBR encourages users to visit and interact with the site through its loyalty points system, its
4    encouragement is not specifically directed at illegal publications (as were the questions in
5    *Roommates.com*). Second, the fact that SBR users may contribute loyalty points to each other
6    further attenuates SBR's information-creating role: "[w]ithout reviewing every [user award of
7    loyalty points], [SBR] would have no way to distinguish unlawful [encouragement] from perfectly
8    legitimate [encouragement]." *Id*. at 1174. Yet the CDA was intended to relieve passive websites of
9    the burden of reviewing all website-user activity. *Id*. at 1163. Third, SBR's policy favoring original
10   content also distinguishes SBR from a developer. *See id*. at 1171 (noting that, in *Carafano*,
11   evidence of the website's "express policies" against unlawful postings was probative as to whether
12   the website was a developer of unlawful content under the CDA). Finally, SBR's "sporadic"
13   attempts to eliminate infringing content are precisely the type of thing that the CDA promotes.
14   "Congress sought to spare interactive computer services [the choice between editing all postings or
15   editing none] by allowing them to perform some editing on user-generated content without thereby
16   becoming liable for all defamatory or otherwise unlawful messages that they didn't edit or delete."
17   *Id*. at 1163. Therefore, SBR is not a "developer" of user-generated content under the CDA, and
18   SBR is eligible for immunity.

19       Unfortunately, this does not conclude the inquiry. Immunity under section 230 applies only
20   to the treatment of a website as a "publisher or speaker" of user-generated content. Of course, not
21   all causes of action require publishing or speaking to establish liability, and therefore the court
22   must interrogate Plaintiffs' state causes of action as to whether they require an element of
23   publishing or speaking. "To put it another way, courts must ask whether the duty that the plaintiff
24   alleges the defendant violated derives from the defendant's status or conduct as a 'publisher or
25   speaker.' If it does, section 230(c)(1) precludes liability." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096,
26   1102 (9th Cir. 2009). Yet the court must also be mindful of attempts to plead around the publishing

or speaking element: "what matters is not the name of the cause of action . . . [but] whether the cause of action inherently requires the court to treat the defendant as the 'publisher or speaker' of content provided by another." *Id*. at 1102-03.

Plaintiffs' first state cause of action is for misappropriation of trade secrets under Florida law.[9] *See* Fla. Stat. § 688.001 *et seq*. "Misappropriation" is defined as either "acquisition" of a trade secret by improper means or "disclosure" of a trade secret without permission. Fla. Stat. § 688.002(2). Construing Plaintiffs' cause of action liberally, it states a claim under both the acquisition and disclosure prongs. The claim under the disclosure prong clearly contemplates disclosure through the SBR users' posts. This is "publish[ing] or speak[ing]" under the CDA, and therefore SBR is immunized from the disclosure claim. The acquisition claim presents a closer question, yet the complaint alleges no facts from which the court may infer that SBR acquired Plaintiffs' trade secrets other than through users' posts to SBR's message board. Since SBR's publication of users' posts is the means of "acquisition" under this theory of recovery, and since SBR is immune from liability for publication under the CDA, this claim, too, must fail.

Plaintiff's second state cause of action alleges "misappropriation of licensable commercial property" under Florida common law. The cause of action merits quotation marks because it is not clear that it is a cause of action in Florida at all.[10] As used in the complaint, misappropriation is

---

[9] SBR objects that a Nevada forum is not the proper place to adjudicate Florida law. Plaintiffs respond that a Nevada court can apply Florida law if it wants to. Neither has it right. When exercising diversity jurisdiction, this court is bound to apply the law of the forum state–here, Nevada. *See Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 78 (1938). This includes Nevada's choice of law rules. *Patton v. Cox*, 276 F.3d 493, 495 (9th Cir. 2002). The court assumes, without deciding, that Nevada's choice of law rules would require application of Florida law to Plaintiffs' state law claims against SBR.

