STEVEN A. GIBSON
Nevada Bar No. 6656
sgibson@dickinsonwright.com
JODI DONETTA LOWRY
Nevada Bar No. 7798
jdlowry@dickinsonwright.com

# DICKINSON WRIGHT PLLC
City Center West
7201 West Lake Mead Boulevard, Suite 503
Las Vegas, Nevada 89128
Telephone (702) 541-7888
Facsimile (702) 541-7899

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

|  |  |
|---|---|
| STEVO DESIGN, INC., a Florida corporation; STEVEN BUDIN, an individual; and ALAN ROLLI, an individual, <br><br> Plaintiffs, <br> v. <br><br> SBR MARKETING LTD., a foreign corporation; and BRIAN DANIELE, an individual, <br><br> Defendants. | Case No.: 2:11-cv-00304-LRH-CWH <br><br> **PLAINTIFFS' OPPOSITION TO DEFENDANT SBR MARKETING, LTD.'S MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT PURSUANT TO FED.R.CIV.P. 12(B)(6)** |

Plaintiffs Stevo Design, Inc., Steve Budin, and Alan Rolli (collectively, "Stevo"), by and through their counsel, Dickinson Wright PLLC, hereby oppose Defendant SBR Marketing, Ltd.'s ("SBR Marketing's") Motion to Dismiss Plaintiffs' Second Amended Complaint Pursuant to Fed.R.Civ.P. 12(b)(6) ("SBR Marketing's Motion"; Doc. No. 59).

This Opposition is based on the following Memorandum of Points and Authorities, on the pleadings and papers on file herein, on any oral argument of counsel to be adduced at hearing, and on any other matter of which this Court wishes to take consideration.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    INTRODUCTION**

Stevo's Second Amended Complaint (the "SAC") sets forth new allegations responsive to this Court's concerns regarding pleading sufficiency and thus states, more than adequately, claims upon which relief can be granted.  SBR Marketing's renewed Motion to Dismiss, on the other hand, either attempts to relitigate matters already decided in Plaintiffs' favor or merely rehashes arguments more appropriately leveled against the First Amended Complaint (the "FAC"), without any meaningful regard to the new allegations presented in the SAC.  Indeed, some of SBR Marketing's arguments border (at a minimum) on the frivolous. As this Court has *already ruled,* Stevo has fully pled the existence of domestically-based Copyright Act and Lanham Act violations.  Stevo's allegations in the SAC eliminate any arguable issues posed by the FAC regarding copyright ownership.  The SAC's allegations demonstrate that no "first sale" of Stevo's Handicapper Reports ever took place that might provide a defense to SBR Marketing on Stevo's Lanham Act claims; further, Stevo has clarified allegations demonstrating that SBR Marketing has made trademark use of Stevo's marks and is not entitled to a defense based on "nominative fair use."  Stevo has further alleged that SBR Marketing's operation of the SBR Website is sufficiently active with respect to "development" of illegal content to take SBR Marketing outside the immunity protection of the Communications Decency Act.  At a minimum, the factual issues before this Court clearly give rise to a need for discovery.

**II.    FACTS**

Stevo is in the business of selling, on pay-per-view and subscription bases, limited, non-exclusive licenses to access electronically-distributed reports setting forth sports handicapping information and analysis regarding selected sporting events determined by the authors of those reports to be of particular interest to readers (the "Handicapper Reports").  SAC (Doc. No. 53) at ¶ 32.  Stevo is the owner of the service marks AL DEMARCO, BRANDON LANG, JEFF BENTON, MATT RIVERS, and STEVE BUDIN, all of which are registered with the United States Patent and Trademark Office in International Class 41 for handicapping for sporting

-2-

events[1] (collectively, the "Registered Marks").  Doc. No. 53 at ¶ 33.  Stevo also provides services in the nature of handicapping for sporting events under a number of other service marks which have not yet achieved registration with the USPTO (collectively with the Registered Marks, the "Marks").  Doc. No. 53 at ¶ 34.  By virtue of Stevo's long-standing use of the Marks, extensively advertised throughout the United States, the Marks have each gained secondary meaning primarily denoting Stevo as each Mark's respective source of origin.  *Id.* at ¶ 38.

Stevo sells licenses to access the Handicapper Reports through a number of websites reposed at various Internet domains under the names of which Stevo does business (the "Stevo Websites").  Doc. No. 53 at ¶ 39.  None of the Stevo Websites are, or have been at any time relevant to this lawsuit, independent entities or subsidiaries of Stevo.  *Id.* at ¶ 40, 1:23.  Stevo owns, and has owned at all times relevant to this lawsuit, all copyrights to all Handicapper Reports.  *Id.* at ¶ 41, 1:23.  Each of the Stevo Websites displays terms of use (the "User Contract," Doc. No. 7-1), which may be viewed by anyone accessing any of the Stevo Websites irrespective of purchase of a license to view any of the Handicapper Reports.  *Id.* at ¶ 42.  No license to view any of the Handicapper Reports may be purchased until the prospective purchaser has had the opportunity to read the User Contract and has affirmatively agreed to enter into the User Contract.  *Id.* at ¶ 43.  By entering into the User Contract, a purchaser of a license to view any of the Handicapper Reports expressly represents and warrants that such licensee "will not reproduce, republish, rebroadcast, retransmit, recast or in any way distribute the information that [the purchaser] will receive from this website (regardless of whether [the purchaser] receive[s] such information directly, from this website or from any affiliated website) **anywhere**, including without limitation on the Internet (e.g. on other websites, blogs, newsgroups, chat rooms, discussion forums, message boards and social media services such as Twitter, Facebook and MySpace), via instant or text messaging services (whether Internet- or phone-based), in podcasts, or in any other printed or electronic form, including without limitation radio and television" (emphasis in original).  *Id.* at ¶ 44.

---

[1] The BRANDON LANG mark's scope of use also includes handicapping for "other entertainment" events.  Doc. No. 53 at ¶ 33.

SBR Marketing procures and publishes content related to sports betting and handicapping at the website reposed at the domain sbrforum.com (the "SBR Website"), soliciting members of the public to contribute content for publication by SBR Marketing regarding topics related to, at a minimum, sports wagering and handicapping.  Doc. No. 53 at ¶ 49.  The content published by SBR Marketing through the SBR Website is available to and used by individuals throughout the United States, including, without limitation, individuals in Nevada.  *Id.* at ¶ 50.  SBR Marketing receives revenue from advertisers who pay SBR Marketing for customers and/or revenue gained by those advertisers when those customers click through advertisements appearing on the SBR Website and thereby reach the advertisers' own websites.  *Id.* at ¶ 51.  The more SBR Website readers that click through advertisements to advertisers' websites, the more revenue SBR Marketing gains from those advertisers.  *Id.* at ¶ 52.

SBR Marketing awards loyalty points, which SBR Marketing describes as "our *currency here*" (emphasis in original) (the "SBR Currency"), to registered users of the SBR Website ("SBR Marketing Contributor-Agents") whenever those SBR Marketing Contributor-Agents engage in certain activities on the SBR Website, including merely logging on to the SBR Website, contributing content to the SBR Website, or reporting other users' infractions of the SBR Website's terms of use to SBR Marketing.  Doc. No. 53 at ¶ 53.  SBR Marketing's solicitation of and payment for content from SBR Marketing Contributor-Agents by means including, without limitation, payment of SBR Currency to SBR Marketing Contributor-Agents creates privity of business relationships between SBR Marketing and each so-incentivized SBR Marketing Contributor-Agent.  *Id.* at ¶ 54.  The business relationships between SBR Marketing Contributor-Agents and SBR Marketing make SBR Marketing Contributor-Agents more than mere passive posters of content at the SBR Website; SBR Marketing's engagement of SBR Marketing Contributor-Agents through business relationships constitutes more than mere solicitation of passive viewers or passive posters of content at the SBR Website and has a direct material advantageous effect on SBR Marketing's ability to generate revenues from the SBR Website.  *Id.* at ¶¶ 55-57.