[10] Florida has a "commercial misappropriation" statute preventing the unauthorized use of "the name, portrait, photography, or other likeness of any natural person without . . . consent." Fla. Stat. § 540.08. But this cause of action requires Plaintiffs to allege that they are "authorized in writing" to use the names of natural persons. Fla. Stat. § 540.08(1)(b). This, Plaintiffs have not done. Florida also appears to recognize a common law action for "idea misappropriation," but it requires a showing of confidentiality and novelty–qualities not at issue here. *See Garrido v. Burger King Corp.*, 558 So. 2d

19

"[t]he common law tort of using the noncopyrightable information or ideas that an organization collects and disseminates for a profit to compete unfairly against that organization, or copying a work whose creator has not yet claimed or been granted exclusive rights in the work." MISAPPROPRIATION, Black's Law Dictionary (9th ed. 2009). The elements of this tort are that (1) the plaintiff must have invested time, money, or effort to "extract" the information, (2) the defendant must have appropriated the information without a similar investment, and (3) the plaintiff "must have suffered a competitive injury because of the taking." *Id*.[11] Even assuming Florida recognizes this tort (or something similar), however, Plaintiffs' claim falters at the third element. The competitive injury contemplated by this cause of action–that SBR gave away for free what Plaintiffs charged for–is impossible without characterizing SBR as a publisher or speaker. SBR cannot give away that which it cannot disclose. Therefore, SBR is immunized as to this claim.

Plaintiffs' third state law claim is similar to the second: contributory misappropriation of licensable commercial property. But this claim is trickier:[12] it does not require that SBR speak or publish, merely that SBR induced others to speak or publish. Under this theory of recovery, a plaintiff could allege that the website induced others to publish the offending content (rather than published it itself). Such a theory threatens to swallow CDA immunity. As outlined above, SBR generally encouraged users to post on its message board, but it did not tell users "what kind of information they should or must include" and it did not "encourage or enhance" any infringing content. *Roommates.com*, 521 F.3d at 1174. "Such weak encouragement cannot strip a website of its section 230 immunity, lest that immunity be rendered meaningless as a practical matter." *Id*. Therefore, SBR must be immunized as to this claim as well.

---

79, 83 (Fla. Dist. Ct. App. 1990).

[11] Plaintiffs have carefully alleged each element as outlined in the Black's Law definition; therefore, Plaintiffs likely intended to allege this cause of action.

[12] Again, to the extent it is recognized under Florida common law.

20

Plaintiffs' fourth state law claim is civil theft under Florida law. Fla. Stat. § 772.11. Florida's section 722.11 provides a civil remedy for theft, defined as obtaining or using the property of another with intent to appropriate the property to his or her unauthorized use.[13] *See* Fla. Stat. § 812.014(1). Yet only the only plausible mechanism of SBR's "procuring" or "using" Plaintiffs' property is through publication. Since this cause of action derives from SBR's "status or conduct" as a publisher, SBR is immunized against it. *Barnes*, 570 F.3d at 1102.

Plaintiffs' fifth and final state law claim is tortious interference with contractual relations under Florida common law. The elements of this claim are "(1) an advantageous (2) business relationship (3) under which plaintiff has legal rights, plus (4) an intentional and (5) unjustified (6) interference with that relationship (7) by the defendant which (8) causes (9) a breach of that business relationship and (10) consequential damages." *Heavener, Ogier Services, Inc. v. R. W. Florida Region, Inc.*, 418 So. 2d 1074, 1076 (Fla. Dist. Ct. App. 1982). There are at least two problems with this claim. First, while Plaintiffs have alleged that SBR knew about specific contracts its users had with Stevo, nothing in the complaint raises this allegation above the "speculative level." *Twombly*, 550 U.S. at 555. Second, and more importantly, the only interference that the court may plausibly infer involves SBR's publication of Stevo's sports analysis. But then this cause of action depends on SBR's status as publisher as well.

### C.   The Lack of Personal Jurisdiction over Defendant Daniele

Defendant Daniele has objected that the court lacks personal jurisdiction over the claims against him. (Daniele's Answer #12, ¶ 12.) Taking every allegation in the complaint as true, Plaintiffs have failed to allege facts sufficient to establish jurisdiction.

Where a defendant challenges the exercise of personal jurisdiction, the plaintiff bears the burden of demonstrating that the court has jurisdiction over the defendant. *Schwarzenegger v. Fred*

---

[13] This section also requires a written demand be made on SBR prior to the filing of a civil action.