SBR Currency is ultimately convertible by SBR Marketing Contributor-Agents into cash or cash-equivalent compensation.  SBR Marketing Contributor-Agents may spend accrued SBR Currency on, without limitation, merchandise such as T-shirts and shot glasses; gift cards from national chain restaurants and stores; and credits at offshore online sports books that advertise on the SBR Website.  Doc. No. 53 at ¶ 62.  For example, as of January 31, 2011, any SBR Marketing Contributor-Agent could exchange 825 SBR Currency units for $50 credit at the bodog.com offshore online sports book.  If that user bet via bodog.com the $50 bodog.com credit that SBR Marketing Contributor-Agent received from the SBR Website in exchange for 825 SBR Currency units, and won the bet, that SBR Marketing Contributor-Agent would be able to recoup from bodog.com the full monetary amount of that SBR Marketing Contributor-Agent's winnings (minus fees charged by bodog.com) irrespective of the fact that the credit used for the bet came from SBR Website in exchange for SBR Currency, and not from actual funds provided by the SBR Marketing Contributor-Agent.  *Ibid*.  When SBR Marketing Contributor-Agents visit offshore online sports books that advertise on the SBR Website after exchanging SBR Currency for credit at those offshore online sports books, if those SBR Marketing Contributor-Agents bet any amount of those SBR Marketing Contributor-Agents' own funds beyond the credits received in exchange for SBR Currency, SBR Marketing gains revenue from those advertisers as a result of those transactions.  *Id.* at ¶ 63.

SBR Marketing's business model is based in significant part on the revenue SBR Marketing receives from offshore online sports books that advertise on SBR Website as a result of SBR Marketing Contributor-Agents and other readers of the SBR Website clicking directly through those offshore online sports books' advertisements on the SBR Website to the offshore online sports books' own websites.  SBR Marketing boasts in SBR Marketing's communications to potential advertisers that "[m]ore players join the top sportsbooks via [the SBR Website] than all other watchdog and rating sites combined."  Doc. No. 53 at ¶ 65.  SBR Marketing developed and implemented the SBR Website "to meet the demand for handicapping stat[istic]s and sports handicapping information."  *Id.* at ¶ 66.  One subdivision of the SBR Website is titled "Service Plays" (the "Service Plays Section") and the content of the Service Plays Section is specifically

related to analysis—"plays"—provided by handicapping "services" such as Stevo whose business models consist of publication and licensing of access to such "service plays" for fees and/or other consideration.  *Id.* at ¶¶ 67-68.  SBR Marketing conceived of, developed, and implemented the Service Plays Section with the intent of soliciting SBR Marketing Contributor-Agents to effectuate republication of paid content such as the Handicapper Reports on a free-of-charge forum, and compensating SBR Marketing Contributor-Agents for such effectuation of republication of paid content, thereby, without limitation, driving traffic to the SBR Website and increasing SBR Marketing's revenues therefrom.  *Id.* at ¶ 69.  SBR Marketing retains, pursuant to the SBR Website's terms of use, the right to edit and/or delete any content submitted by any SBR Marketing Contributor-Agent, including, without limitation, an SBR Marketing Contributor-Agent who has submitted content in the Service Plays Section.  *Id.* at ¶ 72.

Daily or almost daily, SBR Marketing Contributor-Agents effectuate publication of misappropriated and infringed Handicapper Reports, or portions thereof, in the Service Plays Section, as well as solicitations from SBR Marketing Contributor-Agents to one another to submit content from other Handicapper Reports for publication in the Service Plays Section.  Doc. No. 53 at ¶ 73.  An SBR Marketing Contributor-Agent who submits for publication in the Service Plays Section all or a portion of a Handicapping Report automatically receives at least six units of SBR Currency—two for logging in to the SBR Website, and four for contributing content to the SBR Website.  *Id.* at ¶ 74.  SBR Marketing recognizes that at least a subset of content published on the SBR Website constitutes republications of content not personally authored by the SBR Marketing Contributor-Agents submitting that material for publication by SBR Marketing, because SBR Marketing specifies that SBR Marketing will pay more than four units of SBR Currency to an SBR Marketing Contributor-Agent "contributing a well[-]thought[-]out pick write[-]up or handicapping[-]oriented post in any sports subforum," and that "[o]nly original content will be eligible for this reward."  *Id.* at ¶ 75.  Daily or almost daily, SBR Marketing Contributor-Agents who submit all or a portion of a Handicapping Report for publication in the Service Plays Section request and receive additional units of SBR Currency as rewards from other SBR Marketing Contributor-Agents.  *Id.* at ¶ 76.

SBR Marketing has full knowledge of the nature, dimension, and unlawfulness of SBR Marketing Contributor-Agents' contributions of content to the SBR Website that SBR Marketing has engaged SBR Marketing Contributor-Agents to provide to SBR Marketing.  Doc. No. 53 at ¶ 58.  Further, SBR Marketing knowingly uses, and knowingly engages SBR Marketing Contributor-Agents to use, Stevo's Marks in connection with published infringements of the Handicapper Reports, in order to gain higher placement in Internet search engine results with respect to the Marks and thereby illegitimately divert commercial traffic from Stevo for SBR Marketing's financial gain.  *Id.* at ¶ 154.

## III.   <u>ARGUMENT</u>

### A.   <u>The SAC Was Timely Filed.</u>

Sadly, not only has SBR Marketing stooped to present a hypertechnical argument that should have no place before this Court, that argument is, remarkably, technically ***wrong***—which should perhaps signal to this Court that SBR Marketing's other arguments are themselves little more than desperate attempts to eke out some relief.  This argument, which SBR Marketing curiously advances only in the Introduction to the Motion to Dismiss without any further argument, is based on the notion that, because this Court *signed* the January 2013 Order on January 24, 2013, and granted Stevo leave to file an amended complaint "within twenty (20) days of the date of this Order" (Doc. No. 52 at 24:5-6), Stevo was required to file the SAC within 20 days after January 24, 2013, *i.e.,* no later than February 13, 2013.  The CM/ECF heading on the January 2013 Order, as well as the Notice of Electronic Filing generated in connection with the Court's filing and service of the January 2013 Order, make clear that, although the Court apparently *signed* the January 2013 Order on January 24, 2013, the January 2013 Order was not *filed* until January 25, 2013. Because the January 2013 Order did not become effective until filing and service on January 25, 2013, as discussed *infra,* Stevo's filing and service of the SAC 20 days thereafter on February 14, 2013 was timely.

The Local Rules demonstrate an order becomes effective (and, by extension, becomes capable of triggering any deadlines emanating from that order) when the order was *filed,* not when the order is *signed.*  Local Rule 15-1(b) provides that a party may only file and serve an

amended pleading "[a]fter the Court has **filed** its order granting permission to amend" (emphasis supplied).  Thus, the Local Rules demonstrate that the January 2013 Order did not have any effect on the parties—and, by inference, that no deadlines emanating from the January 2013 Order were triggered—until the January 2013 Order was actually *filed.*  Thus, the date from which Stevo had 20 days to file the SAC was clearly the January 2013 Order's filing date of January 25, 2013.  February 14, 2013, the date on which Stevo filed the SAC, is 20 days after January 25, 2013.  Stevo's SAC was thus timely filed.

Additionally, the Notice of Electronic Filing generated by CM/ECF on January 25, 2013 provides that "Amended Complaint due within 20 days," *i.e.,* 20 days after January 25, 2013, further supporting that the SAC could be filed on or before February 14, 2013.  While Stevo recognizes that CM/ECF notices are not, strictly speaking, "orders" of this Court, parties should nonetheless be able generally to rely on the Court's minute entries in calculating due dates.  Moreover, it would be illogical for the Court to require parties to calculate due dates based on events of which the parties had no knowledge or ability to gain knowledge; Stevo had no way of knowing that the Court had signed the January 2013 Order on January 24, 2013 until the January 2013 Order was actually filed and served the next day, on January 25, 2013.  This Court should find it appropriate and reasonable for a party to rely on a CM/ECF notice, dated January 25, 2013 and stating "Amended Complaint due within 20 days," for the proposition that the Amended Complaint would be due 20 days after January 25, 2013.  While Stevo cannot imagine that this Court will take issue with Stevo's filing of the SAC on February 14, 2013, 20 days after the filing and service of the January 2013 Order, Stevo respectfully requests, if this Court does disagree with Stevo's due date calculation, that this Court nonetheless allow the SAC to stand based on Stevo's rule-based, good-faith date calculation and the utter absence of prejudice to SBR Marketing from the SAC having been filed one day late.

**B.** **SBR Marketing's Attempt To Relitigate Whether Infringement Occurred In The United States Is Illegitimate And Wastes This Court's Resources.**

**1.** **SBR Marketing's Argument Of No Domestic Infringement Constitutes Nothing More Than A Synopsis Of SBR Marketing's Prior Unsuccessful Briefing.**

SBR Marketing's argument that the SAC fails to plead domestic infringement actionable under the Copyright Act and/or the Lanham Act presents nothing new to behold. SBR Marketing's argument in this regard constitutes nothing more than a shorter reiteration of arguments already presented by SBR Marketing in SBR Marketing's Motion to Dismiss the FAC (Doc. No. 26 at 8-9) and rejected by this Court in the January 2013 Order, as discussed further *infra*.