21

*Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004). Whether a court has jurisdiction over a non-resident defendant depends on the "nature and quality" of the defendant's contacts with the forum state. William Schwarzer et al., *California Practice Guide: Federal Civil Procedure before Trial* § 3:101 (2011). When these contacts are "substantial, continuous, and systematic," the court may exercise jurisdiction over the defendant to the extent consistent with state law. *See Perkins v. Benguet Consolidated Mining Co.*, 342 U.S. 437, 445 (1952). When these contacts are less substantial, the court may still exercise jurisdiction over the defendant on claims relating to his contacts with the forum state. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476-78 (1985); *Schwarzenegger*, 374 F.3d at 802. In the latter case, the defendant must have purposefully directed his activities toward the forum state, the claim must have arisen out of these activities, and the exercise of jurisdiction must be reasonable. *Schwarzenegger*, 374 F.3d at 802.

Here Plaintiffs have not established the court's jurisdiction over Daniele. Plaintiffs assert three distinct bases of jurisdiction: that SBR paid Daniele to publish infringing material on SBR's message board, that Daniele's publications relate to the "sports wagering" industry in Nevada, and that Daniele's publications were accessible in Nevada through the internet. Even accepting these assertions as true, these are not the type of contacts that give rise to personal jurisdiction. *See id*. at 800 (noting that, in circumstances like these, the plaintiff need only make a *prima facie* showing through its pleadings and affidavits that the exercise of personal jurisdiction over the defendant is proper).

First, it is beyond cavil that Daniele's alleged contacts with Nevada are not "substantial, continuous, and systematic." Second, Daniele's status as SBR's paid agent does not establish jurisdiction over him. While an agent's contacts may be imputed to the principal for purposes of personal jurisdiction, the converse is not true. *See Ochoa v. J.B. Martin & Sons Farms, Inc.*, 287 F.3d 1182, 1189 (9th Cir. 2002) (imputing an agent's contacts to the principal); *Holland America Line, Inc. v. Wärtsilä North America, Inc.*, 485 F.3d 450, 459 (9th Cir. 2007) (holding that a parent

1    corporation's contacts may not be imputed to its subsidiary). Plaintiffs' attempts to impute SBR's

2    contacts to Daniele must therefore fail.

3           Third, the fact that Daniele's publications related to sports wagering does not establish

4    jurisdictional contacts with Nevada. Plaintiffs urge that the publications were directed at Nevada

5    since the publications discussed sports wagering and since sports wagering is only legal in Nevada

6    (within the United States). But merely discussing sports betting on an online message board does

7    not provide the discussant with a "reasonabl[e] anticipat[ion]" of being haled into Nevada courts.

8    *See World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). Furthermore, if

9    advertising alone is not sufficient to support jurisdiction in these circumstances–and it is not, *see*

10   *Cybersell, Inc. v. Cybersell, Inc.*, 130 F.3d 414, 420 (9th Cir. 1997)–then simple publication must

11   not be, either.

12          Finally, the fact that Daniele's postings were available over the internet in Nevada is not

13   enough to establish purposeful direction toward the Nevada forum. This is especially true where, as

14   here, the alleged victims of the postings are not residents of the forum state. *See Cybersell*, 130

15   F.3d at 417 (holding that posting an infringing trademark on a web site is not sufficient to

16   demonstrate purposeful availment); *Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124,

17   1129 (9th Cir. 2010) (holding that posting of infringing copyrighted material *may* give rise to

18   jurisdiction where the victim-plaintiff was a resident of the forum state); *Young v. New Haven*

19   *Advocate*, 315 F.3d 256, 263 (4th Cir. 2002) (holding that posting defamatory information on the

20   internet is not sufficient to subject the poster to jurisdiction in each state in which the information

21   is accessed). Therefore, even taking the allegations in the complaint as true, Plaintiffs have failed

22   to establish a prima facie showing that jurisdiction over Daniele is appropriate.

23   **III.    Conclusion**

24          The court has the power to hear Plaintiffs' case, but not the power to grant Plaintiffs relief.

25   Thus, Plaintiffs' claims remain dismissed.

26

23

1    IT IS THEREFORE ORDERED that Plaintiffs' Motion to Alter or Amend Judgment under

2    Rule 59(e) (#49) is GRANTED in part and DENIED in part.

3    IT IS FURTHER ORDERED that Plaintiffs' First Amended Complaint (#7) is

4    DISMISSED without prejudice.

5    IT IS FURTHER ORDERED that Plaintiffs are granted leave to file an amended complaint

6    within twenty (20) days of the date of this Order.

7    IT IS SO ORDERED.

8

9    DATED this 24th day of January, 2013.

10                                                        _____
                                                         LARRY R. HICKS
11                                                       UNITED STATES DISTRICT JUDGE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

24