**2.** **This Court Has Ruled That Stevo Has Alleged Copyright And Mark Infringement In The United States.**

This Court unequivocally ruled that Stevo has adequately alleged copyright and mark infringement in the United States, and SBR Marketing's illegitimate attempt to relitigate this issue wastes this Court's resources. This Court held in the January 2013 Order that, with respect to Stevo's Lanham Act claims:

> Here, SBR's alleged [mark] infringement took place in the United States. SBR's U.S.-centric content—English-language analysis of American professional and collegiate sports—supports the notion that the SBR website's "intended audience" was United States consumers. In addition, the complaint successfully alleges that at least one member of SBR's "actual audience," Daniele, accessed the SBR website from Virginia.

Doc. No. 52 at 10:23-11:1. *See also* Doc. No. 53 at ¶ 207 ("Mr. Daniele contributed the Daniele SBR Contributions to the SBR Website from a location within the United States of America.") Further, this Court recognized that, presumably for the same reasons, "Plaintiffs would likely succeed in showing that their copyright claims are within the reach of the Copyright Act." *Id.* at 8:18-19 (n. 4). It is not clear on what basis SBR Marketing believes the SAC has changed in a manner that vitiates these rulings from this Court. As such, SBR Marketing's attempt to relitigate these issues, on the basis of *the same argument* this Court has already rejected, appears

-9-

wholly frivolous and, as with SBR Marketing's arguments regarding copyright ownership allegations, constitutes nothing more than a waste of this Court's time and resources.

**C.** **The Allegations In Stevo's SAC Satisfy The Requirements Of Stating A Claim Of Ownership Of Infringed Copyrights.**

     **1.** **Potentially Inartful Language In The User Contract Does Not Vitiate Stevo's Consistent Allegations Of Copyright Ownership.**

     The SAC's allegations should make abundantly clear to this Court that, notwithstanding the potentially inartful language of the User Contract, only Stevo and no other entity owns or has owned the copyrights to the works at issue in the SAC.  In the SAC, Stevo makes clear that "[t]he Stevo Websites are not independent entities or subsidiaries of Stevo" (Doc. No. 53 at ¶ 40), that Stevo sells licenses to view Handicapper Reports through "a number of websites… under the names of which websites Stevo does business" (*id.* at ¶ 39), and that "Stevo owns all copyrights to all Handicapper Reports" (*id.* at ¶ 41), "at all relevant times." *Id.* at 1:23.  The SAC thus clarifies that Stevo owns and has owned all copyrights at issue in this matter, at all times relevant to this matter.  The ***only*** reasonable inference that can be drawn from these allegations is that the User Contract's reference to "this website" as copyright owner is actually a reference, however arguably oblique, to Stevo.

     If the User Contract is fairly construed, the SAC's allegations clarify, rather than contradict, the language at issue. As such, the notion that the User Contract's language could, in theory, be construed in a manner suggesting inconsistency with the SAC does not mandate dismissal of Stevo's copyright-based claims. SBR Marketing argues that "when a written instrument contradicts allegations in a complaint to which it is attached, *the exhibit trumps the allegations.*" *See* Doc. No. 59 at 8:1, apparently referring to *Thompson v. Ill. Dept. of Prof. Regulation,* 300 F.3d 750 (7th Cir. 2002) (quoting *Northern Indiana Gun & Outdoor Shows, Inc. v. City of South Bend,* 163 F.3d 449 (7th Cir. 1998) ("*NIGOS*"); emphasis supplied by *Thompson* court).  An examination of the jurisprudential roots of *Thompson* demonstrates that this putatively "well-settled rule" must actually be applied with flexibility and regard for underlying facts. In *NIGOS,* on which *Thompson* relies, the Seventh Circuit recognized that, in applying this

principle, "it is necessary to consider why a plaintiff attached the documents, who authored the documents, and the reliability of the documents."  163 F.3d at 455.  *NIGOS* relies in turn on an even earlier Seventh Circuit case, *Graue Mill Dev. Corp. v. Colonial Bank & Trust Co. of Chicago,* 927 F.2d 988 (7th Cir. 1991) ("*Graue Mill*"), which reflects a principle not at all appreciated or referenced by SBR Marketing. The *Graue Mill* court, and, before it, the Seventh Circuit in *Foshee v. Daoust Const. Co.,* 185 F.2d 23 (7th Cir. 1950), more precisely characterized this principle by recognizing that "where the allegations of a pleading are inconsistent with the terms of a written contract attached as an exhibit, the terms of the latter, ***fairly construed,*** must prevail over the averments differing therefrom."  *Foshee,* 185 F.2d at 25 (emphasis supplied).  In other words, the rule wielded as a blunt instrument by SBR Marketing actually provides that, even if an exhibit's language *appears* to be *facially* different from the language used in Complaint allegations, the exhibit's language must be *construed substantively* before a final determination may be made regarding whether any inconsistency is actually present.

    In this case, if the terms of the User Contract are "fairly construed," it is clear that the User Contract's provisions are not substantively in conflict with the allegations in the SAC.  The User Contract provides in pertinent part that the licensee "acknowledge[s] and agree[s] that ***this website*** is and shall remain the owner of all rights, title and interest in and to this website…" Doc. No. 53-1 at 3, ¶ 4 (emphasis supplied).  The User Contract's reference to "this website" is clearly not a reference to some independent entity other than the owner of the website, because a website, in and of itself, ***is not an entity*** capable of owning intellectual property rights or anything else.  The import of the above-referenced language from the User Contract is not that the website in question has somehow gained an independent ability at law to assert ownership rights with respect to same and holds such rights to the exclusion of the website's owner, but that the ***owner*** of the website—*i.e.,* not the ***user*** of the website—"is… the owner of all rights, title and interest" therein and thereto.  There is simply no other way in which the User Contract's pertinent terms may be "fairly construed."

-11-

Further, *Thompson* is specifically distinguishable from the instant case because the SAC actually sets forth allegations specifically addressing and clarifying the arguable facial disconnect between the terms of the User Contract and the SAC's other relevant allegations.  In *Thompson,* the Seventh Circuit's decision was based on part on the utter absence in Mr. Thompson's Complaint of any allegations recognizing, addressing, or attempting to reconcile the claim-dispositive inconsistency created by one of Mr. Thompson's exhibits.  300 F.3d at 757-58. In this case, the SAC's allegations regarding the User Contract's terms are specifically intended to ***resolve*** any *purported* "contradiction" between those terms by providing data that demonstrates the absence of any *actual* contradiction.  Stevo has thus clearly alleged facts establishing Stevo's ownership of the copyrights at issue in this matter, and this Court's concerns in this regard should thereby be assuaged.

### 2.   SBR Marketing's Argument Of Continued Contradiction Of Allegations Regarding Copyright Ownership Is Nonsensical.

SBR Marketing's attempt to fabricate an ongoing contradiction between the SAC's allegations and the terms of the User Contract utterly ignores the SAC's allegations and, frankly, makes no sense. SBR Marketing appears to take the position that, notwithstanding Stevo's clear allegations that Stevo does business under the names of the Stevo Websites (Doc. No. 53 at ¶ 39) and that the Stevo Websites are not independent entities or subsidiaries of Stevo (*id.* at ¶ 40), the Stevo Websites somehow *were* independent entities or subsidiaries of Stevo at the time of the copyright infringements alleged in the SAC and, presumably, somehow then changed status between the time of the infringements and the time Stevo filed applications for copyright registration.  Doc. No. 59 at 7:1-8:6.  SBR Marketing provides no actual evidentiary support for this tortured proposition.  Rather, SBR Marketing's basis for this position is simply that "Exhibit 1 trumps the SAC's allegations" and that, as such, "the copyright belonged to the website… at which Stevo's customers purchased the betting reports allegedly infringed by SBR [Marketing]." As discussed *supra,* the notion that Exhibit 1 axiomatically "trumps" the SAC is not supported by the Seventh Circuit's analysis in *Thompson* and its progenitors.  The SAC makes clear that, ***"at all relevant times"*** (Doc. No. 53 at 1:23; emphasis supplied), Stevo owned all copyrights to

all Handicapper Reports (*id.* at ¶ 41) and the Stevo Websites were not "independent entities or subsidiaries of Stevo" (*id.* at ¶ 40). Further, as also discussed *supra,* if the User Contract is "fairly construed," the notion is patently absurd that a non-entity website, incapable as a matter of fact and law of owning *anything,* somehow escaped that stricture during the period of time that the relevant copyright infringements took place. SBR Marketing's attempt to manufacture *post hoc* entity status for the Stevo Websites, based on a nonsensical claimed—but nonexistent—contradiction of terms, borders (at best) on the frivolous and wastes this Court's time.

    **D.**    **The SAC Clearly Alleges Actionable, Indefensible Mark Infringement By SBR Marketing.**

        **1.**    **The SAC Alleges That SBR Marketing Makes "Trademark Use," Not Merely "Trademark Mention," Of Stevo's Marks, And The Nominative Fair Use Defense Is Thus Not Available To SBR Marketing.**

            **a.**    ***"Nominative Fair Use" Only Protects "Trademark Mention,' Not "Trademark Use" Such As SBR Marketing's.***

The SAC sets forth new and supplemented allegations demonstrating that SBR Marketing engages in "trademark use" of the Stevo Marks, not merely "trademark mention," and the defense of nominative fair use is thus not available to SBR Marketing. In recognition of this Court's concerns expressed in the January 2013 Order regarding the sufficiency of the FAC's allegations of "trademark use," the SAC sets forth new and supplemented allegations advancing more explicitly than the FAC's allegations that: (i) SBR Marketing compensates individuals for contributing content to the SBR Website; (ii) SBR Marketing has structured the SBR Website in a manner that specifically calls for the contribution of content misappropriated from professional sports handicappers who ordinarily would only license such content to paying subscribers for those paying subscribers' personal use; (iii) by structuring the SBR Website in such a manner, and encouraging contribution of infringing and misappropriated content by compensating contributors, SBR Marketing knowingly obtains higher search engine placement than the owners of the rights to such infringing and misappropriated content; and (iv) SBR Marketing engages in such activities for SBR Marketing's financial gain at the expense of intellectual property rightsholders. Doc. No. 53 at ¶¶ 53-63, 68-69, 154. As discussed in detail *infra,* Stevo has thus

amply addressed this Court's concerns as expressed in the January 2013 Order that Stevo failed to allege any use of Stevo's Marks by SBR Marketing that would tend to create initial interest confusion or otherwise go beyond the parameters of "trademark mention"; *see, e.g.,* Doc. No. 52 at 13:2-10, 15:10-13 (Stevo failed to allege, *e.g.,* that "SBR manipulated Google's search results" or otherwise "created the type of confusion needed to defeat application of the first sale doctrine").  The SAC has, without question, specifically alleged in far richer detail than the FAC that SBR Marketing actively sought to create and capitalize on the likelihood that Internet users seeking Stevo's Handicapper Reports would believe, for at least enough time to reach the SBR Website, that SBR Marketing was somehow an authorized purveyor of those Stevo-mark-denominated Handicapper Reports.  The SAC further alleges that SBR Marketing Contributor-Agents' actions in repeatedly posting content containing the Stevo Marks on the SBR Website have the ultimate effect of benefitting SBR Marketing economically to Stevo's detriment.  Thus, to the extent that this Court believed that the FAC did not allege that SBR Marketing had taken its own affirmative steps to create consumer confusion (as suggested in the January 2013 Order at 12:11-13:10), the SAC's new and supplemented allegations should resolve such concerns.  To the extent this Court has any remaining doubt in this regard, Stevo trusts this Court will recognize that these allegations raise factual issues amenable to and warranting discovery.

"Nominative fair use," as this Court recognized in the January 2013 Order, can only occur when use of another's mark does not—and cannot—create confusion among consumers. In *New Kids On The Block v. News America Publishing, Inc.,* 971 F.2d 302 (9th Cir. 1992) ("*NKOTB*"), the Ninth Circuit described the parameters of "nominative fair use" of another's mark as occurring when "the user of the trademark does not attempt to capitalize on consumer confusion or to appropriate the cachet of one product for a different one," holding further that "[s]uch nominative use of a mark—where the only word reasonably available to describe a particular thing is pressed into service—lies outside the strictures of trademark law."  971 F.2d at 307-08.  If the only use SBR Marketing made of Stevo's Marks was, *e.g.,* comparative—"SBR Marketing's sports handicappers are just as good as Al DeMarco and Steve Budin"—nominative fair use analysis might be applicable, because it would indeed be clear from such a statement that

the marks AL DEMARCO and STEVE BUDIN denoted a source of sports handicapping information other than SBR Marketing. However, as the SAC's allegations make clear, Stevo **does not** take the position that SBR Marketing is only engaged in this genus of use of Stevo's Marks, and nominative fair use analysis is thus inappropriate and unavailing.

As alleged in the SAC, SBR Marketing's business model is centered on "capitaliz[ing] on consumer confusion" with respect to Stevo's Handicapper Reports. SBR Marketing engages in business practices that result in consumers being lured to the SBR Website and obtaining content there for free that those consumers would have to pay for if those consumers obtained the content appropriately from the content's actual source: Stevo. In this regard, SBR Marketing's use of Stevo's marks is more like the inappropriate trademark use hypothesized by the Second Circuit in *Rescuecom Corp. v. Google Inc.,* 562 F.3d 123 (2d Cir. 2009): "[I]f a retail seller were to be paid by an off-brand purveyor to arrange product display and delivery in such a way that customers seeking to purchase a famous brand would receive the off-brand, believing they had gotten the brand they were seeking, we see no reason to believe the practice would escape liability…" 562 F.3d at 130. As alleged in the SAC, and discussed more fully *infra,* SBR Marketing—like the "off-brand purveyor" in the Second Circuit's hypothetical—pays SBR Marketing Contributor-Agents to effectuate publication on the SBR Website of content containing Stevo's marks. Given the manner in which Internet search engines operate, this paid encouragement of contribution of content that uses others' marks effectively constitutes the online equivalent of "arrang[ing] product display and delivery in such a way that customers seeking to purchase a famous brand… receive the off-brand." Potential Stevo customers are lured to the SBR Website based on search engine results, which rank the SBR Website ahead of the Stevo Websites due to the sheer number of uses on the SBR Website of Stevo Marks by the compensated force of SBR Marketing Contributor-Agents. Doc. No. 53 at ¶ 154. Once those potential Stevo customers reach the SBR Website, and find that the Handicapper Reports they were seeking to purchase from Stevo appear at no cost on the SBR Website, there is no further need for Stevo customers to continue their online journey to any Stevo Website. Not only has Stevo's goodwill been misappropriated—Stevo's sales have been frustrated altogether. The

situation is precisely like that described by the Ninth Circuit in *Brookfield Communications, Inc. v. West Coast Entertainment Corp.,* 174 F.3d 1036 (9th Cir. 1999) ("*Brookfield*"), in which the Ninth Circuit recognized that deliberate use by one website of another's marks in a manner that might skew search-engine results would result in actionable infringement:  "A consumer who was originally looking for [the mark owner's] products or services may be perfectly content with [the infringer's service] (especially as it is offered free of charge); but he reached [the infringer's] site because of its use of [the mark owner's] mark as its second-level domain name, which is a misappropriation of [the mark owner's] goodwill by [the infringer]." 174 F.3d at 1057.  While *Brookfield* specifically addressed a website owner's use of, *inter alia,* metatags incorporating a mark owned by a nonconsenting third party, the Ninth Circuit's ruling that such metatag use constituted mark infringement in no way limits the universe of means by which mark infringement may occur online when a website owner "act[s] affirmatively" in using another's marks in a manner "*creating* … initial interest confusion."  174 F.3d at 1065 (emphasis in original). Such affirmative creation of initial interest confusion is not consistent with mere "trademark mention" or nominative fair use.

SBR Marketing's Motion to Dismiss does not meaningfully address the impact of Stevo's enhanced allegations regarding the privity of relationship between SBR Marketing and SBR Marketing Contributor-Agents on Stevo's Lanham Act claims.  SBR Marketing instead merely reiterates this Court's holdings as set forth in the January 2013 Order without meaningfully addressing the SAC's new and supplemented allegations, arguing only that, *e.g.*:

> Stevo still does not allege that SBR manipulated Google's search results by purchasing search engine keywords incorporating Stevo's marks, or using website metadata incorporating Stevo's marks—conduct at the heart of initial interest confusion on the internet.  *See Brookfield Communications, Inc. v. West Coast Entertainment Corp.,* 174 F.3d 1036, 1065 (9th Cir. 1999); *Playboy Enterprises, Inc. v. Netscape Communications Corp.,* 354 F.3d 1020… (9th Cir. 2004).

*Id.* at 11:27-12:1.  SBR Marketing does not grapple with the notion that there may be other ways to manipulate search engine results beyond those recognized in *Brookfield* and other reported appellate opinions, such as—as Stevo has more explicitly pled in the SAC paragraphs quoted

*supra*—by paying contributor-agents to upload a collective flood of content that has the known effect of overwhelming a search engine algorithm.  Nor does SBR Marketing grapple with the effect of the explicit new allegations of the SAC regarding the non-passivity of SBR Marketing Contributor-Agents and the benefit SBR Marketing knowingly derives from SBR Marketing Contributor-Agents' paid activity, and the effect those allegations have on the potential imputability of SBR Marketing Contributor-Agents' activity to SBR Marketing.  Although Stevo continues to believe that the FAC sufficiently alleged such concepts, the clearer allegations of the SAC should leave no doubt in the mind of this Court that SBR Marketing has encouraged, and reaped the benefits of, misappropriation of others' intellectual property—or, at a minimum, that Stevo's allegations warrant discovery regarding SBR Marketing's knowledge and intent.

>    **b.      *The SAC Alleges That SBR Marketing Contributor-Agents Are In Privity Of Relationship With SBR Marketing.***

As an initial matter, the SAC clearly alleges that SBR Marketing has created an operational structure that places SBR Marketing Contributor-Agents in—at a minimum— economic privity of relationship with SBR Marketing.  Specifically, the SAC alleges, as quoted above, and in greater detail than the FAC, that SBR Marketing effectuates payment, in goods and in actual financial compensation, to users of the SBR Website.  Doc. No. 53 at ¶ 53, ¶¶ 62-64.  In other words, Stevo has alleged that SBR Marketing pays SBR Marketing Contributor-Agents in loyalty points that are directly redeemable for, *inter alia,* gift cards (which, as this Court may presumably judicially notice, effectively constitute cash equivalents when tendered to the issuing merchants; *i.e.,* a $50 Applebee's gift card will be treated no differently than $50 in cash if tendered at an Applebee's restaurant in exchange for food and beverages), and for cash-equivalent credits at offshore online sports books that advertise on the SBR Website.  In turn, SBR Marketing benefits from SBR Marketing's relationships with SBR Marketing Contributor-Agents, as Stevo alleges in the SAC, because, *inter alia,* SBR Marketing obtains a financial benefit whenever viewers of the SBR Website click through the SBR Website to SBR Marketing's advertisers, which benefit increases proportionally with the increasing number of SBR Website viewers engaging in such click-throughs.  Doc. No. 53 at ¶¶ 51-52.  SBR

Marketing further gains financial benefit when SBR Marketing Contributor-Agents exchange any amount of those individuals' own funds in addition to SBR Currency at the offshore online sports books that advertise on the SBR Website.  Doc. No. 53 at ¶ 63.  As such, SBR Marketing's relationship with SBR Marketing Contributor-Agents is not merely that of a typical online "bulletin board" and those who post content thereon—SBR Marketing actually *pays people to post content on the SBR Website.*  As the SAC's new and supplemented allegations make clear, SBR Marketing Contributor-Agents are "more than mere passive posters of content at the SBR Website" (Doc. No. 53 at ¶ 55), and that SBR Marketing's engagement and compensation of SBR Marketing Contributor-Agents "constitutes more than mere solicitation of passive viewers or passive posters of content at the SBR Website" (*id.* at ¶ 56).  As such, the SAC clearly alleges, at a minimum, economic privity of relationship between SBR Marketing and SBR Marketing Contributor-Agents, resulting in non-passive conduct on the part of SBR Marketing Contributor-Agents undertaken with the expectation of compensation from SBR Marketing, which this Court must take as true for purposes of adjudicating the Motion to Dismiss.

          **c.**          ***The SAC Alleges Use By SBR Marketing, Via SBR Marketing Contributor-Agents, Of Stevo Marks In A Manner Exceeding "Trademark Mention."***

Taking the SAC's allegations regarding likelihood of consumer confusion as true, this Court can only find that the SAC's allegations of trademark use by SBR Marketing through SBR Marketing Contributor-Agents vitiate SBR Marketing's nominative-fair-use defense.  In *Estate of Fuller v. Maxfield & Oberton Holdings, LLC,* case no. 5:12-cv-02570-LHK, 2012 U.S. Dist. LEXIS 158539 (N.D. Cal. November 5, 2012) ("*Estate of Fuller*"), a case postdating any prior relevant briefing by the parties, the plaintiff estate of inventor Buckminster Fuller sued a toy company for Lanham Act violations based on the toy company's marketing of "BuckyBalls," a name including the late Mr. Fuller's trademarked nickname.  The Northern District of California found that the estate's allegations of likelihood of customer confusion, if taken as true, vitiated the defendant's nominative fair use defense:

> The third [nominative fair use] factor—that the user must do nothing that would suggest sponsorship or endorsement—is

dispositive here.  Plaintiff has specifically alleged that Defendant's
use of Mr. Fuller's name is "likely to cause confusion among the
general public about Plaintiff's endorsement of Defendant's
product.  In particular, consumers are likely to believe that
BuckyBalls are authorized, sponsored, approved or otherwise
related to Plaintiff and its licensees, when in fact they are not."  …
Because the Court takes allegations in the Complaint as true for
purposes of a motion to dismiss, the Court assumes that
Defendant' conduct did in fact suggest sponsorship or endorsement
by Mr. Fuller.  Thus, the third element of the defense cannot be
established, and the complaint cannot be dismissed on these
grounds.

*Estate of Fuller,* 2012 U.S. Dist. LEXIS 158539 at *31-*32.  In this case, in addition to the

allegations discussed *supra,* Stevo has expressly alleged that SBR Marketing's use of, at a

minimum, Stevo's registered service marks "is likely to cause confusion, cause mistake, or

deceive consumers and the public with respect to the goods and services offered in commerce by

SBR Marketing."  Doc. No. 53 at ¶ 222.  Under the Northern District of California's reasoning in

*Estate of Fuller,* then, Stevo has thus made allegations that, if taken as true in the light most

favorable to Stevo, clearly remove this case from the realm of "trademark mention" and

nominative fair use.  At a minimum, it is clear that the factual issues presented are susceptible to

discovery.

### 2. The First Sale Doctrine Does Not Protect SBR Marketing, Because, As The SAC Clearly Alleges, Stevo Has Not Sold Or Otherwise Transferred Ownership Of Handicapper Reports.

#### *The First Sale Doctrine Requires "Sale" Or Other Transfer Of Title To The Embodiment Of A Product.*

The first sale doctrine, which allows the buyer of a product from a mark owner to resell

that product without any potential mark-related liability, only protects actual *buyers* or others to

whom ownership has been transferred of the product's embodiment.  SBR Marketing's

arguments in support of application of the first sale doctrine arise entirely from the unwarranted

inference that the infringed and misappropriated Handicapper Reports were *bought* from Stevo.

The law is indeed clear in the Ninth Circuit that "[o]nce a trademark owner sells his product, the

buyer ordinarily may resell the product under the original mark without incurring any trademark

law liability."  *NEC Electronics v. CAL Circuit Abco,* 810 F.2d 1506, 1509 (9th Cir. 1987), *cited

in Sebastian Int'l, Inc. v. Longs Drug Stores Corp.,* 53 F.3d 1073, 1074 (9th Cir. 1995) ("[T]he

right of a producer to control distribution of its trademarked product does not extend beyond the first sale of the product.  Resale by the first purchaser of the original article under the producer's trademark is neither trademark infringement nor unfair competition.").  However, the converse, which SBR Marketing fails to address, is true as well:  if a product was not actually the subject of a first *sale*, "even an unwitting purchaser who buys [the product] in the secondary market" is not protected and may be subject to liability.  *American Int'l Pictures, Inc. v. Foreman,* 576 F.2d 661, 664 (5th Cir. 1978) (regarding copyrighted articles and copyright liability[2]).  "[U]nless title… passes through a first sale… subsequent sales do not confer good title."  *Ibid.*  Although the first sale doctrine "applies not only when a [product] is first sold, but when a [product] is given away or title is otherwise transferred without the accout[re]ments of a sale," *UMG Recordings, Inc. v. Augusto,* 628 F.3d 1175, 1179 (9th Cir. 2011) ("*UMG Recordings*"), "not every transfer of possession… transfers title."  *Id.* at 1180.  By way of example (of which this Court may presumably take judicial notice), *Newsweek* magazine ceased print publication at the end of 2012 and is now only available in electronic form.[3]  Before this change, a purchaser could buy a print copy of *Newsweek* from a newsstand, thereby obtaining title to that particular copy of the magazine, and could thereafter give away or sell that particular copy of the magazine as desired.  The first sale doctrine would protect that magazine purchaser from any allegations of copyright or mark infringement based on such subsequent transfer of that single purchased embodiment of *Newsweek.*  Now, a person wishing to read the current *Newsweek* purchases a license from publisher The Newsweek/Daily Beast Company LLC to access an electronic version of the magazine, which license only entitles that reader to view the electronic *Newsweek* and not to copy, republish, or otherwise transfer the content therein.[4]  If that electronic license

---

[2] The same criteria apply in the mark context as in the copyright context for determining whether a "first sale" has occurred.  *Denbicare U.S.A. Inc. v. Toys "R" Us, Inc.,* 84 F.3d 1143, 1151 (9th Cir. 1996).

[3] *See* http://www.thedailybeast.com/apps-and-mobile-faq.html (accessed April 8, 2013) ("*Newsweek*'s first digital-only issue was published on January 4, 2013.").

[4] http://www.thedailybeast.com/company/terms-of-use.html (accessed April 8, 2013) ("Except for content you have posted on the Services, or unless expressly permitted, you may not copy, reproduce, distribute, publish, enter into a database, display, perform, modify, create derivative works, transmit, or in any way exploit any part of the Services, except that you may download, for your own personal use, one machine readable copy and/or one print copy that is limited to occasional articles of personal interest only. Without limiting the generality of the

purchaser attempts to transfer *Newsweek* marks or content in derogation of the license's

provisions, the first sale doctrine does not provide any protection, because no embodiment of the

magazine has actually been *sold*—only *licensed*.   Thus, SBR Marketing is only protected by the

first sale doctrine if Stevo actually ***transferred title,*** and not merely sold a license, to

embodiments of Stevo's Handicapping Reports[5] to SBR Marketing Contributor-Agents.

> ### *a.*   *Granting Of A License Does Not Constitute A "Sale" For Purposes Of The First Sale Doctrine.*

The law is clear that sale of a license to view or use a product does not transfer ***title*** to

that product for purposes of the first sale doctrine.  As SBR Marketing fails to address in the

Motion to Dismiss, the Ninth Circuit has recognized that "[t]he first sale doctrine does not apply

to a person who possesses a copy of the [product] without owning it, such as a licensee." *Vernor*

*v. Autodesk, Inc.,* 621 F.3d 1102, 1107 (9th Cir. 2010) ("*Vernor*"); *see also Microsoft Corp. v.*

*Harmony Computers & Electronics, Inc.,* 846 F. Supp. 208, 213 (E.D.N.Y. 1994) ("Entering a

license agreement is not a 'sale' for purposes of the first sale doctrine."); *ISC-Bunker Ramo*

*Corp. v. Altech, Inc.,* 765 F. Supp. 1310, 1331 (N.D. Ill. 1990) ("…[T]he so-called 'first sale'

doctrine only applies when the [intellectual property rights] holder has sold the works in

question. … [A rightsholder] does not lose his right to control distribution of copies of his work

that have never been sold."); *UMG Recordings,* 628 F.3d at 1180 ("[W]e have recognized that

[intellectual property] owners may create licensing arrangements so that users acquire only a

license to use the particular copy… and do not acquire title that permits further transfer or sale of

that copy without the permission of the [owner/rightsholder]").  Thus, mere acquisition of a

license to view Stevo's Handicapper Reports does not constitute acquisition of title sufficient to

trigger the protections of the first sale doctrine.

---

foregoing, you may not distribute any part of the Services over any network, including a local
area network, nor sell or offer it for sale. In addition, you may not use the Services or any content
on the Services to construct any kind of database."… "You may not assist anyone else in
accessing Subscription Services on an unauthorized basis, including by sharing your access
credentials or providing any content or other materials that you obtained through Subscription
Services to third parties.")
    [5] Under no circumstances, of course, did Stevo actually transfer the *copyrights themselves*
with respect to any Handicapper Reports, and SBR Marketing does not appear to contend that
Stevo did so.

1

2

> **b.   As Alleged In The SAC, Stevo Only Sells Licenses To View Handicapper Reports And Does Not Transfer Title To Handicapper Reports.**

3    The SAC clearly alleges that Stevo sells licenses to access and view Handicapper Reports

4 and does not sell (or otherwise dispose of) the Handicapper Reports themselves in a manner that

5 transfers title.  The SAC alleges that Stevo "sells *licenses* to access the Handicapper Reports."

6 Doc. No. 53 at ¶ 39 (emphasis supplied).  The SAC further alleges that a prospective purchaser

7 of such a license cannot complete that purchase without scrolling all the way through a license

8 agreement (the "User Contract") and affirmatively indicating assent to the terms of the User

9 Contract.  Doc. No. 53 at ¶ 43.  Those terms include restrictions on the license purchaser's ability

10 to, *inter alia,* "reproduce, republish, rebroadcast, retransmit, recast or in any way distribute the

11 information that [the purchaser] will receive from this website," Doc. No. 53 at ¶¶ 44-46, as well

12 as an acknowledgement (Doc. No. 53 at ¶ 47) that the User Contract does not confer on the

13 license purchaser any license or other grant of rights to use marks owned by Stevo.

14    The Ninth Circuit has recognized that comparable license agreements with respect to

15 electronic products and content do not transfer ownership or constitute "sales" triggering the first

16 sale doctrine.  In *Vernor,* the Ninth Circuit held, in the comparable context of licensure of

17 software, that:

18    a… user is a licensee rather than an owner of a copy where the copyright owner (1) specifies that the user is granted a license; (2)

19    significantly restricts the user's ability to transfer the software; and (3) imposes notable use restrictions.

20

21 621 F.3d at 1111.  The User Contract, as described in the SAC, meets all of these conditions.

22 The User Contract "specifies that the user is granted a license" (Doc. No. 53 at ¶ 39),

23 "significantly restricts the user's ability to transfer" any licensed Handicapper Reports (Doc. No.

24 53 at ¶¶ 44-46), and "imposes notable use restrictions" (Doc. No. 53 at ¶¶45-46).  As such, it is

25 clear that Stevo merely grants licenses to the Handicapper Reports and does not transfer title to

26 Handicapper Reports so that downstream "purchasers" or users of Handicapper Reports are

27 protected by the first sale doctrine.

28

c.   **As Alleged In The SAC, SBR Marketing Contributor-Agents Only Purchased Licenses To View Handicapper Reports, And No "First Sales" Of Handicapper Reports Occurred.**

Stevo clearly alleges in the SAC that all of the Handicapper Reports illegitimately republished by SBR Marketing and SBR Marketing Contributor-Agents were licensed, not sold, by Stevo, and SBR Marketing is thus not protected by the first sale doctrine with respect to any of Stevo's claims. *See* Doc. No. 53 at, without limitation, ¶¶ 85-87, ¶¶ 90-92, ¶ 95, ¶¶ 99-101, ¶¶ 105-107, ¶¶ 113-115, ¶ 122, ¶¶ 125-127, ¶ 132, ¶ 138, ¶ 140, ¶ 143, ¶ 145-146, ¶¶ 148-150. As a representative example of Stevo's above-referenced allegations of licensure rather than sale of the Handicapper Reports, Stevo alleges that:

> 148.   On or about September 20, 2010, Pedro Ganes ("Mr. Ganes") purchased a year-long subscription granting Mr. Ganes a limited, non-exclusive license to view Handicapper Reports published and licensed by Stevo under the mark JEFF BENTON ("Mr. Ganes' Subscription").

> 149.   In order to purchase Mr. Ganes' Subscription, Mr. Ganes had to scroll through and affirmatively indicate Mr. Ganes' entry into a User Contract (the "Ganes User Contract").

> 150.   On or about October 27, 2010, Stevo published, and furnished to Mr. Ganes under the terms of Mr. Ganes' Subscription, a Handicapping Report entitled "Jeff Benton Wednesday's Action" (the "10-27-2010 Benton Report").

Doc. No. 53 at ¶¶ 148-150. Certainly, if this Court takes Stevo's allegations as true, Stevo has pled that no "sale" or other transfer of title of Handicapper Reports takes place when Stevo furnishes Handicapper Reports to licensee-subscribers. SBR Marketing thus cannot rely on the first sale doctrine as a defense to Stevo's Lanham Act (or any other) claims.

E.   **SBR Marketing Is Not Entitled To CDA Immunity With Respect To Stevo's State-Law Claims.**

1.   **CDA Immunity Only Attaches To "Interactive Computer Service[s]" That Are Not Also "Information Content Provider[s]."**

The Communications Decency Act, 47 U.S.C. § 230 (the "CDA"), affords immunity to suit on state-law-based intellectual property claims only to "provider[s] or user[s] of… interactive computer service[s]." The CDA defines an "interactive computer service" as:

> any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions.

47 U.S.C. § 230(f)(2).  The CDA further provides that "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  47 U.S.C. § 230(c)(1).  Thus, while the CDA affords immunity to "provider[s and] user[s] of interactive computer service[s]" with respect to claims treating such persons or entities as "publishers" or "speakers," such immunity only attaches when the content at issue is "provided by another information content provider," and not "provided by" the "interactive computer service" itself.

By the same token, an "information content provider" is not entitled to CDA immunity as the publisher or speaker of information created or developed by itself.  The CDA defines an "information content provider" as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f)(3).  As such, given the proviso in § 230(c)(1) that immunity only attaches with respect to "information provided by **another** information content provider" (emphasis supplied), if a person or entity *itself* "responsible," "in whole or in part," for "creation or development" of information provided through an interactive computer service, that person or entity is not entitled to immunity under the CDA with respect to such created or developed content.

### 2. The SAC Makes Clear That SBR Marketing Is "Responsible" For "Development" Of Unlawful "Information," And Is Thus An "Information Content Provider."

#### a. A Party "Develops" Unlawful Content By "[M]aterially Contributing To Its Alleged Unlawfulness."

The new and supplemented allegations of the SAC make clear that SBR Marketing is a "developer" of unlawful content as recognized in the Ninth Circuit.  In addition to the new and supplemented allegations regarding SBR Marketing's privity of relationship with SBR Marketing Contributor/Agents, set forth and discussed *supra,* new and supplemented allegations

demonstrating SBR Marketing's role as a "developer" of unlawful content include, without

limitation, the following:

> 68.    The content of the Service Plays Section is specifically
> related to analysis—"plays"—provided by handicapping
> "services" such as Stevo whose business models consist of
> publication and licensing of access to such "service plays" for fees
> and/or other consideration.

> 69.    SBR Marketing conceived of, developed, and implemented
> the Service Plays Section with the intent of soliciting SBR
> Marketing Contributor-Agents to effectuate republication of paid
> content such as the Handicapper Reports on a free-of-charge
> forum, and compensating SBR Marketing Contributor-Agents for
> such effectuation of republication of paid content, thereby, without
> limitation, driving traffic to the SBR Website and increasing SBR
> Marketing's revenues therefrom.

For purposes of determining whether a person or entity is an "information content provider" not

entitled to CDA immunity, the Ninth Circuit has recognized that "development" of information

occurs if that person or entity "materially contribut[es]" to the "alleged unlawfulness" of content.

In *Fair Housing Council Of San Fernando Valley v. Roommate.com, LLC,* 521 F.3d 1157 (9th

Cir. 2008) ("*Roommate.com*"), the Ninth Circuit analyzed the scope of "development" for

purposes of CDA immunity:

> We believe that both the immunity for passive conduits and the
> exception for co-developers must be given their proper scope and,
> to that end, we interpret the term "development" as referring not
> merely to augmenting the content generally, but to materially
> contributing to its alleged unlawfulness.  In other words, a website
> helps to develop unlawful content, and thus falls within the
> exception to section 230, if it contributes materially to the alleged
> illegality of the conduct.

521 F.3d at 1167-68.  In the case of Roommate.com, the "encourage[ment] of illegal content"

was a requirement, imposed as an embedded structural feature of the Roommate.com site, that

any user submitting a roommate search specify certain housing preferences based on gender,

sexual orientation, and number of children that might "indicate preference, limitation, or

discrimination," or allow potential landlords to engage in such "preference, limitation, or

discrimination," in violation of the Fair Housing Act.  521 F.3d at 1164.  The Ninth Circuit

found that this embedded website feature—which did not require landlords searching for

1  potential tenants to indicate an inevitably discriminatory housing preference, but provided a
2  search capability based on a set of optional criteria that included both lawful housing preferences
3  and unlawful discriminatory housing preferences—took Roommate.com outside the CDA's grant
4  of immunity.  "The message to website operators is clear," the Ninth Circuit held:  "If you don't
5  encourage illegal content… you will be immune."  521 F.3d at 1175.  As such, under
6  *Roommate.com,* a website would fall outside the CDA's grant of immunity if that website
7  "contribute[d] materially to" or "encourage[d]" illegal conduct, even if it was possible for a user
8  to interact with the website in an entirely lawful manner.
9         The SAC's new and supplemented allegations clearly resolve this Court's concerns
10  expressed in the January 2013 Order regarding "whether SBR's practice of awarding loyalty
11  points for posts makes SBR a 'developer' under the CDA" and *Roommate.com,* by making clear
12  that SBR Marketing compensates users for contributing content to a site knowingly set up by
13  SBR to facilitate unlawful activity with respect to others' intellectual property.  As the SAC sets
14  forth in more detail than the FAC, SBR Marketing has deliberately structured the SBR Website
15  to include the Service Plays Section, which can only be viewed as a direct solicitation of
16  contributions of content owned by non-consenting third-party sports handicapper services.  Doc.
17  No. 53 at ¶¶ 68-69.  SBR Marketing compensates individuals who contribute such content,
18  further reinforcing SBR Marketing's active role in "contribut[ing] materially to" or
19  "encourag[ing]" illegal conduct.  *Id.* at ¶¶ 54-59.  While it is true that, as this Court appeared to
20  recognize in the January 2013 Order (Doc. No. 52 at 18:4), an SBR Website user does not
21  axiomatically engage in unlawful activity simply by contributing *any* content of *any* nature to the
22  SBR Website, the Roommate.com website feature found by the Ninth Circuit to constitute
23  "development" of illegal content did not inevitably require a user to engage in discriminatory
24  housing practices either; a landlord posting a housing opportunity to Roommate.com could have
25  done so in a manner that did not "limit the universe of acceptable tenants," 521 F.3d at 1167, on
26  an illegally discriminatory basis.  As such, Stevo's additional allegations in this regard should
27  alleviate any concern on this Court's part that the SBR Website reflects "development" of illegal
28

1  content that eliminates SBR Marketing's claim to CDA immunity, at least to an extent

2  warranting discovery.

3          **b.      A Party Is "Responsible" for "Development" Of Unlawful**
                  **Content When It "[S]pecifically Encourages Development Of**
4                 **What Is Offensive About The Content."**

5          Stevo's new and supplemented allegations may be seen as strengthening Stevo's

6  argument against CDA immunity to an even greater extent when viewed in light of other

7  circuits' case law consistent with *Roommate.com.* Courts have further recognized that a party

8  may be "responsible" for "development" of unlawful content if that party "specifically

9  encourages development of what is offensive about the content." In *Federal Trade Comm'n v.*

10 *Accusearch Inc.,* 570 F.3d 1187 (10th Cir. 2009) ("*Accusearch*"), the Tenth Circuit addressed the

11 appropriate construction of the word "responsible" in § 230, an issue not specifically touched on

12 in *Roommate.com,* recognizing that "[t]he meaning of *responsible* becomes an issue under the

13 CDA when a court is considering whether CDA immunity from liability is unavailable because

14 one is 'responsible, in whole or in part, for the creation or development of information' that is

15 the source of the liability." 507 F.3d at 1198 (emphasis in original). Accusearch Inc.

16 ("Accusearch") operated the website Abika.com, which offered to the general public the ability

17 to request information searches regarding particular individuals. 570 F.3d at 1191. Accusearch

18 furnished search results to requesting customers through e-mail and posting to the customer's

19 abika.com account page. *Ibid.* Accusearch relied for all information search fulfillment on

20 "third-party researchers, who were required by Accusearch to provide assurances that they would

21 perform their work in accordance with applicable law." *Ibid.* Accusearch advertised via

22 Abika.com the availability of mundane government record searches for, *e.g.,* "court dockets," but

23 also specifically advertised searches for "'details of incoming or outgoing calls from any phone

24 number, prepaid calling card or Internet Phone.'" *Ibid.* As the court noted with respect to such

25 phone record searches, "[a]cquisition of this information would almost inevitably require

26 someone to violate the Telecommunications Act or to circumvent it by fraud or theft," *id.* at

27 1192, because the Telecommunications Act bars disclosure of such information by

28

1  telecommunications carriers "[e]xcept as required by law or with the approval of the customer."

2  *Ibid.*, quoting 47 U.S.C. § 222(c)(1).

3  The Federal Trade Commission sued Accusearch for unfair practices—specifically,

4  trading in information protected by statute from disclosure—in violation of the Federal Trade

5  Commission Act.  570 F.3d at 1192.   Accusearch asserted immunity under the CDA "because

6  the FTC's claim treated it as the publisher of telephone records that were provided by others (that

7  is, telephone companies and independent researchers) and traded over Abika.com."  *Id.* at 1193.

8  The Tenth Circuit resolved this issue, in an opinion borrowing from the Ninth Circuit's

9  reasoning in *Roommate.com* significantly throughout, by considering the purpose of the CDA

10  and to whom immunity should rightfully attach:

11  > … [T]o be "responsible" for the development of offensive content,
12  > one must be more than a neutral conduit for that content.  That is,
   > one is not "responsible" for the development of offensive content if
13  > one's conduct was neutral with respect to the offensiveness of the
   > content (as would be the case with the typical Internet bulletin
14  > board). … This construction of the term *responsible* comports with
   > the clear purpose of the CDA—to encourage Internet services that
15  > increase the flow of information by protecting them from liability
   > when **independent persons** negligently or intentionally use those
16  > services to supply harmful content.  *See* 47 U.S.C. § 230 (a), (b).
   > We therefore conclude that a service provider is "responsible" for
17  > the development of offensive content only if it in some way
   > specifically encourages development of what is offensive about the
   > content.
18

19  570 F.3d at 1199 (italics in original; boldfaced emphasis supplied).  The Tenth Circuit,

20  importantly, made clear that CDA immunity protects "interactive computer service" providers

21  from actions by "independent persons" who "negligently or intentionally use those services to

22  supply harmful content."   In Accusearch's case, Accusearch itself used Accusearch's own

23  services to "specifically encourage[] development of what is offensive about the content," and

24  the Tenth Circuit accordingly found Accusearch not to be immune under the CDA:

25  > Accusearch solicited requests for confidential information
   > protected by law, paid researchers to find it, knew that the
26  > researchers were likely to use improper methods, and charged
   > customers who wished the information to be disclosed.
27  > Accusearch's actions were not "neutral" with respect to generating
   > offensive content; on the contrary, its actions were intended to
28  > generate such content.  Accusearch is not entitled to immunity
   > under the CDA.

570 F.3d at 1201.  While *Accusearch* is not binding precedent in the Ninth Circuit, the *Accusearch* court heavily utilized the Ninth Circuit's reasoning in *Roommate.com* in its opinion, and the Tenth Circuit's holding is in no material way in conflict with *Roommate.com.*

*Accusearch* reflects an immunity-defeating situation even more egregious than that presented in *Roommate.com,* and even more similar to the operations of SBR Marketing as alleged in the SAC, demonstrating further why this Court should not find that SBR Marketing is entitled to the protections of CDA immunity.  Like Accusearch, SBR Marketing effectively "solicit[s] requests" for contribution of content in derogation of the intellectual property rights of the original creators of that content, maintaining the Service Plays Section as a specific forum for trade in misappropriated intellectual property.  Doc. No. 53 at ¶¶ 68-69.  SBR Marketing pays SBR Marketing Contributor-Agents for contributing such content.  *Id.* at ¶¶ 54-57, ¶ 59, ¶¶ 62-64.  SBR Marketing knows that SBR Marketing Contributor-Agents' content contributions may be unlawful.[6]  *Id.* at ¶ 58. As such, SBR Marketing, like Accusearch, has taken "actions… intended to generate [unlawful] content" as alleged in the SAC, and if any doubt remains in this Court's mind that SBR Marketing should not be afforded immunity under the CDA, the SAC's allegations should at a minimum warrant discovery.

### c.   The SBR Forum's Design Reflects SBR Marketing's Knowing Invitation Of Misappropriation, Making SBR Marketing "Responsible" For "Developing" Unlawful Content.

By structuring the SBR Forum to include a specific subsection expressly devoted to "Service Plays," and compensating individuals who contribute content to that subsection, SBR Marketing, like Accusearch and Roommate.com, is "responsible" for "development" of unlawful content and is thus not immune under the CDA.  SBR Marketing cannot deny that it was the decision of SBR Marketing, not that of any "independent" contributors or users of the SBR

---

[6] As in *Roommate.com,* it is clear that an Accusearch customer—like a user of the SBR Website—could do business with Accusearch in a manner not inevitably resulting in anyone breaking any law.  For example, an Accusearch user could apparently request, and Accusearch could provide, a compilation of nothing more than court records readily accessible to the general public, and neither the Telecommunications Act nor the FTC Act would have been offended. The Tenth Circuit specifically rejected Accusearch's argument in this regard that Accusearch was merely "the provider of neutral tools," and held Accusearch not immune under the CDA based merely on the fact that Accusearch encouraged *some* offensive content, irrespective of whatever quantum of non-offensive content Accusearch encouraged as well.  570 F.3d at 1201.

Website, to include the Service Plays Section as an embedded structural feature of the SBR Website.  The Service Plays Section can only logically have been intended for use to discuss and share "plays," *i.e.* recommended wagers, that originally emanated from "services," *i.e.* professional sports handicapping businesses. SBR Marketing cannot feign ignorance of the likelihood that unlawful misappropriation of the intellectual property of such "services" would occur in such an expressly designated setting.  By structuring the SBR Website to include a specific section for discussion of "Service Plays," SBR Marketing has "encourage[d] illegal conduct" at a minimum, as condemned by the Ninth Circuit in *Roommate.com.*  Further, by rewarding SBR Marketing Contributor-Agents who post to the Service Plays Section with SBR Currency, as discussed in the SAC at ¶¶ 51-59, SBR Marketing has "contribute[d] materially to the alleged illegality of the conduct," as further condemned in *Roommate.com,* by literally ***compensating*** intellectual property thieves for sharing the fruits of misappropriation (and thereby driving more traffic to the SBR Website for SBR Marketing's ultimate financial benefit). As such, based at a minimum on the new and supplemented allegations set forth in the SAC, this Court should view SBR Marketing, like the Ninth Circuit viewed Roommate.com and the Tenth Circuit viewed Accusearch, as far more than a mere "interactive computer service," but as an "information content provider" in its own right not entitled to the benefit of CDA immunity.  At a minimum, this Court should find that Stevo has alleged sufficient immunity-defeating facts to allow discovery against SBR Marketing regarding these issues.

## IV.   CONCLUSION

For the reasons set forth herein, Stevo respectfully requests that this Court deny SBR Marketing's Motion to Dismiss and allow all claims set forth in the SAC to proceed.

Respectfully submitted this 15th day of April, 2013.

DICKINSON WRIGHT PLLC

By   /s/ J.D. Lowry.

STEVEN A. GIBSON
Nevada Bar No. 6656
JODI DONETTA LOWRY
Nevada Bar No. 7798
7201 West Lake Mead Boulevard, Suite 503
Las Vegas, Nevada 89128

-30-

**CERTIFICATE OF SERVICE**

Pursuant to Local Rule 5 of this Court, I certify that I am an employee of Dickinson Wright PLLC and that on this 15th day of April, 2013, I caused a correct copy of the foregoing **Plaintiffs' Opposition to Defendant SBR Marketing, Ltd.'s Motion to Dismiss Plaintiffs' Second Amended Complaint Pursuant to Fed.R.Civ.P. 12(b)(6)** to be served via United States first-class mail to:

Brian Daniele
7002 Braddock Mews Place
Springfield, Virginia  22151
*In Proper Person*

Pursuant to Local Rule 5 of this Court, I certify that I am an employee of Dickinson Wright PLLC and that on this 15th day of April, 2013, I caused a correct copy of the foregoing **Plaintiffs' Opposition to Defendant SBR Marketing, Ltd.'s Motion to Dismiss Plaintiffs' Second Amended Complaint Pursuant to Fed.R.Civ.P. 12(b)(6)** to be served via CM/ECF to:

Gary Jay Kaufman, Esq.
The Kaufman Law Group
1901 Avenue of the Stars, Suite 1010
Los Angeles, California  90067

Chad Bowers, Esq.
Chad A. Bowers, Ltd.
3202 West Charleston Boulevard
Las Vegas, Nevada 89102
*Attorneys for Defendant SBR Marketing Ltd.*

/s/ Erin L. Wood
An employee of Dickinson Wright PLLC